IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

IPCOM GMBH & CO. KG,                )     Case No. 2:20-cv-00322
                                    )           (LEAD CASE)
            Plaintiff,              )
                                    )
vs.                                 )
                                    )
AT&T, INC., et al.                  )
                                    )
VERIZON COMMUNICATIONS, INC.,       )     Case No. 2:20-cv-00323
et al.                              )           (MEMBER CASE)
                                    )
            Defendants.             )
                                    )
NOKIA OF AMERICA CORPORATION,       )
                                    )
ERICSSON, INC.,                     )
                                    )
            Intervenors.            )
_____     )


PRETRIAL CONFERENCE

BEFORE THE HONORABLE RODNEY GILSTRAP

FEBRUARY 28, 2022
Day 1 of 2

10:00 a.m.

```
 1                          APPEARANCES

 2    MR. MARTIN J. BLACK                 FOR THE PLAINTIFF
      MR. MICHAEL A. FISHER
 3    MS. SHARON K. GAGLIARDI
      MR. JEFFREY S. EDWARDS
 4    Dechert, LLP
      2929 Arch Street
 5    Cira Centre
      Philadelphia, Pennsylvania  19104
 6    (215) 994-4000
      martin.black@dechert.com
 7    michael.fisher@dechert.com
      sharon.gagliardi@dechert.com
 8    jeffrey.edwards@dechert.com

 9    MR. JEFFREY B. PLIES
      Dechert, LLP
10    515 Congress Avenue, Suite 1400
      Austin, Texas  78701
11    (512) 394-3012
      jeff.plies@dechert.com
12
      MR. CHAD EVERINGHAM
13    MS. CLAIRE HENRY
      Ward, Smith & Hill, PLLC
14    1507 Bill Owens Parkway
      Longview, Texas  75604
15    (903) 757-2323
      ce@wsfirm.com
16    claire@wsfirm.com

17    MR. SAMUEL F. BAXTER            FOR DEFENDANT AT&T
      MR. NICHOLAS M. MATHEW          AND INTERVENOR
18    MR. JONATHAN POWERS             ERICSSON
      MR. MATTHEW D. FOLKS
19    McKool Smith, PC
      300 Crescent Court, Suite 1500
20    Dallas, Texas  75301
      (214) 978-4914
21    sbaxter@mckoolsmith.com
      nmathews@mckoolsmith.com
22    jpowers@mckoolsmith.com
      mfolks@mckoolsmith.com
23

24

25
```

```
1     APPEARANCES (cont.)

2     MR. JOSHUA W. BUDWIN
      McKool Smith, PC
3     300 West 6th Street, Suite 1700
      Austin, Texas  78701
4     (512) 692-8700
      jbudwin@mckoolsmith.com
5
      MR. THEODORE STEVENSON, III                FOR INTERVENORS NOKIA
6     Alston & Bird, LLP                         AND ERICSSON
      220 Ross Avenue, Suite 2300
7     Dallas, Texas  75201
      (214) 922-3507
8     ted.stevenson@alston.com

9     MR. JOHN HAYNES
      MR. MICHAEL DEANE
10    MS. EMILY WELCH
      MR. WESLEY C. ACHEY
11    Alston & Bird, LLP
      One Atlantic Center
12    1201 West Peachtree Street, Suite 4900
      Atlanta, Georgia  30309-3424
13    (404) 881-7000
      john.haynes@alston.com
14    michael.deane@alston.com
      emily.welch@alston.com
15    wesley.achey@alston.com

16    MR. KEVIN PAUL ANDERSON                     FOR DEFENDANT VERIZON
      MR. BRIAN H. PANDYA
17    Duane Morris, LLP
      505 9th Street, NW, Suite 1000
18    Washington, DC  2004-2100
      (203) 776-7800
19    kpanderson@duanmorris.com
      bhpandya@duanemorris.com
20
      MS. JENNIFER H. DOAN
21    MR. KYLE R. AKIN
      Haltom & Doan
22    6500 Summerhill Road
      Crown Executive Center, Suite 100
23    Texarkana, Texas  75503
      (903) 255-1000
24    jdoan@haltondoan.com
      kakin@haltondoan.com

25
```

1          JUDGE GILSTRAP:  Be seated, please.

2          All right.  This is the time set for pretrial matters

3     in the case of IPCom vs. AT&T; Nokia America; Ericsson,

4     Inc.; Verizon Communications.  This pretrial conference

5     involves case No. 2:20-cv-322, which is designated as the

6     lead case in this consolidated series of two cases, and the

7     member case being Case No. 2:20-cv-323.

8          The Court will call for announcements at this time.

9     What says the plaintiff, IPCom?

10         MR. EVERINGHAM:  Good morning, Your Honor.  May it

11    please the Court, Chad Everingham and Claire Henry are here

12    from the Ward, Smith & Hill firm, and we're joined by our

13    co-counsel from the Dechert firm, Mr. Marty Black, Jeff

14    Plies, Sharon Gagliardi, Michael Fisher, and on the pew

15    back there, Mr. Jeff Edwards.  And we're ready proceed.

16         JUDGE GILSTRAP:  All right.  Thank you, Counsel.

17         What's the announcement for the defendants?  Let's

18    start with AT&T.

19         MR. BAXTER:  Good morning, Your Honor.  Sam Baxter,

20    McKool Smith, along with Nick Mathews, Josh Budwin,

21    Jonathan Powers, Matt Folks, and in-house from AT&T, Tim

22    Dill and Lon Howton.  That would do it for AT&T, except,

23    Your Honor, because of we now have mixed representation,

24    I'll let Mr. Stevenson introduce himself and his others.

25    We also represent Ericsson, Your Honor, the same crowd.

1          JUDGE GILSTRAP:  All right.

2          MR. BAXTER:  Along with Jennifer Wells who's in-house

3     with Ericcson who's here today.

4          JUDGE GILSTRAP:  All right.  Thank you.  Let me hear

5     announcements for Nokia.

6          MR. STEVENSON:  Good morning, Your Honor.  Ted

7     Stevenson with Alston & Bird for Nokia and Ericcson.  And

8     with me are Michael Deane, Emily Welch, John Haynes, Wes

9     Achey, and our client representative for Nokia is Chris

10    Godziela.  And Jennifer Wells is here for Ericcson.  And we

11    are ready to proceed.

12         JUDGE GILSTRAP:  All right.  Thank you.  Do we have

13    other announcements?

14         MS. DOAN:  Good morning, Your Honor.  For Verizon

15    Jennifer Doan and Kyle Akin.  With us here today are Mr.

16    Brian Pandya.  Our lead counsel, Kevin Anderson, our client

17    Sandjeev Mehta, and we're ready to proceed, Your Honor.

18         JUDGE GILSTRAP:  All right.  Thank you.

19         Have I missed anybody?  Doesn't appear that I have.

20    Okay.

21         Counsel, before we get into the disputed dispositive

22    motions and then move on to the disputed motions in limine,

23    and then finally on to the disputed exhibits, let me cover

24    some housekeeping matters with you.

25         As you're aware, this case is set for jury selection

1        and trial on April the 4th of this year.  I intend to seat
2        eight jurors to hear this case, and each side will be
3        afforded four preemptory challenges.  Each side will be
4        afforded 30 minutes to examine the venire panel.  As is the
5        Court's practice, you may use, but you're not required to
6        use up to, but not more than three minutes of your time on
7        the front end to give a very high level non-argumentative
8        bare bones sketch of what's at issue for the panel and
9        their benefit.  Keep it non-argumentative or I will
10       intervene and limit it to not more than three minutes if
11       you choose to do that.
12              Also, Counsel, so you'll know, we have the entirety
13       of the day set aside on my calendar for today, and I have
14       until noon, or I have a half a day tomorrow, and we may
15       well use every bit of it.  There's quite a bit before the
16       Court for pretrial in these matters, but we will move as
17       expeditiously as we can.
18              After the jury's selected and seated, we'll proceed
19       to trial.  Each side is going to be afforded 14 hours per
20       side to put on their evidence.  That does not include jury
21       selection, opening statements or closing arguments.  Each
22       side will be afforded 30 minutes per side for opening
23       statements and 40 minutes per side for closing arguments.
24              Throughout the trial process, as is reflected in the
25       pretrial order, the Court requires that you meet and

1      confer, more or less without ceasing, as to any issue that

2      may arise.  And if there are disputes that develop as a

3      part of that disclosure and meet and confer obligation,

4      during the trial, then you're to advise my staff not later

5      than 10:00 p.m. the night before such issues would arise

6      before the jury.  You're to continue meeting and conferring

7      after that.  And if by 7:00 a.m. the next morning you have

8      not resolved such issues, then at 7:00 a.m. you are

9      directed to deliver to chambers a three-ring binder

10     containing printed copies of the actual items that are at

11     issue, be it demonstrative exhibits, or whatever it is,

12     together with a supporting single paragraph from each side

13     as to your position on that dispute or those disputes.

14          I'll then meet with you in chambers by 7:30, and

15     we'll use the intervening hour until 8:30, if necessary, to

16     resolve and give you guidance on those overnight disputes.

17     It's my plan each day after the first day to bring the jury

18     in by 8:30 and begin that day's portion of the trial.  That

19     schedule and the time between 7:30 and 8:30 each morning to

20     take up and give you guidance on overnight disputes is

21     intended by the Court to maximize the effective use of your

22     designated trial time.  It's a burden on the Court, but I

23     believe it makes for a smoother and less disjointed

24     presentation of the evidence.  It also, as I say, should

25     substantially maximize your designated trial time.

```
 1              If you have disputes regarding witnesses who are
 2       going to appear by deposition, whether they're deposition
 3       designations or counter-designations, those needs to be
 4       brought to me not later than the day before the day they're
 5       going to be presented.  I don't want to have a unintended
 6       delay because there's time needed to recut videos or other
 7       things that could be done in advance.  So bring me any
 8       deposition disputes or counter-designation disputes not
 9       later than the day before the day they are intended to be
10       presented.
11              After all the evidence has been presented, the Court
12       will consider and take up motions either side wishes to
13       offer pursuant to Rule 50(a) of the Federal Rules of Civil
14       Procedure.  I will not hear those at the time plaintiff
15       rests their case in chief, but I'll hear those after both
16       plaintiff has rested its case in chief, defendant has
17       rested its case in chief, and plaintiff's rested any
18       rebuttal case they may put on.
19              After I've heard and ruled on motions under Rule
20       50(a), I'll conduct an informal charge conference where I
21       can review with counsel off the record and in chambers and
22       informally the then existing most current iteration of the
23       proposed final jury instructions and verdict form.  That's
24       intended to be casual and free-flowing where I can have an
25       opportunity to not only hear you out on any issues where
```

1     you're not in complete agreement, but where I can ask

2     questions and probe the parties with regard to anything the

3     Court may wish to take up concerning both the charge and

4     the verdict form.

5          I see a lot of familiar faces in the courtroom today,

6     so I probably don't need to say this, but I'll make it

7     clear on the record just in case, it's this Court's

8     practice to prohibit reference to any individual by first

9     name only before the jury.  I expect counsel to abide by

10    that.  I expect counsel to instruct their witnesses and

11    their witnesses to abide by that.  Identifying or referring

12    to individuals by first name only invites confusion in the

13    record and simply is not in keeping with the necessary

14    decorum for a United States District Court, in the Court's

15    view.

16         I also refer all the parties and all present to the

17    Court's standing order on protecting confidential or

18    proprietary information.  Just so there is no doubt,

19    posttrial redactions are not the appropriate method for you

20    to protect confidential or proprietary information.  You

21    should refer to and apply the Court's standing order in

22    that regard, as I suspect there's a high likelihood of

23    confidential information being presented to the jury during

24    this trial.

25         There will be a juror questionnaire available to the

1          parties in advance of voir dire, and I'll refer you to Miss
2          Clendening, our deputy in charge for this division, as to
3          access to that juror questionnaire.  I'll simply remind you
4          that we encourage citizens who are summoned for jury duty
5          and who receive such a questionnaire to be candid and fully
6          forthcoming in their answers.  And part of the way we do
7          that is we assure them that they do not have to worry about
8          their answers being retained or copied or stored in some
9          law firm's database only to pop up at some inconvenient
10         time in the future.  So, again, I'm instructing you to
11         follow Miss Clendening's directives in regard to these
12         questionnaires, but let me make it clear they are not to be
13         copied, they are not to be scanned, you are not to retain
14         any of the information from those questionnaires.  You'll
15         receive hard copies.  You may use them during jury
16         selection, and I'm confident Miss Clendening's going to
17         instruct you to return those hard copies to her after the
18         jury's selected and seated.
19              All right.  As a part of this pretrial process, the
20         last area I expect us to cover will be objections as to
21         exhibits that are tendered by either party to be
22         pre-admitted by the Court.  It's the Court's practice to
23         pre-admit the exhibits to be used during the trial.  That,
24         too, avoids the disruptions of offer and argument and
25         ruling on exhibits before the jury.  It also importantly

1       maximizes your designated trial time.

2            The Court will consider any evidentiary disputes

3       regarding exhibits to be pre-admitted as a part of this

4       process.  Once the Court has ruled, we'll begin the trial

5       with a defined universe of pr-admitted exhibits.  Once

6       they're pre-admitted, they are free for either party to

7       offer before the jury without a formal offer or predicate,

8       and the Court will keep a running record, a running

9       account, of the pre-admitted exhibits that have been used

10      as a part of the record in the case.  And the way we will

11      do this is each morning before I bring the jury in,

12      beginning on day two, I'll expect each side to have a

13      representative prepared to read into the record any items

14      from the list of pre-admitted exhibits that have been used

15      before the jury during the preceding day's portion of the

16      trial.  And we'll do that each morning beginning with day

17      two and before I bring the jury in so that we can keep a

18      running record of those items that have been used and

19      published to the jury during the trial and consequently

20      have moved from the list of pre-admitted exhibits to the

21      list of admitted exhibits and are part of the evidence in

22      the case.  Those on the list of pre-admitted exhibits not

23      used or published before the jury are not a part of the

24      record evidence in the case and merely remain unused,

25      pre-admitted exhibits.

1            I'm going to direct that the parties jointly

2       collaborate and prepare 12 copies of a juror notebook for

3       use during this trial.  Those 12 copies should be delivered

4       to chambers not later than noon on Monday the 28th of

5       March.  They should be comprised of simple three-ring

6       binders, including single-sided copies of the

7       patents-in-suit, a side-by-side chart for claim

8       construction terms with the left-hand column showing the

9       claim language that's been construed by the Court, and a

10      corresponding right-hand column showing the adopted

11      constructions from the Court of that language.  Nothing

12      further from the claim construction order opinion is to be

13      included, other than the claim language as construed and

14      the adopted construction.

15            Also, those notebooks should contain a single witness

16      page for each witness.  That includes those on your will

17      call and your may call list.  That includes your deposition

18      witnesses.  Each witness page should have a head and

19      shoulders photograph of the witness superimposed at the top

20      of the page identified by their name below their

21      photograph, with the balance of each page ruled lines for

22      note taking.  You're not to characterize the witness as you

23      identify them on those witness pages.  If it's Dr. John

24      Smith, that's fine, but don't put Dr. John Smith,

25      plaintiff's damages expert.

1           Also, those witness pages should each be tabbed with

2      the name of the witness so the jurors don't have an

3      inordinately difficult time flipping through those and

4      finding the appropriate page as the witnesses are called

5      during the trial.

6           And following the witness pages there should be a new

7      three-hole punched legal pad put in the back of the

8      notebooks for additional note taking, should the jury elect

9      to do that.  And in the front pocket of those notebooks

10     please put a non-noisemaking pen for the jurors' use.  And,

11     again, 12 copies of those should be delivered to chambers

12     by Monday the 28th of this month, not later than noon on

13     that date.

14          Again, seeing many of you in the courtroom today that

15     have tried several jury trials before me, this may be

16     somewhat unnecessary, but I think it's worth saying even if

17     it's already known to many of you.

18          In a patent infringement case such as the one we're

19     going to try in this matter, there are invariably competing

20     expert witnesses, and there are times when counsel may urge

21     objections that an expert witness is attempting to exceed

22     the scope and the bounds of their expert report.  Clearly,

23     expert witnesses are limited to and confined by the four

24     corners of their expert reports.  Those objections,

25     however, are highly disruptive by their nature.  We're

1          going to have multiple experts.  They're going to have

2          issued at least one, and often more than one report, and I

3          assure you I will not have those reports memorized by the

4          time this case goes to trial.  So if there's an objection

5          tendered that an expert is attempting to testify outside

6          the scope of their reports, I really can't address that

7          without getting the report here on the bench, sending the

8          jury out, finding out from you where you believe that

9          objection has occurred, looking at the competing sections

10          of the reports where each party takes their various

11          positions as to whether the witness is or is not attempting

12          to testify beyond the scope of the report and then give you

13          a ruling and then bring the jury back in and then reconvene

14          the trial.

15              It's just highly disruptive, and there's no way

16          around it.  If you feel it's warranted, and you're

17          confident that you have a meritorious basis, make the

18          objection.  Don't make the objection for strategic

19          purposes.  Don't make the objection to break opposing

20          counsel if they're on a roll with a witness.  If it's the

21          kind of -- if that objection is tendered for what I believe

22          is anything other than a meritorious purpose, I'll consider

23          it to be strategic, and I'll probably sanction the

24          offending party.  Also, be aware that the time it takes to

25          send the jury out, get the reports, hear the argument, rule

1        on it, then bring the jury back in, that time's going to be

2        counted against whoever ends up on the short end of that

3        process as far as the objection and response goes.  So that

4        time will count against your designated trial time.

5             It's just a part of this kind of trial, but I want to

6        remind the parties, your expert witnesses are not to

7        testify outside the scope of their written reports.  And if

8        they do, we'll follow that kind of an approach in dealing

9        with any necessary and meritorious objections in that

10        regard.

11             Let me talk to you just briefly about public health

12        protocols.  As everybody in the courtroom knows, we're in a

13        -- we are in an evolving environment regarding COVID-19 and

14        its various variants and the public health of the public.

15        Unless something significantly changes, here's how I have

16        in mind addressing that during the trial in early April of

17        this year.

18             I'm going to -- I'm going to place the venire panel

19        in the gallery and direct the Court's -- the deputy in

20        charge to space them as best as possible, and we're going

21        to take up the entire gallery with the venire panel.

22        You'll examine the venire panel from the podium.  Each

23        member of the venire panel will be masked throughout the

24        jury selection process.  When they're called upon to give a

25        specific answer to a question, my instructions to them will

1     be that they are to stand, they are to remove their mask,

2     they'll be handed a handheld microphone from a court

3     security officer.  They're to use that to answer your

4     question.  They're then to hand the microphone back to the

5     court security officer and replace their mask and have a

6     seat.  And that's the process we'll follow.

7          There will be two court security officers in the

8     gallery.  They'll each have separate handheld microphones,

9     and after any member of the venire panel uses a handheld

10    microphone, it will be sanitized by the court security

11    officer before it's handed to or used by another member of

12    the venire panel.

13         Once the jury's selected and seated, I'm going to

14    direct the jury to replace their masks with a clear face

15    shield, like this, as it's the Court's considered opinion

16    that we can't try a jury trial unless you can see the faces

17    of the jury.

18         And in that regard, each trial team seated inside the

19    bar is going to need to advise the Court in advance of the

20    trial what your vaccination status is.  I'm going to assume

21    that everybody on each trial team is going to be fully

22    vaccinated.  If that's the case, then you're not required

23    to mask inside the bar.  If you have a particular health

24    considerations that even though you're vaccinated you would

25    be more comfortable being masked inside the bar, you're

1          certainly free to do that.  That goes for counsel as well

2          as corporate representatives and anybody that would be

3          seated inside the bar.

4               Once you go to the podium, Counsel, no matter what

5          your status is, you are to remove a mask if you have it.

6          Again, you need to see the jury, the jury needs to see you.

7          The Court needs to see both of you.  Once you've finished

8          your examination or cross-examination at the podium, and

9          you return to your seat at counsel tables, if you're

10          masked, then you need to replace your mask.

11               The witnesses should by masked as they come into the

12          courtroom.  And as you can see, we've got a Plexiglass

13          barrier surrounding the witness stand.  They'll unmask as

14          they are sworn and seated at the witness stand.  And then

15          once their testimony is complete, and I've directed that

16          they may step down, if they've -- if they're wearing a

17          mask, they'll put it back on as they leave the witness

18          stand.

19               There are in this courtroom four independent air

20          filtration units, and they will be running throughout the

21          trial to filter the air here in the courtroom.  Also, I'm

22          going to instruct the Court's cleaning staff to separately

23          clean, deep clean, the jury room, the jury box and the

24          restrooms that serve the jury room each night after we

25          recess for the evening.  Also, I'm going to order the jury

1          sequestered during the trial for lunch, and the Court's

2          going to provide them lunch.  I'm not going to have them

3          going out in the community and standing in line to get food

4          with whoever may be out in the public, and then coming back

5          to the courthouse.  That's a public safety concern, public

6          health concern, in my view.  It also means we'll be able to

7          take a shorter break and get in more trial time each day

8          during the trial.

9               There may be some other additional protocols that are

10         appropriate, and if there are, I'll try to make sure you

11         know about those in advance.  Those are the main ones.  As

12         I say, we live in an evolving situation.  It looks like

13         things are in a positive mode now where the exposure and

14         risk is declining, but we've ridden this roller coaster for

15         a couple of years, and nobody knows what the future holds.

16         That's where -- that's where the Court stands today on how

17         it intends to address the public health issues related to

18         the trial.  All right.

19              With those housekeeping instructions and overviews,

20         let me ask if any of the parties present have any questions

21         or need any clarification on any of these.

22              MR. EVERINGHAM:  No, Your Honor.  Thank you.

23              JUDGE GILSTRAP:  Anything from the defendants' side?

24              MR. STEVENSON:  Nothing from defendants.

25              JUDGE GILSTRAP:  All right.  Counsel, previously, in

1          communications with the Court's staff you've submitted what
2          you would suggest to be an order for the Court to follow in
3          taking up your disputed motions and other disputed issues
4          today and tomorrow.  I'm going to attempt to follow that.
5          I won't promise you that it's going to be perfect, but I'm
6          going to attempt to follow the order that you've suggested.
7               We've also clearly got a lot of lawyers in the
8          courtroom.  I'm going to ask again for clarity of the
9          record when you go to the podium to argue on a motion or on
10         a limine, or on anything else, when we get to exhibits on
11         exhibits, identify yourself for the record, even if that's
12         the 12th time you've been to the podium during the pretrial
13         process.  When you begin your arguments, please identify
14         yourself for the record.  We have a visiting court reporter
15         today.  She doesn't recognize as many of you as I
16         recognize, so please help her out by announcing your name
17         into the record when you start your arguments.
18              All right.  Let's turn to the defendants' and
19         intervenor's motion for summary judgement of
20         unenforceability of the patents-in-suit or in the
21         alternative an adverse inference jury instruction.  This is
22         document 187.  Let me hear from the moving defendants and
23         intervenors first.
24              MR. BUDWIN:  Thank you, Your Honor.  Josh Budwin of
25         McKool Smith, and I'll be presenting this argument on

1          behalf of the defendants and intervenors.

2                  JUDGE GILSTRAP:  It's clear, Counsel, that you're

3          asking for the death penalty here for all intents and

4          purposes, so tell me why this is of such an egregious

5          nature that it should warrant that.

6                  MR. BUDWIN:  Yes, Your Honor.  There are five

7          patents-in-suit.  Two of the patents were originally

8          assigned to Hitachi, and three were originally assigned to

9          Bosch.  IPCom availed itself of this court knowing that the

10         Court has a policy of liberal, open and forthright

11         discovery, fast times to trial, and compressed discovery

12         time periods.

13                 This gentleman is Bernhard Frohwitter.  He is the

14         most important person in IPCom's history.  There's no

15         dispute, no debate, Bernhard Frohwitter is the key man

16         behind IPCom.  And as I'll explain, even though he's the

17         key man behind IPCom, we have none of his documents in this

18         case.  Okay?

19                 JUDGE GILSTRAP:  He is the key man, or he was the key

20         man --

21                 MR. BUDWIN:  He was --

22                 JUDGE GILSTRAP:  -- or is it both?

23                 MR. BUDWIN:  I believe it's both.  He was officially

24         IPCom's managing director until July 31st of 2020, which is

25         approximately two months before these lawsuits were filed.

1          And as you'll see throughout the course of the argument, he

2     continued to represent IPCom in some licensing discussions

3     even after these suits were filed.

4          There's three separate and related entities that all

5     now relate to IPCom and the course of this argument, all of

6     which involve Mr. Frohwitter.  There's the Frohwitter law

7     firm, there's an entity called FIPA which is the Frohwitter

8     Intellectual Property Agency.  It's a German company.  Mr.

9     Frohwitter is a German citizen.  They were the original

10    assignee of the Hitachi patents-in-suit, and then there's

11    IPCom who was the original assignee of the Bosch

12    patents-and-suit.  Shortly before this case was filed,

13    FIPA, Mr Frohwitter's intellectual property group, assigned

14    the Hitachi patents to IPCom, which was also his entity.

15         So we know that Mr. Frohwitter, he was the founder

16    and managing director of IPCom, and, indeed, in their

17    opposition brief, IPCom itself refers to him as one of its

18    top executives, at least until July 31st, 2020, two months

19    before these suits were filed.

20         Mr. Suh, who's the current managing director of

21    IPCom, he testified that when you're the managing director,

22    you're equivalent to the CEO.  Mr. Frohwitter was the CEO

23    of IPCom from its founding until at least two months before

24    suit was filed.

25         Mr. Suh, the current managing director of IPCom, also

1      tells us in his deposition that Mr. Frohwitter was key in

2      the formation of IPCom and that IPCom wouldn't exist today

3      without him.  No dispute about that.

4           Mr. Frohwitter was also the founder and a partner at

5      the Frohwitter law firm that bears his name, from where he

6      conducted IPCom's business.  From the founding of IPCom

7      through until at least the time that he resigned, if not

8      beyond, he conducted IPCom's business from his law firm.

9      And this isn't in dispute either.  IPCom admits this.  Mr.

10     Frohwitter always worked out of his office at the

11     Frohwitter law firm, including for IPCom matters when he

12     was the managing director.  And, in fact, he co-mingled and

13     frequently used his Frohwitter law firm e-mail address, as

14     IPCom admits in its opposition, as his default e-mail

15     address for IPCom's business.  And this is going to be

16     important for reasons that we'll come to explain.

17          JUDGE GILSTRAP:  I understand those e-mails are on

18     his law firm's server.

19          MR. BUDWIN:  So Mr. Frohwitter was also the founder

20     and managing director of FIPA, the Frohwitter Intellectual

21     Property Agency, the former signee of the Hitachi patents.

22     And, again, as Mr. Frohwitter testified in a deposition in

23     2009, not in this case, he was the CEO of that group also.

24          Mr. Frohwitter also negotiated the purchase of the

25     Bosch portfolio in exchange for a payment of 100 million

1     Euros, and he, or his law firm, received all records and
2     documents related to the Bosch patents.  So Mr. Suh, the
3     current managing director, tells us that Mr. Frohwitter was
4     the person who primarily brokered the sale of the patents
5     from Bosch to IPCom for a hundred million Euros.  No debate
6     about this.  Mr. Frohwitter signed the purchase agreement
7     on behalf of IPCom and also the Frohwitter intellectual
8     Property group.  No dispute about the payment of a hundred
9     million Euros, either, for that.

10         In exchange for the payment of a hundred million
11     Euros, and to get the Bosch portfolio, the seller, Bosch,
12     was required to deliver to the purchaser, IPCom, at
13     closing, written confirmation by Frohwitter, and this is
14     now the German name for the Frohwitter patent firm.  You
15     can see.  It's like Patent Waffle, or Wave, I can't
16     pronounce the German word, but that's the Frohwitter Law
17     Firm, written confirmation that the Frohwitter law firm has
18     possession of, quote, all records and documents in seller's
19     possession, including those in the possession of seller
20     Bosch's advisors, which also included the Frohwitter law
21     firm and FIPA.  So Mr. Frohwitter had previously
22     represented Bosch, then he brokers the sale of the Bosch
23     patents to an entity that he controls.  When they do that
24     in exchange for the payment of a hundred million Euros, as
25     you'd expect, they -- IPCom gets written certification that

1          the Frohwitter law firm has all of the documents relating

2          to the Bosch patents in its possession, including, and this

3          is the last provision, any documents or information

4          relating to the patents which are, or might be, of material

5          relevance to, amongst other things, the enforcement of the

6          patents.

7               And what we're going to see is we know we're missing

8          at lease a host of preexisting encumbrances, so licenses

9          that Bosch executed to the patents before they were

10         transferred to IPCom.  There's a host of those that we've

11         asked for; IPCom says they don't have, we haven't gotten.

12         We believe Mr. Frohwitter and his law firm received them as

13         part of this transaction, and we believe that he has them

14         today.  And IP --

15              JUDGE GILSTRAP:  What basis do you have to believe

16         that they were actually received?  I know the recital says

17         they go there, but do you have any evidence they were

18         actually received?

19              MR. BUDWIN:  So there is a dispute over whether the

20         licenses were or were not -- or -- let me -- let me walk

21         that back.

22              IPCom admits in there -- if we could to slide 30.  So

23         this is a declaration of a former IPCom employee, Mr.

24         Tomlinson, and it's important to note that Mr. Tomlinson

25         was never listed on the initial disclosures, nor subject to

```
 1          deposition in this case, but he submits a declaration in
 2          opposition to this motion.  And he says, "Any licenses in
 3          the possession of the Frohwitter firm were received and
 4          held" -- this is IPCom's position -- "pursuant to Mr.
 5          Frohwitter's obligations to Bosch and Hitachi, not in
 6          trust, on behalf of FIPA or IPCom."  That's -- that's the
 7          word that he says here, "Not in trust for FIPA or IPCom."
 8               JUDGE GILSTRAP:  Now, that describes the basis upon
 9          which the asserted licenses that are there are held.
10          Doesn't tell me what came in the door.
11               Do you have anything to show what actually was
12          received?
13               MR. BUDWIN:  So Your --
14               JUDGE GILSTRAP:  Or is that -- that just an open
15          question?
16               MR. BUDWIN:  So, Your Honor, we -- we, unfortunately,
17          don't know exactly what was received because we haven't
18          been able to take Mr. Frohwitter's deposition.  It seems to
19          be not in dispute, and perhaps IPCom's counsel can
20          represent this, that Mr. Frohwitter does currently have
21          possession of the Bosch licenses, all of them.  The dispute
22          is whether or not he's authorized to provide them.  There's
23          been statements made by IPCom that Mr. Frohwitter needs,
24          quote, unquote, Bosch's permission in order to provide
25          them, which is a suggestion that Mr. Frohwitter holds them
```

1    even today.

2         JUDGE GILSTRAP:  But there's never been, He has

3    license A, B, C, but he needs permission to release them.

4    Just that if he has any licenses, he needs permission.

5         MR. BUDWIN:  My understanding, and this is really the

6    question for IPCom, based on some of the representations

7    and statements they've made to us in the meet and confer

8    process and in the opposition briefing, it's my belief and

9    understanding that Mr. Frohwitter has all of the Bosch

10   licenses and all of the Hitachi licenses.

11        The dispute is whether he received those and has them

12   on behalf of IPCom or IPCom's predecessor, or he holds them

13   on behalf of the Frohwitter firm.  That's the dispute, as I

14   understand it.

15        JUDGE GILSTRAP:  That's your belief.

16        MR. BUDWIN:  That's my belief.

17        JUDGE GILSTRAP:  Okay.

18        MR. BUDWIN:  Could we see slide 24, please, Mr.

19   Moreno.  ]

20        So Mr. Frohwitter represented Bosch prior to the

21   purchase of the portfolios, and he says that he wrote

22   letters, and he kept copies of those letters in his files.

23   So this is when he's negotiating with licenses for the

24   Bosch portfolio on behalf of Bosch, and also on behalf of

25   actual licenses and potential licenses.

```
1            So he tells us that he has, and this is, again, a
2       deposition from 2009, not in this case, but we're piecing
3       together the tea leaves, he has copies of documents related
4       to Bosch licenses.  Now we're talking about another Bosch
5       license here on slide 25, which is to LG.  He's asked again
6       in his 2009 deposition, not in this case, "Did you
7       negotiate that license?"  And he says, "Yes."  And he's
8       asked the question, "do you have a copy of any of the
9       relevant documents related to this licensing negotiation,
10      including without limitation, the license itself?"  And he
11      says, "We certainly should have some communications."
12            Again, it's indicative that he at least has some
13      communications related to LG, which is one of the missing
14      licenses that we have.
15            One more example, again from his 2009 deposition,
16      asking about Samsung, did he negotiate this agreement?
17      Yes.  And the question from the counsel in this prior
18      deposition is saying, I'm asking about FIPA or the
19      Frohwitter Law Firm, or anything in IPCom's possession;
20      those three entities, "Do any of those three entities have
21      in their possession any documents related to this license?"
22      the Samsung license.  And he tell us, "I bet they have,
23      yeah."
24            Could we have slide 28, please, Mr. Moreno?  It's one
25      of the ones that's hidden.
```

1            Now, this is a part of that deposition that counsel
2       refers to in their opposition, and he talks about in this
3       excerpt from the 2009 deposition, that he, being the
4       Frohwitter Law Firm, had copies of negotiations in his
5       files.  Then he's asked the questions, Do you have the
6       actual licenses?  And the answer is, "Maybe of drafts."
7            So that goes to the Court's question, he at least has
8       communications related to the negotiation of the Bosch
9       licenses, and he testifies in this prior deposition that he
10       potentially has drafts of the license agreements.
11            In addition to Bosch, Mr. Frohwitter also negotiated
12       the purchase of the Hitachi portfolio for               .
13       And, again, as we saw with Bosch, there's going to be the
14       purchase agreement that represents that he, or at least his
15       law firm, received all documents related to the Bosch
16       patents.
17            No dispute with Mr. Suh, again, the current IPCom
18       managing director, that Mr. Frohwitter was the one who
19       acquired the Hitachi patents on behalf of FIPA, which is
20       the predecessor to IPCom.
21            Mr. Frohwitter signed the Bosch -- the Hitachi
22       purchase agreement.  Again, no dispute that they paid
23                       to acquire those patents.  And, again, we see
24       -- this is slide 36 -- a delivery provision that was
25       similar to the one that we saw for Bosch.  So here it says,

1          "Seller shall deliver to purchaser" -- so Hitachi will

2      deliver to Bosch -- "written confirmation that the

3      Frohwitter Intellectual Property Counselors," the law firm,

4      "has possession of," and then there's a list of the

5      documents that Hitachi is representing to IPCom that it's

6      delivered to IPCom's lawyers in this transaction, the

7      Frohwitter firm.

8          It's our position that Mr. Frohwitter, in addition to

9      negotiating this -- the Bosch and Hitachi agreements on

10     behalf of himself, was also acting as IPCom's lawyers.  And

11     this provision and the prior provision from Bosch is

12     suggestive of that.  At closing, in exchange for the

13     payment of either                                    ,

14     we're going to certify to you, IPCom or FIPA, that your

15     lawyers, the Frohwitter firm, have copies of documents,

16     including all records and documents in Hitachi's

17     possession, including, but not limited to, documents and

18     information related to the patents, which might be of

19     material relevance to the infringement or enforcement

20     thereof.

21          JUDGE GILSTRAP:  Counsel, I don't want to interrupt

22     your argument --

23          MR. BUDWIN:  Yes.

24          JUDGE GILSTRAP:  -- but let me ask you, if you're

25     going to talk about purchase prices paid for patents, is it

1    appropriate the courtroom be sealed, or is it not necessary

2    in your view?

3         MR. BUDWIN:  Thank you, Your Honor.  I conferred with

4    counsel before, and we agreed that this portion of the

5    argument didn't need to be sealed.

6         MR. BLACK:  Which counsel?

7         MR. BUDWIN:  Mr. Plies.

8         MR. BLACK:  Did you tell him that you were going to

9    mention the purchase price?

10        MR. BUDWIN:  I said we were going to go through the

11    argument and included the exhibits, yes.

12        MR. BLACK:  Well, it strikes me that the mention of

13    the purchase price is gratuitous and unnecessary and should

14    be -- I was going to ask for confidential treatment of that

15    and ask that you not do that in the future.

16        MR. BUDWIN:  Okay.  We had tried to resolve this

17    beforehand.  Maybe it makes sense.  There's probably

18    several other exhibits that we'll go through that will

19    subject to confidentiality obligations.

20        JUDGE GILSTRAP:  Well, I didn't mean to invite a

21    conversation between counsel, I just wanted to inquire.

22        I take it, Mr. Black, you feel like that particular

23    item needs to be treated confidentially.

24        MR. BLACK:  Yes, Your Honor.  We don't have any --

25    we're in federal court, so now and first amendment applied,

1          and so we have to be pretty liberal about what comes into

2          the record and only seal things that are appropriate.  So

3          we -- Mr. Plies agrees, I think it's appropriate that this

4          motion could be heard what Mr. Frohwitter did 20 years ago

5          isn't some secret.  I don't understand why counsel put the

6          purchase price number out and repeated it over and over

7          again.  I have some concern about that, but hopefully now

8          that it's been raised we'll --

9               JUDGE GILSTRAP:  I'll order the reference to the

10         purchase price for the patents as a part of the previous

11         argument redacted from the record, and I understand that

12         unless there's some particular reason to, having

13         communicated it to the Court, there'll be no need to

14         reiterate that going forward.

15              MR. BUDWIN:  Thank you, Your Honor.

16              JUDGE GILSTRAP:  And with that we'll leave the

17         courtroom open and unsealed.  All right.  Let's proceed.

18              MR. BUDWIN:  So here we have on slide 38, and this is

19         Exhibit 7 to docket 187, this is a list of the preexisting

20         licenses to the Hitachi patents.  And here we have an

21         express reference from IPCom that goes to Your Honor's

22         prior question with respect to Bosch.  But here, we know

23         IPCom asked the Frohwitter firm if they had the Hitachi

24         license, licenses, and the firm responded that it held the

25         licenses pursuant to its obligations to Hitachi and

1          couldn't provide them to IPCom.

2                  So here we know, at least as to the Hitachi licenses,

3          it's undisputed that the Frohwitter firm has them.  The

4          question is whether they're within IPCom's control or not.

5                  Mr. Frohwitter was also the one who selected the

6          proud list patents, which is central to IPCom's damages

7          methodology in this case, and so I've got an excerpt here

8          from the Bratic report.  This IPCom's damages expert.  And

9          he talks about the proud list of patents and how that proud

10         list of patents drove IPCom's deal with Deutsche Telekom,

11         which is the centerpiece of their damages case in this --

12         damages claims in this case.

13                 It's interesting that in this discussion Mr. Bratic

14         -- or Dr. Bratic, relies on a deposition of Christoph

15         Schoeller and interviews with Mr. Schoeller.  Mr. Schoeller

16         is Mr. Frohwitter's business partner, and he, unlike Mr.

17         Frohwitter, has cooperated and appeared for deposition.

18                 But in his deposition we asked Mr. Schoeller about

19         the proud patent list and whether he knew about it.  "Do

20         you have an understanding as to how the patents that were

21         selected for presentation to potential licensees were

22         selected by IPCom?"  "No."  "It was Mr. Frohwitter who was

23         primarily responsible or those working at his direction who

24         were presumably" -- it should say primarily -- "responsible

25         for identifying the patents to be highlighted to potential

1      licensees."  That was Mr. Frohwitter's job, not Mr.

2      Schoeller's job.  And he tells us expressly that he

3      explained his philosophy on the proud list, that he's not

4      responsible for the patent part of this company, and he's

5      not responsible for selecting these patents, all of this.

6      Mr. Schoeller wasn't the guy behind the proud patent list.

7      It was Mr. Frohwitter.

8           And we have an express -- this is slide 45 -- an

9      express statement from Mr. Schoeller.  He's asked about the

10      purpose of the proud patent list, and he says he doesn't

11      know.  That was Mr. Frohwitter.  Mr. Frohwitter did that.

12      And I think this is important to just understand the

13      division of roles in this -- in IPCom before its

14      reorganization.

15           Mr. Schoeller is a German industrialist, he's not a

16      lawyer, he doesn't have a background in patents.  He's the

17      business guy in IPCom.  Mr. Frohwitter who's a lawyer,

18      patent attorney, he does the strategy and the litigation.

19      That was all him.  So he's negotiating the purchase of

20      Bosch and Hitachi, he's negotiating with potential

21      licensees, he's selecting the proud patent list that's the

22      centerpiece of their damages claims in this case, and he

23      also managed IPCom's litigation with Deutsche Telekom and

24      the negotiation of that agreement with Deutsche Telekom,

25      which, again, is the centerpiece of IPCom's damages claims.

1          No dispute, again, with Mr. Schoeller that it was Mr.
2     Frohwitter who managed the Deutsche Telekom litigation.
3     And tellingly, Mr. Frohwitter continued to represent IPCom
4     in negotiations, at least with Deutsche Telekom, after his
5     resignation from IPCom, and after IPCom filed these suits.
6     So here's an excerpt from Mr. Suh's deposition.  There's
7     some e-mails and other documents in the record that
8     substantiate this further.  But in discussions in November
9     of 2020, Mr. Frohwitter, so that's after these suits were
10    filed in October of 2020, Mr. Frohwitter, still speaking on
11    behalf of IPCom in discussions with Deutsche Telekom in
12    November of 2020.
13         So let's just build a timeline real -- really
14    quickly, if we can, because I think it's important to help
15    understand what we're talking about.  FIPA's founded, the
16    Frohwitter Intellectual Property Agency, by Mr. Frohwitter
17    in 2002.  Frohwitter then founds IPCom to acquire the Bosch
18    portfolio, and we saw that agreement.  That's 2007.
19    Frohwitter brokers the sale of the Bosch patents to IPCom
20    in April of 2007.  Frohwitter brokers the sale of the
21    Hitachi patents to FIPA in December 2007, and we saw the
22    agreement related to that already.  Then IPCom sues
23    Deutsche Telekom and Vodafone in 2009, a litigation that
24    Frohwitter manages.  IPCom settles with Deutsche Telekom in
25    July of 2013.  Mr. Suh, who's the current managing

1        director, joins IPCom in July of 2018, but Mr. Frohwitter

2        and Mr. Schoeller remain the managing directors at that

3        time.  Then, in the lead up to the filing of these cases in

4        November of 2019 and January of 2020, IPCom sends letters

5        to AT&T and Verizon -- and these are attached as Exhibits 2

6        and 4 to the motion -- inviting them to engage in licensing

7        discussions with IPCom, and attaching a list, a long list,

8        of patents that includes all five of the patents currently

9        in suit.

10            IPCom identifies these letters to Verizon and AT&T in

11       late 2019 and early 2020 as their basis to indicate that

12       the defendants was first provided with notice of alleged

13       infringement.  We have their interrogatory response.  So

14       these letters, at the very least, in late 2019 and early

15       2020, that's the line in the sand.  There's no argument

16       from IPCom that they didn't anticipate litigation at least

17       as of the date of these letters to AT&T and Verizon.  I

18       would also assert that as a patent assertion entity whose

19       primary business is licensing and litigation if licensing

20       is unsuccessful, they're probably under a heightened duty

21       to preserve documents related to patents that may be the

22       subject of litigation.  But at the very least, we have this

23       line in the sand in late 2019 and early 2020.

24            And so I want to look at what happened after that

25       date.  Okay?  So after these letters are sent to Verizon

1        and AT&T, IPCom does, I think two things that are telling

2        and relate to the relief being requested in this motion.

3        These are two things that it does intentionally and knowing

4        what the effect of those are going to be.

5              First, in April 2020, it amends its agreement with

6        Hitachi for the fourth time to add what we'll call the best

7        efforts provision, and as I'll show Your Honor, really what

8        it does is it removes an obligation for Hitachi to

9        cooperate with IPCom in litigation.  And that's important

10       because we have been unable to get any documents from

11       Hitachi, and this Court has also sent a request for

12       judicial assistance to Japan.  No response received.

13       Motions to compel were filed against Hitachi's U.S.

14       subsidiaries.  In fact, motion was granted against the U.S.

15       subsidiaries, and I'll walk Your Honor through that, but,

16       basically, Hitachi Japan told the U.S. subsidiary that

17       notwithstanding the court's order, a different court's

18       order, they wouldn't provide documents.

19             JUDGE GILSTRAP:  Not this Court's order.

20             MR. BUDWIN:  Not this Court's order.  It was a court

21       in Dallas.  Northern District.

22             JUDGE GILSTRAP:  Northern District.

23             MR. BUDWIN:  So here on slide 58 we have the four

24       versions of the agreement with Hitachi, and I want to talk

25       about the original, the first and the third.  And these are

1      the ones the parties talk about in their briefing.  And the

2      third one is important because it's after those letters

3      were sent.

4             So slide 59.  So this is the original Hitachi patent

5      purchase agreement.  This is the one that I talked about in

6      the overview earlier.  It showed the requirement to deliver

7      documents to the purchaser in exchange for the purchase

8      price.  But importantly, this document, paragraph 6, has a

9      broad technical and commercial support obligation.  And it

10     says that "Hitachi will provide reasonably available

11     support to FIPA at reasonable cost regarding any technical

12     issues in asserting the mobile phone portfolio," which

13     includes the Hitachi patents in this case.  And that was

14     the requirement as of the original execution of this

15     agreement in 2007.  Broad cooperation requirement.

16            Then we advanced to the first amendment of this

17     agreement in June 2014, and what happens here is that broad

18     cooperation requirement, section 6 that we saw in the prior

19     slide, is deleted, and it's replaced with a more narrow

20     cooperation requirement but still a cooperation

21     requirement.  And what this provision requires is that

22     Hitachi is at least required to cooperate with respect to

23     the inventors, and presumably documents in the inventor's

24     possession, custody, or control.  So it says, "If FIPA

25     actively requests the involvement in writing and there

1          exists inventors who are then-current employees of Hitachi,

2          and the cooperation of any such Hitachi inventor is

3          required by a court or tribunal in any FIPA litigation

4          occurring in the U.S. or UK, then FIPA may request

5          cooperation under the condition that any reasonable cost

6          associated with such cooperation is paid by FIPA."

7               So as of this 2014 amendment, we know there's still

8          at least some requirement for Hitachi to cooperate with

9          respect to the enforcement of these patents, at least with

10         respect to inventors.

11              JUDGE GILSTRAP:  And in that language, if you'll put

12         that preceding slide back up, it says, if the cooperation

13         is required by a court.  At some point you're going to have

14         to explain to me why you never moved to compel in this

15         case.

16              MR. BUDWIN:  Yes, Your Honor.  We'll get -- we'll get

17         to that.

18              Now we have the third amendment in April of '20,

19         which, again, is after those letters were sent to AT&T and

20         Verizon, and what this does is it removes any obligation

21         for Hitachi to cooperate.  Now purchaser is going to use

22         its best efforts not to involve Hitachi in litigation.  And

23         this amendment was made to remove even the requirement to

24         cooperate with respect to inventors about six months before

25         suit was filed and after the notice letters were sent.  So

1          we have -- we have that.

2               There's one other thing that I think happens after

3          the notice letters are sent and shortly before suit was

4          filed that I think is telling.  So Frohwitter and Mr. -- so

5          Mr. Frohwitter and Mr. Schoeller officially resign as the

6          managing directors of IPCom effective July 31st, 2020.  Mr.

7          Suh, who's the current managing director, is promoted to

8          managing director effective either that day or the next

9          day, August 1st.  October 1st, 2020, suit is filed against

10         AT&T, and then we don't need to worry about the rest of

11         those dates right now.  The important date is this October

12         1st, 2020, date when suit is filed.

13              Could we have slide 63, Mr. Moreno, please.  So we

14         know that IPCom hired litigation counsel before Mr. Suh

15         became the managing director.  So if we could go back to

16         slide 62, Mr. Moreno, I think this is important because

17         when we look, Mr. Suh becomes the managing director, at

18         least as of August 1st, 2020.  Litigation counsel was hired

19         before that.  And when Mr. Frohwitter and Mr. Schoeller

20         resigned, and we're going to look at that complicated

21         series of agreements related to that, the effect is going

22         to be that IPCom claims they lost access to all of the

23         documents in Mr. Frohwitter's possession related to IPCom.

24              So we have agreements that effectuate the

25         restructuring of IPCom that occur shortly before these

1     suits are filed, and again after litigation counsel has
2     been hired.  There's a cooperation agreement and a
3     framework agreement, and these agreements are very
4     complicated, and they involve a lot of parties, including
5     Mr. Frohwitter himself, and a bunch of other entities,
6     including, as you can see, Karols, which is an arm of
7     Fortress; and Goldman Sachs, which is a bank.  These
8     agreements were advised by counsel, so there's UK counsel
9     here, Linklaters.  And the important part of this, all of
10    this, is about two months, almost to the day, before the
11    suit are filed -- these suits are filed, after litigation
12    counsel is hired, IPCom effectuates this complicated
13    multi-party restructuring of its business, but it fails to
14    preserve access to any of Mr. Frohwitter's documents or his
15    ESI, including his e-mails.
16         The post reorganization structure IPCom is very
17    complicated.  These agreements are very complicated.  This
18    is the best, as I can understand it, and the important part
19    of this is not really the corporate structure, it's more
20    those agreements contained what's called a payment
21    waterfall.  So if there's any recoveries in this case, it
22    specifies how those recoveries are paid.  And here, we've
23    worked out for a hypothetical a hundred million.
24         JUDGE GILSTRAP:  What is it, Mr. Black?
25         MR. BLACK:  He's going to give a hypothetical what

```
 1          would happen if there's a certain judgment, or something
 2          like that, using numbers --
 3               MR. BUDWIN:  Let me make the point without --
 4               MR. BLACK: -- I don't think anywhere --
 5               MR. BUDWIN:  -- without any numbers.
 6               JUDGE GILSTRAP:  Wait a minute.  Just a minute,
 7          gentlemen.
 8               He's entitled to make his argument.
 9               MR. BLACK:  Yes.
10               JUDGE GILSTRAP:  And if it's hypothetical, it's
11          hypothetical.
12               MR. BLACK:  Yes, Your Honor.
13               JUDGE GILSTRAP:  If you can make it without giving
14          express numbers, or showing on the screen without
15          verbalizing them in the record, that's probably preferable.
16               MR. BLACK:  And my other -- thank you, Your Honor.
17          My other point is that it should be based on something in
18          the summary judgment record, a declaration, or something.
19               JUDGE GILSTRAP:  All right.  Let's continue with the
20          argument.  This is -- this is a lengthy motion, and there's
21          a lot at stake here, but we're going to get through it
22          without further interruptions.  All right.  Continue.
23               MR. BUDWIN:  Here's -- here's the basic takeaway from
24          this, Your Honor.  If IPCom gets a recovery, Mr. Frohwitter
25          gets a payment personally, and he gets a payment that
```

1          funnels through this FIPA group that you can see to the
2          right-hand side, which we've talk about earlier.  It's his
3          Frohwitter Intellectual Property Agent.  It's not his law
4          firm, it's another Frohwitter entity, and he owns something
5          like 55 percent of that entity.  So he gets paid twice,
6          directly and indirectly, through his ownership stake in
7          FIPA.
8               So we'll go past that, and we'll get to something on
9          the summary judgment record.  And so I asked Mr. Suh about
10         this in his deposition, and so what he tells us is after
11         this complicated multi-party restructuring two months
12         before this suit is filed, after litigation counsel is
13         hired, this restructuring gives Mr. Frohwitter significant
14         financial interest direct and indirect in any recoveries in
15         this case.  And we also know from IPCom's opposition that
16         Mr. Frohwitter's resignation as managing director was
17         apparently contemplated years earlier, at least as of the
18         time when Mr. Suh was hired in July of 2018.
19              So IPCom works on this restructuring for a period of
20         years, consummates that restructuring two months before
21         suit is filed, and then Mr. Frohwitter's given a
22         significant interest in the outcome of these cases and
23         waltzes out the door without any requirement to produce any
24         documents in this case, hand over any of his e-mails, or
25         appear for deposition.

1          Can we have slide 70, please.  So the legal standards

2     for unclean hands, Your Honor's familiar with this, your

3     court clerks, I'm sure, are familiar with it also, but the

4     question is, is there misconduct that has an immediate and

5     necessary relation to the equity that IPCom as the

6     plaintiff seeks in the litigation.  And the answer is yes.

7          Mr. Frohwitter is the key guy behind IPCom, at least

8     until his resignation on July 31st, and potentially beyond,

9     continuing to represent IPCom in discussions with licensees

10    after this litigation is filed.  He's the guy who knows

11    about the proud patent list, he's the guy who negotiated

12    the agreement with Deutsche Telekom.  Those are the two

13    centerpieces to their damages methodology in this case.

14    And we don't have access to the witness or his documents.

15    We also don't have access to documents related to the Bosch

16    and Hitachi encumbrances and potentially correspondence

17    related thereto, that at least as to Hitachi, IPCom has

18    admitted it's still -- IPCom has admitted Mr. Frohwitter

19    and his firm still possess, and at least as to Bosch, we

20    believe the firm still possess them, although they've been

21    less clear with respect to that.

22          Rule 37(e), this applies specifically to ESI.  In

23    this case there's an ESI order.  We wanted Mr. Frohwitter

24    to be one of our custodians.  We were told that there's no

25    ESI available for Mr. Frohwitter.  So the question under

1          Rule 37, and at least as to the subset of documents related
2          to Mr. Frohwitter's ESI is did IPCom fail to take
3          reasonable steps to preserve his ESI.  The answer to that
4          is unequivocally yes.

5              If they failed to take reasonable steps, then under
6          prong one, if we as the plaintiffs -- or we as the
7          defendants and intervenors have prejudice, then the Court
8          may order measures to cure that prejudice.  And if the
9          Court further finds, so not just that we're prejudiced,
10         which I think it's clear that we are.  We're lacking access
11         to documents that the most key guy in IPCom's history has,
12         if that -- if there was an intentional act to deprive us
13         with that evidence, this restructuring of the agreement in
14         July -- consummated July 31st of 2020, two months before
15         suit was filed, after litigation counsel was hired, if that
16         was intentional to let him, Mr. Frohwitter, waltz out the
17         door without preserving his documents, then the Court may
18         also undertake these additional steps, which is presuming
19         the missing information is unfavorable, instruct the jury,
20         or dismiss the action.

21             So let's walk through a few of IPCom's excuses, and
22         this goes to one of Your Honor's questions earlier.

23             The first excuse is they couldn't expect that Mr.
24         Frohwitter wouldn't cooperate and voluntarily produce his
25         documents and ESI.  But that excuse rings hollow because

1      they told us that IPCom worked on this reorganization for

2      years, and they contemplated the reorganization for years.

3      They had counsel involved at Linklaters, and a complicated

4      series of agreements effectuating that transition, a very

5      complicated payment waterfall, and they didn't secure

6      access to Mr. Frohwitter's documents or testimony?  That

7      strains credibility, in our view.

8          They tell us in Mr. Suh's declaration in opposition,

9      they had no reason to believe that he wouldn't refuse to

10     cooperate in discovery.  But, again, this is after he

11     resigned, and he was managing director for seven or eight,

12     nine months after those letters to AT&T and Verizon were

13     sent.  How could they not take steps to preserve access to

14     his documents after Mr. Suh himself sends letters to the

15     defendants in this case that allegedly put them on notice

16     of infringement?  And, again, this reorganization was

17     consummated, and Mr. Frohwitter apparently walked out the

18     door, although still appearing in some discussions after

19     suit was filed, after litigation counsel was hired.  This

20     is two months before these suits were filed.  Presumably

21     the decision to file these suits had already been made when

22     Mr. Frohwitter's resignation was effectuated.

23         Here's the second excuse.  Mr. Frohwitter's a lawyer,

24     a German lawyer, and he has professional obligations to his

25     law firm clients, and he's bound by European data privacy

1    laws.  And because of that, he can't -- we can't get his
2    ESI.  So even if he wanted to cooperate, we can't get it.
3    And here we can see this excuse from Mr. Suh.  This is his
4    declaration in the opposition, German and European data
5    protection laws and professional obligations.  IPCom
6    availed itself of this court.  They made the decision to
7    file here, and they should have taken steps to preserve Mr.
8    Frohwitter's ESI, segregate it from any of his other law
9    firm business, and get whatever permissions they need under
10   European data privacy laws, before filing this case, or at
11   least shortly thereafter.  And they didn't do it.
12        And I think this is important.  IPCom tells us that
13   his ESI, Mr. Frohwitter's ESI was intermingled with those
14   of his law firm's other clients on his law firm's e-mail
15   system.  So when we were talking about the Bosch and
16   Hitachi encumbrances earlier, it's clear that Mr.
17   Frohwitter intermingles the licenses and the correspondence
18   related to Hitachi and Bosch at his law firm files.  It's
19   also clear that he intermingles his ESI with his law firm
20   files.  But they tell us, IPCom tells us, this is where his
21   e-mails had always been during his years as IPCom 's
22   managing director.
23        And if we could slide back to slide 13, please, Mr.
24   Moreno, because we kind of brushed over this earlier, but
25   Mr. Frohwitter, IPCom tells us this, he always worked out

1        of his office at the Frohwitter firm, including for IPCom

2        matters when he was managing director.

3            Mr. Frohwitter's office -- again, this is in their

4        opposition, one of their supporting declarations, his

5        office is today, and always has been at the Frohwitter

6        firm.  He used his law firm e-mail address as his default

7        e-mail address for IPCom's business.

8            So if we could go back to slide 84, it doesn't seem

9        -- it strains credibility to say that it was unexpected

10       that the e-mails would be all on Mr. Frohwitter's law firm

11       server intermingled with all of his other files.  IPCom

12       tells us this is the way he'd done throughout the 13 years

13       he was IPCom's managing director.  There's no surprise

14       there.  And they should have gathered those e-mails and

15       segregated them however they needed to, before availing

16       themselves of this Court.

17           This goes to the question Your Honor asked us

18       earlier -- asked me earlier.  We didn't move to compel

19       IPCom to produce IP -- produce Mr. Frohwitter's documents.

20       Well, I think this is important.  This is IPCom's

21       opposition to the motion to stay that defendants and

22       intervenors filed early in this case, so defendants and

23       intervenors filed a motion to stay to permit us to seek

24       discovery from Bosch, Hitachi, and Mr. Frohwitter, both in

25       the U.S. and Germany and in Japan.

```
 1
 2              IPCom opposed that, and the Court denied that motion
 3      to stay, and we'll walk through the steps the Court did
 4      grant us.
 5              JUDGE GILSTRAP:  That was letters rogatory.
 6              MR. BUDWIN:  Correct.
 7              JUDGE GILSTRAP:  I'm aware of these steps.
 8              MR. BUDWIN:  But IPCom told us at the meet and
 9      confer, and in other discovery correspondence it cited
10      throughout the briefing, they didn't have access to Mr.
11      Frohwitter's documents or ESI, IPCom didn't have the
12      Hitachi or Bosch licenses.  They didn't have them.  And so
13      what we -- the decision that was made by the defendants and
14      the intervenors was not to move to compel IPCom to produce
15      documents that it claimed not to possess.  We accepted
16      that.  They told us that in the meet and confer.  They told
17      us that in multiple letters that are cited in the briefing.
18              So they tell us they don't have documents, there's
19      nothing for us to move to compel from them if they don't
20      have them.  And if they do have them, then they were
21      obligated to produce them, one, under the Court's discovery
22      order that requires them to produce the documents; and,
23      two, under the Court's ESI order where we made a specific
24      request for Mr. Frohwitter's ESI and were told IPCom didn't
25      have access to it.
```

1          So -- so they told us they don't have the documents,
2     our only resource is foreign discovery.  We moved to stay.
3     That was denied, but the Court did grant foreign discovery.
4     And, you know, we can talk about this, so this was the
5     docket -- 78 was the motion to stay, and 93 was the Court's
6     order denying.  That same docket 93 in July approved the
7     letters rogatory to Germany related to Bosch to get to
8     documents that maybe Bosch has in its files if it still has
9     copies of the licenses.  And the German court denied that
10    request.  This is docket 153.
11         So we were -- we moved the Court for letters rogatory
12    as to Bosch.  One of the custodians potentially had the
13    missing documents.  The Court granted that request.  The
14    German court denied that request.
15         IPCom tells us that Mr. Frohwitter's not in their
16    control.  They have no ability to get documents from him.
17    So we also asked the Court to send a second letter request
18    to Germany specific to Mr. Frohwitter.  The Court granted
19    that request in September.  We received -- and this is --
20    it should have the exhibit on here.  This is one of the
21    exhibits to the -- our brief -- received a letter addressed
22    to one of the McKool Smith attorneys in Austin from a
23    different German judge dated December 15th, '21, telling us
24    that we're not going to get any of Mr. Frohwitter's
25    documents, and he won't be compelled to sit for at least a

1       U.S. style deposition.

2           We also asked the Court for letters rogatory to

3       Japan, and no response has been received from that one.  So

4       the two German authorities as to Mr. Frohwitter and Bosch

5       denied the request, and the letters rogatory to Japan, no

6       response has been received as of today.

7           We also undertook domestic discovery of Bosch and

8       Hitachi's U.S. subsidiaries.  We filed a motion to compel,

9       so we subpoenaed Hitachi, and we filed a motion to compel

10      them to produce documents related to their licensing of

11      their patents, and the Northern District of Texas denied

12      that.  And -- or excuse me.  The Northern District of Texas

13      granted that request.  Our motion to compel Hitachi U.S.

14      was granted.

15          JUDGE GILSTRAP:  And it's to a subsidiary, and the

16      parent company wouldn't send them to the subsidiary.  I've

17      read all this.

18          MR. BUDWIN:  That's correct.  And so our position is

19      when IPCom tells us they don't have the documents, they

20      don't have the Bosch documents, they don't have the Hitachi

21      documents, and they don't have Mr. Frohwitter's ESI, we

22      went to the source.  There's nothing to move to compel from

23      IPCom with respect to any of those things because they've

24      represented clearly and unequivocally in meet and confers

25      and discovery correspondence, and even in their opposition,

1      they claim not to have access to these documents.  So we
2      went to the sources that claimed to have access to them.
3           Our position is that IPCom did have access to them at
4      points in time when these suits were reasonably
5      foreseeable.  In April of 2020, that's when they amend the
6      Hitachi agreement for the third time to remove the
7      pre-exiting cooperation requirement.  That's after they
8      send letters to AT&T and Verizon.  They're amending the
9      agreement.  They're talking to Hitachi, and they're not
10     securing access to any of the encumbrances, the
11     pre-existing encumbrances to the Hitachi's patents.  Then
12     they remove Hitachi's obligation to cooperate.
13          When we complain in discovery, they apparently asked
14     Hitachi, "Can we have permission for the Frohwitter firm to
15     release these documents to you?"  And Hitachi says no.
16     They were released from the requirement to cooperate after
17     litigation was foreseeable.
18          And as to Mr. Frohwitter, the agreement that -- the
19     restructuring agreement was consummated July 31st, 2020,
20     two months before these suits were filed, after years of
21     negotiation and knowing that he'd always conducted business
22     in the way that he did.
23          IPCom also makes an argument that the missing
24     documents and -- Mr. Frohwitter's documents, ESI and the
25     missing licenses aren't likely to be relevant.  I think

1        that strains credibility, at least as to Mr. Frohwitter,

2        given his key role in IPCom and his key role in proud

3        patents and Deutsche Telekom, but I think it's worth

4        talking about some of the preexisting Bosch and Hitachi

5        licenses that we were able to obtain.  We were able to

6        successfully obtain.

7             JUDGE GILSTRAP:  Mr. Budwin, we're going to have to

8        move this along.  You've been arguing for almost an hour.

9             MR. BUDWIN:  Yes, sir.

10            JUDGE GILSTRAP:  And this is our first motion.  And I

11       understand it's important, and I understand why it was the

12       first one out, out of the box, but we're going to have to

13       bring this argument to a close.  So try to get to your

14       remaining points quickly.

15            MR. BUDWIN:  I'm almost there, Your Honor, and

16       hopefully the other ones will go faster.  But we -- we

17       couldn't get the Nortel agreement.  Nortel was a bankrupt

18       entity.  We searched high and low for it.  We were

19       ultimately able to obtain it.  IPCom dropped their

20       allegations of infringement against Nortel equipment.

21            We have the AT&T license that is going to be argued

22       later, which we believe is a complete defense to at least

23       some of the parties in this case.

24            JUDGE GILSTRAP:  Which you got from IPCom.

25            MR. BUDWIN:  We got from IPCom and from AT&T's own

1    files.  It's the one agreement that both parties had, for

2    some reason.  It's still unclear as to why IPCom had the

3    AT&T agreement.

4         And I think there's one other one that's worth

5    highlighting.  It's the Samsung agreement.  This is one

6    that we were able to obtain also.  And Samsung was licensed

7    for its infrastructure business, and we believe that that

8    license is inconsistent with IPCom's damages claims in this

9    case.

10         And I want to talk about an example of one of the

11    agreements that we haven't gotten, and this is the Sharp

12    One agreement.  Okay?  So Sharp is a Japanese company, I

13    believe, or German company.  I can't remember.  It's one or

14    the other.  Japanese; right?  And they were granted by

15    Hitachi -- by Hitachi; right?  Let's see.  By Bosch.

16    Excuse me.  By Bosch, the exclusive right to grant licenses

17    under this '131 Patent family.  That's the '822 and '909

18    Patents-in-suit.  So Bosch granted Sharp the exclusive

19    right to sublicense Ericsson to practice two of the

20    patents-in-suit.  We have the summary because the purchase

21    agreement has a summary, but we haven't obtained the

22    license itself.  And we did subpoena Sharp's U.S.

23    subsidiary, and the U.S. subsidiary told us they had no

24    right to get documents from the parent, exactly as we saw

25    with respect to Hitachi.  IPCom asserts that this doesn't

1        matter, the fact that Ericsson is licensed -- or LG --

2        Sharp has the right to sublicense Ericsson to two of the

3        patents-in-suit.  They say it doesn't matter because

4        they're not accusing Ericsson equipment of infringing those

5        two patents.

6             First, it would be nice to get a clear representation

7        to that, but, secondly, even if that's true, the amount

8        that was paid for this sublicensing right is -- it has

9        bearing on the other parties in this case.

10            And with that, Your Honor, I'll heed your suggestion.

11       Thank you.

12            JUDGE GILSTRAP:  Let me hear from the plaintiff in

13       response.

14            MR. BLACK:  Yes, Your Honor.  May I just confer with

15       Mr. Plies, Your Honor?

16            JUDGE GILSTRAP:  You may.

17            MR. BLACK:  Thank you, Your Honor.  Martin Black for

18       IPCom.

19            JUDGE GILSTRAP:  Please proceed, Mr. Black.

20            MR. BLACK:  Thank you, Your Honor.

21            So this is a motion -- it's rather unusual both in

22       the requested relief and in the procedural posture.  It is

23       a motion for summary judgment for unclean hands.

24            Whether the defense of unclean hands applies in this

25       situation is a matter the Court would first have to decide.

1          Then you would have to decide the facts underlying the
2     motion, and ultimately, you would have to reach the intent
3     of IPCom as a matter of law, is what they're requesting.
4          We presented declarations from the IPCom employees
5     who were available to us who have explained all the things
6     described in the motion.  There are many disputed facts
7     here, and if there's going to be a bench trial on unclean
8     hands, that would normally succeed the jury trial in the
9     case.  But the arguments that are made by counsel here rely
10    ultimately, as they admit, on what was the intent of IPCom
11    just before the filing of the lawsuit.  Did they
12    intentionally hide evidence?  Come to this Court with the
13    intent to not be able to provide evidence to the Court?
14    And I submit that there is just no evidence of that.  It is
15    a conspiracy theory spun by counsel who gave a closing
16    argument, but this is a summary judgment motion.
17         You would have to find an intent on IPCom to destroy
18    evidence to decide this motion in their favor on summary
19    judgment.  And we have declarations from the IPCom folks
20    explaining everything.
21         Had this been dealt with in the more traditional
22    fashion of a Rule 37 discovery dispute, they would have
23    moved to compel, we would have created a clear record.
24    There are clearly underlying issues of German law involved,
25    what a lawyer can -- what a client can demand from their

1       lawyer.  Ultimately, it's about what is in the possession,
2       custody, or control of IPCom, and did they fail to provide
3       something that they had access to at one point, while in
4       anticipation of litigation, or whether they failed to take
5       adequate steps to obtain information as part of the
6       discovery process.

7           Your Honor would have issued an order, you would have
8       told us what the consequences would be if we didn't meet
9       it, and we would all know -- we would all know where we
10      stood.  We also would have had some explication of what was
11      actually important to this case, and there might have been
12      other ways to get some of that information, but that never
13      happened.  They waited until the end of the case, they
14      filed a summary judgment motion rather than going through
15      the motion to compel process.  But it's fundamentally
16      flawed from a procedural perspective because it depends --
17      it is asking you to skip the bench trial if there ever is
18      going to be one, on unclean hands, and rule as a matter of
19      law that the case should be dismissed.  As you said, the
20      death penalty.

21          So with that preface, I want to go back and go over
22      the actual facts of what happened with Mr. Frohwitter.  So
23      Mr. Frohwitter is a lawyer.  He's a German patent lawyer.
24      You saw his picture.  He is in his mid 70s.  He's no longer
25      associated with IPCom.

1        They put up a timeline, which I think is quite

2    helpful, because it shows almost 20 years of activity.  And

3    what happened is Mr. Frohwitter, he was working for Bosch

4    as their lawyer, and he founded FIPA.  And then he

5    ultimately formed a company to purchase the Bosch

6    portfolio.  That's in 2007, 15 years ago.

7        Now, it is not customary when a patent is sold for

8    the seller to provide all licenses to the buyer, because

9    the licenses always have confidentiality provisions in

10   them.  And the way they dealt with that here is that Bosch

11   provided summaries of the licenses that are actually in the

12   IPCom sales agreement so we can see what the basic terms

13   were, but not the licenses themselves.  If they provided

14   the licenses themselves to IPCom, there would have been no

15   need for the summaries in the agreement.

16       There's no evidence that IPCom had those licenses.

17   It's not even clear that Frohwitter's firm ever actually

18   had any of the licenses.  It is clear that whatever they

19   had, they held in trust as lawyers for Bosch and were not

20   permitted under their German law of attorney relationships

21   with clients, just as the United States, to turn over those

22   documents to IPCom.

23       IPCom never had possession, custody, or control of

24   the Bosch agreements.  Never, ever, ever.  And nothing that

25   happened in 2015 or 2018 or 2020 made any difference to

1     that.

2           Second, with Hitachi, the same thing happened.  Mr.

3     Frohwitter was representing Hitachi, he eventually acquired

4     those patents for IPCom.  This is back in 2007, 15 years

5     ago.  And I think it's fair that Mr. Frohwitter probably

6     had some of the Hitachi licenses, but he held them as

7     counsel for Hitachi.  He's not permitted under German law

8     to provide them to IPCom.  So he did not have the

9     documents, we had no ability to get them.

10          We heard over and over again about the supposed

11    change in the Hitachi relationship just before suit, as if

12    there was some conspiracy to prevent evidence from coming

13    to the court.  It's just the opposite.  I wish all that

14    stuff was here.  I wish Mr. Frohwitter had been willing to

15    cooperate after he left the company, but he wasn't happy.

16    He's not a happy man.  He's in his mid 70s; he does not

17    want to be involved in U.S. litigation.  He did say to us,

18    and we told the defendants that he is willing to sit for a

19    deposition under the protection of German law.  They will

20    allow depositions in Germany under the auspices of a judge,

21    and they filed a letters rogatory.  Rather than move for a

22    continuance so they could get that deposition, they've

23    moved to sanction us by dismissing the case.

24          The e-mails.  So for the license agreements

25    themselves, IPCom as a party, as an individual, never had

1        possession, custody, or control of them.  They were not

2        proved to IPCom, the company.

3              With respect to the e-mails, they sent us an ESI

4        request back to the middle of 2014, six years before suit.

5        There are no -- the transaction related to Deutsche Telekom

6        was in 2013.  These other licenses were before then.

7        There's no reason to believe any of those e-mails still

8        exist anywhere.  But if they did, they're outside their ESI

9        request.

10             When Mr. Frohwitter was working for IPCom, he

11       regularly copied other employees on the e-mails.  If he was

12       communicating with a licensee, like most people

13       negotiating, there's a team.  And his managing partner was

14       Mr. Frohwitter.  The other managing partner was Mr.

15       Schoeller.  Now, Mr. Budwin says, "Well, he wasn't the

16       lawyer, he was a business person."  Yes, he was the

17       business person.  The business person was Mr. Schoeller.

18       He was on the e-mails.  We had hundreds of e-mails that we

19       produced with Mr. Frohwitter's name on them because they

20       were in the e-mail boxes of Mr. Schoeller and Mr. Suh and

21       others.

22             When we went to look for the e-mails, we found

23       something that I had never seen in my life and in my life

24       in litigation, which shows the unusualness, shows that it

25       wasn't an intentional thing set up by IPCom to prevent them

1          from getting evidence, but it's just an oddity of life.
2          Sometimes this happens.  And what they did is they had 15
3          years ago probably, we don't know when, Mr. Frohwitter had
4          an IPCom address, and he had it auto-forwarded to his law
5          firm address.  And e-mails that went out under the IPCom
6          address, went back through the IPCom server.  It happened
7          that the e-mails that he sent out through the IPCom server,
8          they were stored.  But the IT person who set it up didn't
9          check the box, so the incoming e-mails, his copies of those
10         incoming e-mails, say from a licensee, weren't stored in
11         the e-mail box.  And that's been the same way for years.
12         For as long as we know.

13              So we went to look for them, but we realized we
14         didn't have them on his -- on the server.  But it wasn't
15         because anybody changed anything, anybody spoliated
16         anything, anybody did anything as part of his departure
17         from the company in his 70s because he no longer wants to
18         be in this business, some nefarious plot, none of that.
19         It's just a simple -- I don't even know if it was a
20         mistake.  It's the just the way it was.  We didn't lose any
21         of his e-mails.

22              Now, when litigation started, we asked for his
23         assistance, and he said, "I cannot produce documents that
24         belong to my other clients."  And how could it be
25         otherwise?  He did give us the Hitachi patent prosecution

 1        files which were transferred under the agreement to him as

 2        a patent lawyer, produced them to us, and we gave them to

 3        the other side.

 4            This idea that these licenses were in his possession,

 5        were hidden by us, whatever was in his possession was held

 6        in trust for his other clients.

 7            JUDGE GILSTRAP:  Let me ask you this, Mr. Black.

 8        When you and your firm were retained to bring this action

 9        on behalf of IPCom, as a part of your due diligence as a

10        lawyer, being an American lawyer, understanding the

11        expectations of American litigation, and even more

12        specifically, having litigated in this court before and

13        knowing what the Court's expectations were with regard to

14        discovery, did it ever occur to you that this was going to

15        be a problem somewhere down the road, and were there --

16        were there steps taken or attempted to be taken where you

17        said to all these German lawyers, "This may not be a

18        problem in Germany, but when we go file this suit in

19        America, we're going to be expected to come across with

20        some of this stuff"?

21            Did those discussions ever take place, or did you

22        just say, "Sign me up.  We'll go file the lawsuit, and

23        we'll cross all those bridges when we come to them"?

24            MR. BLACK:  Well, that's a --

25            JUDGE GILSTRAP:  I mean, I don't know what Mr.

```
 1          Frohwitter understood about American law.  I understand
 2          what your firm understood about American law.  And when you
 3          were looking at this case to bring, I assume you did due
 4          diligence as to where are the sources of discovery, and how
 5          can we have access to them, and how can we ensure that we
 6          can meet our obligations?
 7              Were there red flags that went up, or is it just red
 8          flags didn't go up?
 9              MR. BLACK:  So I have to be careful because you're
10          asking me a question --
11              JUDGE GILSTRAP:  I'm not asking you to violate
12          anything privileged.
13              MR. BLACK:  I understand.  I understand, Your Honor.
14          I have to answer -- I'm going to answer the question, I'm
15          just going to do it carefully because I've got their
16          privilege issues here.
17              So when we took over the case, which was very --
18          which was late in the day, I'll say, we identified the
19          sources of potential evidence, obviously, the e-mails.  We
20          did not know -- first time we learned that there was a
21          problem with the e-mail, with collecting e-mails from Mr.
22          Frohwitter was when we went to look at the server and after
23          we'd asked him to help produce his material, and he said he
24          couldn't do it.
25              He -- the relationship between IPCom and Mr.
```

```
 1          Frohwitter has deteriorated over time.  There's some
 2     animosity between him and the company at this point, and he
 3     is a -- I don't want to say disgruntled former employee,
 4     but he's a former employee who's -- who's not happy, and
 5     he, therefore, is willing to comply with his obligations to
 6     his -- to IPCom and to his client, but he's not been
 7     willing to go further than that.
 8          The question on this motion is whether or not IPCom
 9     bears responsibility for that.  And if so, what remedy
10     should there be.  People pass away, and their evidence
11     becomes unavailable.  People move to other countries, and
12     their evidence becomes unavailable.  People sometimes leave
13     their jobs and don't want to cooperate with their
14     employers.  And in this case there really is no prejudice
15     to the defendants.
16          The main thrust of the initial motion was based on a
17     false -- false statements to the Court about our ability
18     and our knowledge of and the fact that we had received
19     these licenses at IPCom back in the 2007 or -- timeframe
20     when the -- when the patents were transferred.  And that
21     just never happened.  IPCom never got the licenses.  And,
22     therefore, there's nothing that we could have done in 2005,
23     '10, '15, or '20 to -- to deal with the problem.
24          The e-mail's an issue, but there's no evidence that
25     any e-mails that are missing in the 2014 to 2020 timeframe
```

1      bear on the lawsuit.  He regularly copied other people at
2      IPCom, and we have those e-mails.  And even the e-mails
3      that were received by him and weren't stored, unless those
4      e-mails were sent only to him and not to Mr. Schoeller, the
5      business person, or Mr. Suh, the other managing director,
6      we have a copy of them.
7           So we don't know what topic there was -- there is,
8      whether there's an e-mail in the ESI request period that
9      could be missing or that could have anything relevant to
10     the case.  But there's no evidence that this was done out
11     of spite, a willingness to try to prevent the Court from
12     getting evidence.  We're frustrated as well with our former
13     employee Mr. Frohwitter, but that's the -- those -- that's
14     the situation.
15          Now, I do take serious exception to the argument made
16     that because Mr. Frohwitter was retired -- there's a
17     suggestion made -- was more of a jury speech, that Mr.
18     Frohwitter who was retiring from this business, this was
19     all some setup to trick this Court and to come here without
20     evidence, and I just really take exception.  I take
21     personal exception to it.  The man is in his 70s, he
22     doesn't want be in the patent enforcement business anymore.
23     He's a German citizen, he doesn't want to be involved in
24     U.S. litigation.  He has a right to retire.  And he had
25     some equity in the company.  I frankly doubt he'll get any

1   money out of this, but he is -- he is interested in that
2   sense.  But he doesn't want to turn the materials over, and
3   there's not clear that there is anything that's even
4   relevant to the case.  But the argument that the
5   restructuring of the company, that we restructured the
6   entire company and -- it's just nonsense.
7        On the Hitachi business, the idea that we
8   restructured the Hitachi arrangement prior to this case as
9   some means to hide evidence, that's also nonsense.  The
10  provision he read is almost verbatim in the 2014 agreement.
11  There's a 2014 agreement where Hitachi said, "We're not
12  going to be willing to get involved in the future," and
13  that provision was brought over almost verbatim into the
14  2020 modification.
15       But fundamentally, Your Honor, they've whipped up a
16  story that there's some massive scheme here to prevent you
17  from getting -- from the jury from hearing the evidence in
18  the case that's relevant, that IPCom are a bunch of liars
19  and cheats and manipulators, and it's just not right.  But
20  this is a summary judgment motion.  The predicate should
21  have been laid for some of this stuff in a Rule 37 motion,
22  and there's no basis for granting sanctions, let alone
23  terminating sanctions.  This also isn't the sort -- this is
24  also the sort of conduct which has to be dealt with under
25  Rule 37 which has a very clear path of the things that you

1    have to decide and the rulings that you would have to make

2    in order to issue relief, and then you have to issue the

3    minimum relief necessary to remedy any problem that you

4    see, rather than terminating sanctions.  It's not an

5    unclean hands defense.

6         Section 282 of the patent act defines what the

7    defenses are.  Unclean hands, this sort of defense that

8    they're talking about here, it's not an unclean hands

9    defense.  It's a Rule 37 issue.  It should have been raised

10   earlier.  But if we're going to have a -- if we're going to

11   have the issue play out at trial, it's going to have to be

12   decided by Your Honor under equity after the jury trial

13   when you can hear some evidence.  So summary judgment, it

14   just doesn't fit the bill.

15        JUDGE GILSTRAP:  Is it your view that there's a

16   formal unclean hands defense urged by defendants and

17   intervenors for a post verdict bench trial?

18        MR. BLACK:  Their motion is styled unenforceability,

19   and they cite the law for unclean hands, and that's

20   problematic because the unclean hands case, the Federal

21   Circuit cases, the U.S. Supreme Court cases, they don't

22   involve anything like this.  This is a discovery dispute.

23   Should have been brought under the discovery rules.  We

24   should have made a record about what German law is, about

25   what actually happened.  It's -- it's not -- if it's an

```
 1          unclean hands defense, that defense goes to Your Honor.  It
 2          is an equitable defense which would bar the action.  We
 3          say, and I'll say it clearly, that the defenses under the
 4          Patent Act are defined by Section the 282.  This is not one
 5          of them.  The unclean hands cases they refer to, they're no
 6          resemblance to this case whatsoever.  This needs to be
 7          analyzed under Rule 37, and they should have followed the
 8          Rule 37 procedure.  But if your -- no matter which way you
 9          go, Your Honor, you have to determine intent of IPCom that
10          there was some evidence that they had that they had an
11          intent to spoliate, and then you could issue a remedy.  And
12          there are many different remedies.  You won't even get
13          there, because they didn't intend to do anything here to
14          prevent this court from reaching a decision.  But most
15          fundamentally, they have denominated as a summary judgment
16          motion, which means you have to give all inferences in our
17          favor.  You can't possibly rule for them on intent, and
18          they've called it an unclean hands defense, and that's
19          where we are.
20               I think they didn't want to talk too much about Rule
21          37 because the obvious question is, Well, why do -- why
22          don't we lay some of the predicates for this with motion
23          practice?  I don't know, maybe Mr. Frohwitter would have
24          been -- if there'd been an order from the Court saying that
25          certain things under German law were preempted by the U.S.
```

```
 1          case, I don't know, there may have been issues that you
 2          could have resolved and which would have assisted
 3          everybody.  They could have asked for a continuance, by the
 4          way, if everything was so important with Mr. Frohwitter.
 5          Mr. Frohwitter's still going to sit for a deposition in
 6          Germany, as far I understand it.  They just haven't taken
 7          it yet.
 8               So they took a shot, but they denominated summary
 9          judgment for unclean hands.  They admit that intent is at
10          issue.  Can't find intent on this record -- or generally,
11          at summary judgment.
12               JUDGE GILSTRAP:  All right.  Thank you.
13               MR. BLACK:  Thank you, Your Honor.
14               JUDGE GILSTRAP:  Mr. Budwin, do you have anything new
15          that I haven't already heard you'd like to bring up?  I
16          don't want to just rehash the earlier arguments.  We don't
17          have time.  But if there's something you've overlooked that
18          hasn't been argued or presented, I'll hear it at this time.
19               MR. BUDWIN:  Your Honor, I think you've heard the
20          balance of the argument, and you understand the issues in
21          dispute.  The only thing that I would clarify is that we
22          did move under both Rule 37, and as I showed Your Honor
23          earlier, that has a prejudice requirement, and we're
24          entitled to some relief if there's prejudice; and then a
25          separate intent requirement if intent's found, as well as
```

```
 1          under the Court's equitable powers.
 2               JUDGE GILSTRAP:  All right.
 3               MR. BUDWIN:  Thank you.
 4               MR. BLACK:  Well --
 5               JUDGE GILSTRAP:  Go ahead, Mr. Black.
 6               MR. BLACK:  Only one thing.
 7               JUDGE GILSTRAP:  On the podium.
 8               MR. BLACK:  If it is a Rule 37 motion, how is it
 9          timely?  Discovery motions should have been in a long time
10          ago.
11               JUDGE GILSTRAP:  All right.  Counsel, I don't know
12          that I've ever had a motion quite like this presented
13          before, and I certainly don't recall ever having this kind
14          of a narrative presented in the guise or in the structure
15          of a summary judgment motion under Rule 56.
16               I'm going to deny the motion.  I don't see any way
17          under the constraints of Rule 56 I can find intent or
18          resolve what are clearly open fact questions on this record
19          with what I have.
20               This clearly is a discovery problem, and how it was
21          not further raised during discovery, I don't understand.
22          Movants say they didn't move to compel because they
23          believed plaintiffs -- that plaintiffs didn't have
24          anything.  Well, plaintiffs not having actual possession
25          but perhaps having means by which they could gain
```

1    possession in the future is one of the reasons you bring a

2    motion to compel and seek the support and available relief

3    the Court can perhaps fashion, given the unique

4    circumstances.  That didn't happen here.

5         I'll determine after a verdict's rendered whether

6    there's a proper basis upon which to conduct a bench trial

7    regarding the equitable defense of unclean hands.  There

8    seems to be some question about whether that's properly

9    been pled or raised in light of this, but that's not for

10   today.  I don't see any basis procedurally that I can grant

11   summary judgment here based on what I've been presented

12   with.

13        It's clear that there's nobody here happy with the

14   way Mr. Frohwitter has positioned himself, but I don't have

15   any direct evidence that that attitude and intent is one

16   that's visited upon and bound upon IPCom.  Certainly not

17   that would meet the narrow path open under summary

18   judgment.

19        So the motion's denied.  If this is a viable issue

20   for a post trial -- post verdict bench trial, we'll take it

21   up at that point, but it is not a motion I can grant under

22   summary judgment.

23        And, Counsel, quite honestly it's 10 minutes till

24   noon.  I don't know how we can take up another motion at

25   this point and not go well into the noon hour.

```
 1              Here's what we're going to do.  We're going to recess
 2       for lunch.  Ten minutes until noon.  We'll reconvene at
 3       12:45.  Court stands in recess.
 4         (Wherein a break was taken from 11:50 to 12:49 p.m.)
 5              JUDGE GILSTRAP:  Be seated, please.
 6              Counsel, we'll reconvene the pretrial conference in
 7       the IPCom vs. AT&T, et al., matters.
 8              With regard to docket No. 160, the defendants' and
 9       intervenor's motion to dismiss for lack of standing, I have
10       determined the outcome here based on the papers.  I don't
11       need to hear additional argument.  As a matter of fact, I
12       have a multi-page written order in at least a second draft
13       that should go out either today or tomorrow on this.
14              And the Court's ruling is going to be that this
15       motion is denied.
16              So we can skip over item 160 -- or docket No. 160,
17       and that will take us to intervenor's motion for partial
18       summary judgment of non-infringement based on license and
19       exhaustion.  This is document No. 172.
20              Let me hear argument from counsel on this.
21              MR. ACHEY:  Good afternoon, Your Honor.  Wes Achey
22       with Alston & Bird representing intervenor Nokia of America
23       Corporation.
24              JUDGE GILSTRAP:  Good afternoon, Counsel.  Please
25       proceed.
```

1          MR. ACHEY:  My understanding is that we should move

2      through these as quickly as possible, and I will do that.

3          JUDGE GILSTRAP:  We're going to have to.

4          MR. ACHEY:  I will do just.

5          JUDGE GILSTRAP:  You can assume I've read the

6      briefing, so if you want to start with the most salient

7      points, that would probably be efficient.

8          MR. ACHEY:  Yes, Your Honor.

9          Mr. Moreno, if you could just quickly go to slide 7.

10     This isn't in dispute, but this is just an overview of how

11     Nokia of America has a license stemming from the Hitachi

12     AT&T agreement.  That license flows from AT&T, which was

13     then Trivested to Lucent NCR, and the new AT&T goes to

14     Alcatel-Lucent to Nokia, and then Nokia of America

15     Corporation.  None of this is in dispute, but that is how

16     you get from a 1988 agreement between AT&T and Hitachi to

17     Nokia.

18         So if you could now go -- let's skip to slide 9,

19     please.  So let's first -- as Your Honor's aware, this

20     license agreement impacts two of the Hitachi patents, the

21     '261 and the '463, so I figure I should probably start by

22     explaining how those -- why those two patents are covered

23     by this license agreement.  And the reason they are is

24     because the -- both the -- go to slide 12.  Both the '261

25     Patent and the '463 Patent were filed in 1996, August and

1    December respectively.  And they were filed in Japan as

2    applications, and because of that, they meet the definition

3    of Hitachi patents which covers all Hitachi Patents that

4    were filed in any application around the world prior to the

5    end of 1996.  So they're covered by the license.

6         In addition, as you can see here, it's clear that

7    Hitachi was the owner of these patents when these patents

8    were filed in Japan.  You can see that Hitachi was

9    identified as the patent holder.  So there's -- these are

10   covered by the license.  The next question is whether the

11   accused Nokia-based stations are covered, and the answer to

12   this hinges on the interpretation of the, quote, of the

13   kinds language --

14        JUDGE GILSTRAP:  Okay.

15        MR. ACHEY:  -- that is in the license agreement.  And

16   so all the accused bay stations of the kind of the products

17   and services that were sold by AT&T prior to January 1st,

18   1993, that's the issue, and the answer is simple.  AT&T was

19   selling cellular base stations in 1990 -- before 1993.

20   That's undisputed.  The accused products are cellular base

21   stations.  That is the same kind of product.  That fact

22   alone should resolve this issue.  But if there's any doubt

23   about how broadly this license should be interpreted, I

24   think it's important that we look to the fact that three

25   different courts have construed this exact language.  And

1          not just this exact language, but this exact language from

2          licenses that were related to AT&T and Alcatel that

3          resulted from that Trivestiture that I mentioned earlier.

4                    JUDGE GILSTRAP:  Let me stop you, Counsel.  You've

5          got on the screen the High Point vs. T-Mobile case.  Given

6          that this is a per curiam opinion, given that it's

7          non-precedential on its face, how am I supposed to afford

8          this precedential impact or effect here?

9                    MR. ACHEY:  I don't know that you necessarily have to

10         afford it precedential effect, but I think it is very -- it

11         is clearly relevant to how to -- how this patent license

12         should be interpreted, because, again, it's dealing with

13         the exact same language, the of the kinds language, and

14         this is a patent license that was originated with AT&T.  So

15         the --

16                   JUDGE GILSTRAP:  I mean, if the Federal Circuit

17         wanted me to apply this kind of analysis and come to this

18         kind of result when of the kinds is used in the future, why

19         wouldn't they have made it precedential?  Why would it --

20         why wouldn't one of the three judges on the panel have

21         authored it and made it something other than per curiam?

22         It just -- it seems like to me it either has got to apply,

23         or it doesn't apply.  And in light of the clear intention

24         to make it non-precedential, and it being a per curiam, you

25         can't say it's informative but not precedential.  It's

```
 1            either going to be precedential and inform the court, or
 2            it's not precedential, and it really doesn't inform the
 3            court.  It looks like to me it's a binary choice.
 4                  How can it be something that I'm supposed to be
 5            guided by and informed by, and, yet, the Federal Circuit
 6            clearly intended it be non-precedential and wrote it as a
 7            per curiam opinion rather than one authored by any member
 8            of the panel that heard the argument?  That's my problem
 9            with High Point.
10                  MR. ACHEY:  Okay.  And I understand that, Your Honor.
11            I know it's -- I realize it's not precedential, but I do
12            think it's -- it at least sheds some light on the relevance
13            of the breadth of these claim terms.  And that's not -- but
14            that's not the only --
15                  JUDGE GILSTRAP:  Do you think it's appropriate to
16            brief this issue by citing a non-precedential opinion to
17            the Court?  I mean, you cite this in your briefing and make
18            a big deal out of it.
19                  MR. ACHEY:  I think it's appropriate to point the
20            Court to other licenses that have been interpreted, whether
21            precedentially or not, by other courts that have similar
22            language so that the Court can take that into account when
23            making its own determination of the scope of the patent
24            license.
25                  JUDGE GILSTRAP:  Again, I either take it into
```

```
1         account, or I don't take it into account.  There's not a --
2         there's not a middle ground here that I can see.
3              MR. ACHEY:  Okay.  Well, if you're -- if Your Honor's
4         inclined not to take it into account, there's still
5         additional evidence, undisputed evidence on the record that
6         shows the intent of how broadly this language should be
7         interpreted.
8              JUDGE GILSTRAP:  I'm happy to hear those arguments.
9              MR. ACHEY:  Okay.  If you -- we had -- so Mr. Bernie
10        Zucker, was a former AT&T lawyer.  He started in AT&T back
11        in the early '80s, so well before the 1988 agreement was
12        executed.  He was -- he's a retired individual.  He doesn't
13        -- he no longer works for Nokia, but he sat voluntary for a
14        deposition in this case.  He did not get any compensation
15        for his time.  He sat voluntarily.  And he testified at
16        pretty good length about how the purpose of this type of
17        language, this of the kind language was to protect what he
18        had called protect the business.
19              And the point that he was making in his deposition
20        was that you will always try to make sure that the current
21        products that were being sold by AT&T were protected, but
22        also future development products.  Products that were going
23        to be down the line.  And he specifically testified that
24        this is -- that this is the type of language that provided
25        that broad patent license.
```

1          And we have those -- his testimony can be found at

2     Exhibit N in our opening brief.  And so the only -- the

3     only evidence that we have of -- of the intent for how

4     broadly this patent license term should be applied is test

5     -- undisputed testimony from a lawyer that was working for

6     AT&T during that time that explained that that was the

7     purpose of this language, to grant a broad license so that

8     not just current products were being covered, but future

9     products.

10         And that makes sense, and that's -- the license

11    doesn't say products at the time of the license.  It

12    specifically uses the phrase of the kind of products that

13    are -- that are around during the effective date.  That is

14    purposely meant to be a broader license than simply saying

15    the products that are at issue at the time.

16         So the fact that the accused products are slightly

17    different, they're technologically advanced from the type

18    of base stations that were sold by AT&T in 1992, is

19    irrelevant.  They're still the same kind of products.  They

20    are still cellular-base stations that were sold in 1992,

21    and the accused products are cellular-base stations today.

22    And so the -- using the plain and unambiguous language from

23    the patent license itself, it leads to one conclusion, that

24    Nokia has a license.

25         JUDGE GILSTRAP:  I mean, if this were claim

1          construction, and the claim language were of the kinds, I'd
2          be expecting an indefiniteness argument.  I mean, you're --
3          you're satisfied it's just crystal clear, that it's not
4          subject to -- you know, a 2021 Tesla is an automobile; a
5          1932 Packard is an automobile, but there's a lot of
6          difference between those two.
7               I mean, is a base station a base station, a base
8          station, and it really doesn't matter if it's one from many
9          years prior in this kind of a context?  Is that your
10         argument?
11              MR. ACHEY:  I agree that at some point it probably --
12         the products get too different from what was around, but I
13         think given how broadly we know this type of language
14         should be interpreted based on Mr. Zucker's testimony, that
15         the fact that a base station is accused now and base
16         stations were around prior to '93, it does -- my opposition
17         is it does indeed correlate.  That should be covered by the
18         scope of this license.
19              JUDGE GILSTRAP:  If the Court finds that of the kinds
20         is unambiguous, doesn't that leave us with a fact question
21         for the jury to determine?  Here's a product that was in
22         existence at the time of the license; here's the product
23         today.  Does this product today fit within the unambiguous
24         parameters of other kinds?  Isn't that a fact question?
25              MR. ACHEY:  It -- perhaps it could be, but, again, I

```
 1          think, you know, this type of inquiry has been -- is ripe
 2          for ruling on summary judgment.  I mean, that's exactly
 3          what happened in the High Point case.  It was a motion for
 4          license and exhaustion on summary judgment grounds, and the
 5          language of that was determined to be broad enough to -- to
 6          not create a fact dispute, even though in that case the
 7          accused product at issue wasn't even invented at the time
 8          -- at the relevant time.  There was no such thing as a
 9          media gateway at the time of the license.  But still,
10          because it was broadly considered to be the same general
11          type of product, the same kind of product, it was subject
12          to summary judgment.  But, Your Honor, that's -- that's our
13          argument.
14                 JUDGE GILSTRAP:  Okay.
15                 MR. ACHEY:  It's broad enough to cover it, and the
16          patents fall within the scope of the license.
17                 JUDGE GILSTRAP:  Thank you.  Let me hear a response
18          from plaintiff, please.
19                 MR. BLACK:  Thank you, Your Honor.  I think you're
20          tipping me on the head.  It's a little bit like claim
21          construction.  Once you construe the claim, that leaves a
22          fact issue as to how to apply that claim against the facts
23          of the case.  We have competing expert testimony with
24          respect to what -- of the kinds meant to someone with skill
25          in the art at the time, and that creates a fact issue.
```

1          I can -- I can illuminate a little bit on the High

2     Point case because I happened to argue that motion in that

3     case, and I remember it very well because I walked into the

4     courtroom in Camden, sat down, and Judge Irenas, who was an

5     excellent judge, since passed, he comes out the door right

6     about the distance from here to the bench, and he stops in

7     the middle, turns around as all the lawyers rise, he

8     deadpans.  He says, "Ah, the patent lawyers have risen from

9     their coffins."  So I'll never remember -- I'll never

10    forget that one.  And the motion went downhill from there.

11         But the facts were -- the facts were quite different

12    in that there were -- the MGW at issue was a switching

13    system, and they had made lots of switching systems, and on

14    those facts, I think we probably would have had a trial

15    down here, but in the Third Circuit, maybe not.

16         But the fact of the matter is, we got a dispute about

17    whether the primitive analog cells that were being sold by

18    AT&T are the same kind as what's been made today, and it's

19    just an issue we have to let the jury decide.  Thank you.

20         JUDGE GILSTRAP:  Well, I have a sticky note to myself

21    up here on the bench I try to abide by.  I don't always

22    abide by it.  But in big bold letters it says, "Don't say

23    it."  Obviously, the judge in New Jersey didn't have such a

24    sticky note on his bench -- her bench, whatever.

25         I think there's a fact question here that prevents me

```
 1          from granting partial summary judgment.  I'm going to deny
 2          the motion.
 3               All right.  Next up is defendants' motion for summary
 4          judgment of ineligibility pursuant to 35 U.S.C. section
 5          101.  And this goes to and is directed towards the '822 and
 6          the '909 Patents.
 7               Let me hear from the moving defendants, please.
 8               MR. PANDYA:  Good afternoon, Your Honor.  Brian
 9          Pandya on behalf of the defendants.
10               JUDGE GILSTRAP:  Good afternoon, Counsel.  Let me
11          hear your argument, please.
12               MR. PANDYA:  This case is like many patent
13          eligibility cases where whatever the merits the invention,
14          the claims are too generic and too generalized.  Our
15          patents here claim sending a message, which courts have
16          consistently found to be an abstract idea.
17               Now, if we look at Claim 1 of the '822 Patent, but
18          this reasoning would also apply for the '909 Patent, the
19          claim -- what the claim recites is sending an SMS message
20          according to a known SMS standard.  You have a message with
21          a header and a data portion, you have identifying
22          information inside the data portion.  That's it.
23               Now, it makes no difference for patent eligibility
24          whether the identifiers are used to identify an MMS message
25          or even if the messages are formatted.  Those are field
```

1    abuse limitations.  But as the Federal Circuit, and frankly
2    the Supreme Court has held, a narrow abstract idea is still
3    an abstract idea.  You're still sending data in the known
4    data format.  So I think what we're missing here is there's
5    just no addition to the abstract idea.  If they'd invented
6    a new message format or a new way of sending an MM -- an
7    SMS message, perhaps the arguments would be different here.
8    But that's what distinguishes our case from cases like In
9    Fish or Packet Intelligence, and puts it into the realm of
10   cases like Prism Intellectual Ventures, Drop Box, and the
11   numerous other cases which Your Honor is well-familiar
12   with, dealing with patent eligibility.
13        So we would ask that -- again, I'm happy to get into
14   specific questions, but we would ask that the Court find
15   these claims to be abstract.  And then on the second point,
16   again, what we're talking about here is sending of --
17   sending of a message in a known data format, and there's
18   also not enough to get over the second step of the patent
19   eligibility analysis here because everything that the
20   plaintiffs are pointing to as the benefits of the invention
21   flow from the abstract idea itself.  And, you know, the way
22   IFM will look at these cases when I'm thinking about patent
23   eligibility is are we trying to take a narrower slice of
24   the pie, or are we adding to the pie here.  And the claims
25   here are slicing up the pie in a more narrow way, but they

1    do not change the fundamental nature of the -- of the
2    claimed invention.
3         JUDGE GILSTRAP:  Let me ask you this, Counsel.  I
4    worked my way through law school working for a common
5    carrier, trucking company, and we had big trucks and little
6    trucks.
7         MR. PANDYA:  Sure.
8         JUDGE GILSTRAP:  And rather than send the big truck
9    that was going out of town for a distant delivery to five
10   different locations in the area to pick up the various
11   parcels and cargo that we're going to make the entire load,
12   the little trucks went out and got those and came back and
13   loaded the big truck, and then the big truck left.
14        MR. PANDYA:  Yep.
15        JUDGE GILSTRAP:  It seems like to me, in a very
16   analogous way, that's what these claims are directed to.
17   Rather than sending the big message back and forth and back
18   and forth, it sends the little message and picks up the
19   pieces to send the big message once.
20        Now, if that analogy is anywhere close to being
21   accurate, why isn't that a material improvement on the
22   process that keeps this from being directed to a purely
23   abstract or a primarily abstract concept?
24        MR. PANDYA:  Yeah, let me address that in -- first in
25   lay terms and then put it against the Federal Circuit case

1        law.

2              First of all, I don't think the analogy of using a

3        big truck or a little truck is what survived under Alice.

4        That is, I think, an abstract idea, the method of

5        organizing human activity.  That was -- that was the type

6        of -- for lack of a better word, a commerce patent that

7        would not be protectable under the Federal Circuit case

8        law, so I actually like that analogy, but if -- if --

9              JUDGE GILSTRAP:  Yeah, it's an analogy.  It's not an

10       interpretation of the language.

11             MR. PANDYA:  Right.  But I think if we -- I'll give

12       the more technical answer now that if we look at what the

13       claim is claiming here, our problem with the claim for

14       patent eligibility purposes is that what is being claimed

15       here is using a known data format.  There's no dispute from

16       plaintiffs from the text of the patent itself if we look at

17       columns 1 through 4 that SMS message formats were known.

18       So what is being -- what is being claimed here by the

19       patent is a known format of sending data, just as it's

20       known to you as a big or small truck.  That may be clever.

21       That may have some other usefulness, but that does not make

22       the idea less abstract.

23             And then the third point I would make to that -- to

24       that -- you know, to the analogy is, now whether -- whether

25       that is, in fact, inventive, that may help on the second

1    step, but that does not make the patent any less abstract.
2    The claims here are still drawn.  Whether it's drawn
3    broadly or narrowly, drawn to the idea of sending -- of
4    sending data in a known format, sending an SMS message
5    which existed as of -- as of the filing of these patents 20
6    plus years ago.
7         JUDGE GILSTRAP:  So you think my overly simple
8    analogy may have some application to step 2 but not to step
9    1.
10        MR. PANDYA:  Correct.  If it has, I think it's
11   actually helpful to the step 1 analysis because it shows
12   the -- in many respects the simplicity or the abstractness
13   of what is -- of what is -- you know, when we -- when we
14   look critically at the claim language of what is actually
15   happening here.
16        JUDGE GILSTRAP:  What else do you have for me?
17        MR. PANDYA:  Happy to take any questions, but I'm
18   mindful of your admonition to move these along here, so I
19   will end my time.
20        JUDGE GILSTRAP:  Let me hear from the plaintiff.
21   Thank you.
22        MR. PLIES:  Your Honor, Jeff Plies for IPCom.  So at
23   the time that the invention is being conceived in late
24   1999, the inventors recognized that there was problem with
25   the state of MMS development that was undergoing

1    development in the industry.  They recognized that there

2    was sort of two different classes of messages, MMS

3    messages, that would need to be sent.  There were what were

4    called notifications or overhead messages which tended to

5    be short, and then there were what were called actual user

6    messages.  Those are the long messages that contain the

7    actual video or audio content.  And the inventors

8    recognized that those two disparate classes of MMS messages

9    may need different types of transmission schemes in order

10   to optimize the overall telecommunications network.

11         Now, their solution to that problem was not abstract.

12   It was actually a specific implementation, a specific

13   solution.  And I think it's helpful to look at the claim.

14   So putting up claim 1, Your Honor, the preamble, we're

15   talking about a method from transmitting messages in a

16   telecommunications network.  And when we go to the first

17   body limitation, and I'll read to the second comma,

18   "Sending a message of the dedicated first group of messages

19   of the first message service using a short message of the

20   second message service."  There's actually a lot of

21   specificity in that very first limitation.  Like, there's

22   at least four things that are very specific about it.

23         First of all, when we're talking about the first

24   message service, that's not any message service, it very

25   specifically has to be an MMS multi-media message service.

1    We know that because if you look at the penultimate Wherein
2    clause, it says that the first message service is MMS.
3        The second thing to note is that message of the first
4    dedicated first group of messages, that can't be any MMS
5    message, it has to be selected from the messages that are
6    listed in the last Wherein clause in yellow.  You'll see in
7    that wherein clause in yellow there's nine particular MMS
8    messages that can be sent, and that first body limitation
9    says, "I have to select one of those nine."  So that also
10   increases the specificity of solution.
11       Third, Your Honor, is that this Court construed that
12   first claim element to mean that the message has to be
13   formatted according to the first message service.  In other
14   words, a native message of that service selected from among
15   the dedicated first group of messages.
16       You may recall, Your Honor, during the Markman
17   process, that during prosecution there was a bunch of prior
18   art where there were short messages that were sending
19   information about MMS messages that were somewhere else but
20   did not actually contain the MMS message itself.  And in
21   distinguishing that art, we ended up with this construction
22   that you actually have to have the native formatted message
23   in there.  So that's the third thing that narrows that
24   first claim element.
25       And then the fourth thing that narrows it is you're

1      sending it in a short message of a second message service.

2      Again, that's not any message service.  As we see again in

3      the penultimate Wherein clause, that's specifically an SMS

4      message service.  So there's a lot of specificity right off

5      the bat in every first claim element.

6            And then as we continued on, it says that the short

7      message being provided with a header portion and a data

8      portion, you see that in the figure to the right.  And then

9      it goes on to say that in that data portion, we're going to

10     include an identification of the type of the message of the

11     first message service.

12           So now I'm introducing the concept that I have to

13     include a type identifier, and that type identifier has to

14     identify the type of MMS message.  And in addition, I can't

15     put that identifier anywhere -- it can't go in the header,

16     it has to actually go in the data portion.  So that also

17     makes the claim more specific.  It says, "particular

18     implementation."

19           If we move on to the next claim element, wherein the

20     short message includes an identifier in the data portion

21     for indicating a presence of the message, the first message

22     service in the data portion.  So now I've introduced the

23     concept of having a second identifier, this time to

24     indicate the presence of an MMS message.  That MMS message

25     must be in the data portion.  It can't be in the header.

 1         And, also, that identifier also can't be anywhere.  It has

 2         to be in the data portion.  It also can't be in the header.

 3         And then it goes on to say Wherein that identifier is

 4         distinct from the message, the first message service.  So I

 5         have to put both the MMS message and that second

 6         identifier, both of them in the data portion, but they

 7         can't be the same thing.  They have to be distinct

 8         entities.  Right?  So you can see this claim is, you know,

 9         quite specific when you actually start analyzing the claim

10         elements.

11              JUDGE GILSTRAP:  Well, specific may not be the same

12         thing as abstract.  Is it your position that this is

13         directed to an abstract concept and just happens to be

14         additionally novel and adds some inventive step, or is it

15         your position that it's directed to a nonabstract concept

16         to begin with, and we don't get to step 2?

17              MR. PLIES; Your Honor, it's our position that it is

18         not abstract, and the inquiry should end at step 1 of

19         Alice.  In the alternative, at the very minimum, there's a

20         claim here to the inventive concept, and at least fact

21         disputes relating to whether the claim elements were, you

22         know, conventional in which summary judgment can't be

23         granted.

24              JUDGE GILSTRAP:  Give me your best argument that it's

25         not abstract.

1          MR. PLIES:  Well, for one thing, on the slide I just

2     put out, it's clear that it's -- what the claim is

3     providing for is a definite improvement in the

4     functionality of the operation of the telecom network.

5     And, of course, as we know from the case law, that's an

6     important consideration in determining whether or not the

7     claim is abstract or not.

8          And we see repeatedly in the specification that they

9     talk about optimizing the transmission scheme by sending

10    this MMS message in the SMS, and it's explained there on

11    the left hand of the slide where the inventors explain the

12    specification that if we did not send the short MMS

13    messages using SMS in accordance with the invention,

14    instead they would have to be sent using one of these other

15    line oriented transmission schemes such as GSM, GPLS, or

16    UMTS.  And the problem with having to do that with -- was

17    because that those other transmission schemes required a

18    lot of setup overhead.  And by instead sending the MMS

19    messages using SMS, I could dispense with all that overhead

20    in setting up those line oriented connections.

21         And then the spec goes on to say that that enabled

22    reliable transmission of these dedicated group of MMS

23    messages, and because you're making use of that existing

24    SMS infrastructure to send those MMS messages, you don't

25    have to invest in additional signaling equipment for them.

```
1            So that's a big, you know, cost infrastructure issue.

2                 And, again, SMS was known to be a bandwidth-friendly

3       transmission scheme, and so that could be now applied to

4       this dedicated group of MMS messages.  So I think when you

5       look at the claim, you look at the elements they're -- the

6       claim elements are specific about what has to be included,

7       where it has to go, and then all of this culminating in an

8       invention that provides these improvements to a telecom

9       network shows that the claims are not abstract.

10                And then we also know that in the analysis for Alice,

11      mostly in step 2, but also to some extent in step 1, that

12      the claims have to be, you know, an advancement over the

13      prior art and not well-known or conventional.  Well,

14      there's at least two claim elements that we presented in

15      our briefing that not only were not well-known, they

16      weren't known.  So that very first element that we talked

17      about, the sending of a message to the dedicated first

18      group that the Court construed, the board during the

19      examination relied upon that element as distinguishing all

20      the prior art that was asserted during the reexamination.

21      And then similarly, Your Honor, in this case, Dr. Chrissan,

22      our invalidity rebuttal expert, he's looked at all the

23      prior art the defendants have brought in this case, and his

24      position is that none of them teach that limitation.  So

25      not only during reexamination did none of the references
```

1          teach that claim element, descending claim element, but nor

2          did any of the new references that the defendants have come

3          up with.

4              And then similarly we went through those

5          identification limitations, and in particular the type ID.

6          During prosecution, again, the patentee pulled it out to

7          the examiner and to the board that the novelty in allowing

8          the patents is in the specific implementation details from

9          inventing the MMS and identifying the MMS messages as such.

10         Not the general notion of imbedding one type of message

11         within another type of message.  And, again, Dr. Chrissan

12         has looked at all the art that the defendants rely upon,

13         Your Honor, and in his opinion, none of them teach this

14         claim element.

15             So whether you look at the claim as a whole or

16         whether you even look at individual elements of the claim,

17         we have expert opinions in this case that none of that was

18         known, none of it was certainly well-known.  These were

19         certainly an advancement over the prior art providing

20         improvements to the operation of the telecommunications

21         network.

22             So, again, at a minimum, you know, we think the

23         analysis ended at step 1.  This is not abstract.  And,

24         again, you know, obviously you have to be cautious

25         comparing one case to another because the claims are always

1          very different, but I think if you look -- stack our claim

2          up against, you know, claims that have been found to be

3          abstract, our claim does not really fall under that class.

4          It definitely falls more into the class of the claims that

5          the courts generally uphold as being not abstract and a

6          specific implementation.

7              JUDGE GILSTRAP:  So you think this falls in the

8          progeny of something like In Fish?  Is that what you're

9          arguing?

10             MR. PLIES:  Yes, Your Honor, In Fish or Packet

11         Intelligence, and even the Intellectual Ventures case, Your

12         Honor, that they rely upon out of Delaware, there was some

13         multimedia messaging claims that were invalidated in that

14         case on 101, but those claims, if you just look at them,

15         are, you know, clearly a lot -- very abstract.  But in the

16         very same opinion, there's claims that are a little bit

17         more specific that I think more reasonable our claims, that

18         the same court upheld as being eligible under 101.

19             JUDGE GILSTRAP:  All right.  Thank you, Counsel.

20             MR. PLIES:  Yes, Your Honor.

21             JUDGE GILSTRAP:  Anything further?  Let me rephrase

22         that.  Anything new further?

23             MR. PANDYA:  Well, I want to make one point, and I

24         think Mr. Plies said that SMS was very bandwidth -- was a

25         very bandwidth-friendly scheme, which if that is true, all

```
 1          the -- all of the gains and functionality, or all the gains
 2          and efficiency they're pointing to flows from that purpose,
 3          but that is the abstract idea.  If we take a look at, for
 4          example, figure 4 and 5 of the -- of the '822 patent, that
 5          is prior art, but that's also the structure of this claim.
 6          So I think in essence what they're saying is, just to go
 7          back to your analogy which I really like, is that saying
 8          that by using a small van you save gas or you save diesel,
 9          well, that's -- that's why you're using the small van.
10          That doesn't mean you've invented the small van.  And just
11          like that in this case, you're using a known format to send
12          -- to send messages, and the fact that you may add extra
13          details about you stack boxes, you stack dry goods, you
14          stack clothing in the van, that does not change the nature
15          of the claim.
16               JUDGE GILSTRAP:  Well, I mean, I agree that it's an
17          improvement in -- it's a cost savings, and the claim
18          language here seems to recite a specific method for
19          reducing overhead in the communications network.  And when
20          that's put forward for the first time, that's something new
21          and novel, and it's not just a reordering of heretofore
22          theretofore known processes and steps.
23               What's your response to opposing counsel's argument
24          that this falls within something like the progeny of In
25          Fish or Packet Intelligence?  Why would it not?
```

```
 1              MR. PANDYA:  Well, I think what would distinguish,
 2         and I actually agree with counsel, but we have to be
 3         careful because the claims at every case are different, and
 4         we all know from the Alice case law that you can -- you
 5         know, there's --
 6              JUDGE GILSTRAP:  I don't know what we know from the
 7         Alice case law.  I know what we don't know, but I'm not
 8         sure what we do know.
 9              MR. PANDYA:  I think that the fundamental difference
10         between On Fish and a Prism Technologies and in this case
11         is that in those cases they invented a new type of a new
12         data structure or a new way of sending a message.  Here,
13         they are re-slicing the way of sending an SMS message or
14         repackaging the existing SMS messaging structure.
15              Now, of course, defendants would argue that that's
16         not -- that in of itself is not new or novel, but that's
17         not a question for patent eligibility.  The question is,
18         are we taking the same idea and just repackaging it in
19         another way?  Those might be great arguments to address on
20         step 2 of the claims as to whether -- whether there is
21         something new here, whether they're actually adding to the
22         abstract idea, but what this patent is fundamentally drawn
23         to is taking a message, loading it with -- loading the data
24         portion of the message with identifying information.  That
25         is sending an SMS message.
```

1          Now, what you do with it, the benefits of that, that
2     may all go to step 2, but this is not like In Fish or Prism
3     -- or Packet Intelligence where you're actually coming up
4     with a new -- a new type of message.  This is more like
5     Intellectual Ventures, more like Drop Box, more like the
6     Prism case where you're taking an existing scheme, an
7     existing technology, and adopting a new -- or putting --
8     putting an allegedly new use or a clever way of using the
9     existing technology.
10    JUDGE GILSTRAP:  Well, let me ask you this, Counsel.
11    You seem to be telling me that it's not directed to an
12    abstract concept, but you seem to be telling me in the same
13    breath all these other questions create fact issues as to
14    whether it is new and novel on step 2, which still
15    prohibits me from granting your summary judgment motion on
16    101.  I mean, is there a basis you see for me to grant the
17    motion?  Sounds like to me you're saying it's directed to
18    an abstract concept, but you're admitting that even if it
19    is, there are questions that are open about whether it is
20    or is not well-known and conventional or whether it's new
21    and inventive.  Okay.
22         So I mean, we get to the same end result either way,
23    don't we?
24    MR. PANDYA:  Well, I don't think so.  First of all,
25    that's not my -- if that's -- that's not meant to be my

1          argument, but I think even if that is how you're receiving

2          the argument --

3                    JUDGE GILSTRAP:   That's what it sounds like to me.

4                    MR. PANDYA:   -- you could grant summary judgment on

5          step 1, and then step 2 would go -- would go to the --

6          would go to the jury that these claims are drawn to an

7          abstract idea.   I think that has been done in other cases

8          that we've cited in the briefs, including, I think, the

9          Kaifi case.   But I think what makes this case different is

10         that every benefit that they're claiming from the patent to

11         the invention flows from the abstract idea itself, and

12         that's a ruling that Your Honor can make as a matter of

13         law.

14                   Your Honor can find that the benefits here of what

15         they said was reduced -- reduced overhead or reduced

16         bandwidth, well, that's a function of using -- according

17         their allegation, using an SMS message.   But that is the

18         abstract idea.   So I think Your Honor can resolve this on

19         step 2 as a matter of law based on Your Honor's claim

20         constructions, based on how the alleged benefits tie to the

21         claim language.   But I think at minimum Your Honor can find

22         that this is drawn to an abstract idea of using SMS

23         messaging using a known data format to send messages.

24                   So I think at minimum that can be resolved on summary

25         judgment to narrow the issues that then go to the jury.

```
 1            JUDGE GILSTRAP:  All right.  All right.  Thank you,
 2       Counsel.
 3            With regard to Document 174 and defendants' motion
 4       for summary judgment regarding 35 U.S.C. Section 101, I'm
 5       going to deny the motion, but I'm going to carry the
 6       precise ruling of the Court.
 7            In my view, this is either directed to a nonabstract
 8       concept and survives step 1, or if it is directed to an
 9       abstract concept, it clearly raises fact questions about
10       whether it is well-known, conventional, or otherwise.  And
11       so I think as far as finding it ineligible, I'm going to
12       carry -- I'm going to deny that because I think it's a deny
13       either way.
14            Given the less than clear landscape that we all live
15       within in the area of 101, I'm going to consider the
16       arguments made, and you can expect a subsequent ruling in
17       writing from the Court, either concluding after further
18       reflection that it is directed to a nonabstract concept, or
19       finding that if isn't, that there are unresolved fact
20       questions as to step 2 that require a denial of the request
21       that the Court find is ineligible for patent protection as
22       a matter of summary judgment.
23            And I'll get you a ruling as to which of those two
24       paths the Court goes down, but either one of those paths
25       leads me to ultimately deny the requested relief that the
```

1          defendants are seeking.

2                All right.  Let's go next to plaintiff's motion to

3          strike the expert reports of John Bone, the defendants'

4          damages expert, and other related topics.

5                Let me hear from the moving plaintiff, please.

6                MR. BLACK:  Thank you, Your Honor.  Mr. Black for

7          IPCom, again.

8                JUDGE GILSTRAP:  Please proceed.

9                MR. BLACK:  Thank you.  We have an interesting motion

10         here.  I prepared a set of slides, but there are only three

11         of them.  And let me just get right to it.

12               So Mr. Bone's report is quite unusual because it

13         hypothecates a negotiation not with the carriers, AT&T and

14         Verizon, but with suppliers who intervened in this case.

15         And so to analyze whether that's correct or whether there

16         should be a change in the law, which is what they are

17         asking for, we need to start with first principles.

18               And the first principle comes directly from Congress

19         in Section 284 which says, "Upon finding for the claimant

20         the court shall award the claimant damages adequate to

21         compensate for the infringement, but in no event less than

22         a reasonable royalty for the use made of the invention by

23         the infringer."

24               Now, we speak all the time about a reasonable

25         royalty, and we use that in these cases.  It's never had to

1        be said before, but the statute said it, the infringement
2        has to be adequate to compensate for use made of the
3        invention by the infringer.  Not by the infringer
4        suppliers, affiliates, but by the infringer.

5             How do we resolve that question?  In the 1920s or so,
6        1930s, the Georgia-Pacific case came through and said,
7        Well, one way to do that would be to use as a matter of
8        economics a hypothetical negotiation where we assume a
9        number of things which are not real world, but what would
10       have happened had we tried to have a real licensed
11       negotiation rather than a litigation.  And in that
12       contra-factual world, we have the patentee who's a willing
13       licensor and willingly sits down at the table to negotiate
14       in good faith.  We also have the infringer.  Infringer
15       appears in the room, sits down at the table and negotiates
16       as a willing licensee.

17            We can consider the factors under Georgia-Pacific.
18       Other licenses that the plaintiff had, other licenses that
19       the infringer had.  The profits of the infringer.  What the
20       benefits were to the infringer.  All those things create a
21       new economic reality from which we discern or do our best
22       to determine what a reasonable royalty would have been that
23       the infringer would have paid.

24            JUDGE GILSTRAP:  By the way, Georgia-Pacific vs. U.S.
25       Plywood's out of the Southern District of New York in 1970.

```
 1              MR. BLACK:  I thought it was a lot earlier than that.
 2      Okay.
 3              JUDGE GILSTRAP:  Obviously you did.
 4              MR. BLACK:  I didn't know what you were looking up,
 5      but I knew I was wrong about something.  Okay.  The
 6      principles are much older though.  The principles of using
 7      expert witnesses and -- goes back to setting royalties back
 8      in the equity court.  That's what I was thinking of.
 9      Anyway, it's well-established law either way, and we know
10      how do to that.
11              This motion is quite pernicious because it would
12      allow a defendant who made trillions of dollars using our
13      technology to substitute a supplier and then tie his hands
14      behind his back and say, "Oh, go look at somebody else's
15      situation."  It would be like someone gets in a car
16      accident and says, "Well, I don't have to pay," or "I only
17      have to pay what my insurer indemnity would be willing to
18      pay under the circumstances."  That's just not how the
19      statute's set up.  It's contrary to case law.  It's a new
20      test case, I think that they are sending, trying to send up
21      to the Federal Circuit.  And if the Federal Circuit's going
22      to change the law, they should change the law.
23              JUDGE GILSTRAP:  Let me ask you this, Mr. Black.
24      Aren't the asserted claims here method claims?
25              MR. BLACK:  Yes, Your Honor.
```

```
 1              JUDGE GILSTRAP:  How does a manufacturer who sells a
 2       product avoid falling in a category where it would be
 3       expected they'd be apparatus claims instead of method
 4       claims that were infringed?
 5              MR. BLACK:  Well, in this case -- so there's a method
 6       claim, and they employ the method using equipment and
 7       generate revenue and profit on that basis.
 8              JUDGE GILSTRAP:  Let me say it another way --
 9              MR. BLACK:  Okay.
10              JUDGE GILSTRAP:  -- and perhaps a little more
11       clearly.  This case is not about Nokia or Ericsson
12       infringing the asserted claims because they make the bay
13       station product as an apparatus; correct?
14              MR. BLACK:  That is right.
15              JUDGE GILSTRAP:  Okay.
16              MR. BLACK:  That's right.  And actually, the second
17       slide I had of my three slides is a depiction of the AT&T
18       network, a high level depiction.  This -- and on the left
19       we have the MMSC.  That sends out MMS messages.  And on the
20       right we have the SMSC which sends out the SMS messages.
21       And as we've conveniently had the 101 discussion on these
22       patents a moment ago, Your Honor will know that these have
23       to coordinate together.
24              Now, it happens, then, the AT&T system, the switch on
25       the right, the MMSC is made by Nokia, and that in that same
```

1   system the switch on the right -- I'm sorry.  The switch on
2   the right is made by Mavenir, the SMSC, and on the left
3   Nokia is the MMSC.  And AT&T buys these pieces of equipment
4   from different manufactures, puts them together in the
5   system, lots of other connections, interconnection, then
6   they run a service and send trillions of messages and make
7   a lot of money.
8        So the infringement here is based on the use of the
9   method, and it's wrong conceptually to talk about the sale
10  of the equipment as being relevant to damages.  But it also
11  -- even if you were to accept this new principle that they
12  are proposing, it wouldn't work in this case because AT&T
13  is the one who put the equipment together from different
14  manufacturers.  And Mavenir who's one of the key equipment
15  suppliers here isn't even mentioned in Mr. Bone's report.
16  So he's constructed a negotiation that involves for this
17  patent Nokia only, not AT&T, not Nokia and Mavenir.  It
18  just doesn't make any sense on the facts.
19       Now, to be clear about what they've done in the
20  briefing, they've kind of tried to shift focus a little bit
21  and say that, Well, Ericsson and Nokia would be at the
22  table.  I'm not sure what that means, but it doesn't change
23  the fact that AT&T is the decisionmaker.  And just to be
24  clear about what he did, this is his report, it's paragraph
25  198.  It's a paragraph in every damages report that says

1          who the negotiation is between, and here they say -- Mr.

2          Bone says the negotiation would have been between, one,

3          IPCom, a willing licensor; and, two, Ericcson/Nokia, as

4          willing licensees intervening on behalf of their customers.

5          That's just not the law.

6               Ericsson and Nokia got to intervene and -- into this

7          case the rules of procedure allow them to do that, but they

8          can't change the negotiator.  And why I say it's pernicious

9          is because what happens now when you go through the GP

10         factors, things like the value to the infringer are

11         completely different because you have different people

12         talking about the value to them.  And Mr. Bone used that

13         construct throughout his report and did the whole report

14         from the standpoint of Ericsson and Nokia rather than from

15         the infringer, and that's just wrong.

16              Now, there was a case that came out, a Cal-Tech case

17         that they rely on their sur-reply brief.  We haven't had a

18         chance to respond to that because we didn't have further

19         brief.  It's completely different.  Cal-Tech was at the

20         negotiation.  The Federal Circuit repeated the language

21         that the negotiation is with the licensor.  They

22         constructed a pretty bizarre, frankly, situation where

23         Apple and Broadcom were sued together, and that Broadcom's

24         chips in Apple phones would be negotiated only with Apple

25         but not with Broadcom.  Federal Circuit said that was

```
 1          contrived.  It was.  The Federal Circuit never said it was
 2          appropriate to remove Apple from the negotiation.  Quite
 3          the contrary.  That would require a change in binding
 4          Supreme Court law.
 5               So, look, what they've done here is they've tried to
 6          set up some sort of test case.  If there's going to be a
 7          change in the law, then that's got to come from above and
 8          not here.  And I also point out that I do believe it's
 9          going to be a major theme of their case that somehow
10          Ericsson and Nokia are the real defendants and not the ones
11          who actually benefitted from using our invention.  And we
12          just think it's inappropriate.
13               And while it's rare, this is the case where they've
14          made an intentional decision to go down this road to set up
15          the negotiation improperly and knowingly, and the only
16          option here is to strike the Bone report.
17               JUDGE GILSTRAP:  You're talking about the damages
18          report.
19               MR. BLACK:  On damages.  He has a second report
20          relating to the Hitachi license where all he's really doing
21          is spitting out the terms of the agreement, and he's acting
22          as a -- kind of a -- really, a lawyer getting on the stand
23          to interpret an agreement that he has no special expertise
24          in, and that shouldn't be permitted either.  That's for
25          closing argument.  He doesn't have any expertise in
```

```
 1          interpreting what of the kind means, he's not technical.
 2          He doesn't have any expertise in analyzing the
 3          negotiations.  He wants to discuss, for instance, testimony
 4          from Mr. Zucker.  Well, if Mr. Zucker wants to give
 5          testimony, he needs to come, or they can read his
 6          deposition.  But there's no basis for having Mr. Bone
 7          comment and reiterate Mr. Zucker's testimony as a guise to
 8          allowing him to actually get on the stand and do what
 9          lawyer do, which is make closing argument from the
10          documents.
11                So those are our arguments on Mr. Bone, unless you
12          have any questions, Your Honor.
13                JUDGE GILSTRAP:  There was an element of this motion
14          originally that had to do with the Deutsche Telekom refund
15          litigation.  I take it that that is no longer a disputed
16          issue, or what's your understanding of that?
17                MR. BLACK:  My understanding is that we've agreed
18          that's not going to be discussed during the case, part of
19          the MIL process.
20                JUDGE GILSTRAP:  Okay.  We'll address it when we get
21          to the limine motion, but I'm going to overlook it for
22          purposes of this motion to strike, based on that
23          understanding.
24                Let me hear from the defendants and intervenors in
25          response, please.
```

1          MR. POWERS:  Thank you, Your Honor.  Jonathan Powers

2    on behalf of AT&T and Ericsson, and I'll be arguing this

3    one on behalf of the defendants and intervenors.

4          JUDGE GILSTRAP:  Please proceed, Mr. Powers.

5          MR. POWERS:  So two points.  As Mr. Black noted,

6    we've got Mr. Bone's hypothetical negotiation analysis,

7    which was in his damages rebuttal report, and then his

8    license report which I'll touch on at the end.

9          On the hypothetical negotiation, the primary point

10   here, Your Honor, is that this is a fact issue.  There's no

11   change in the law, as Mr. Black tried to frame it.  Courts

12   routinely look at what -- courts routinely look at what

13   parties have done in the past to understand how the

14   hypothetical negotiation would have played out at the time.

15   And the facts here show, and IPCom doesn't dispute it, that

16   intervenors would have participated alongside their

17   customers, the carriers.  And you'll see here in IPCom's

18   reply brief, they try and ask the Court to ignore this

19   history.  They say, "IPCom's real world discussions, the

20   fact of AT&T, Vodafone, Sprint, Nokia, Ericsson, Huawei,

21   it's not relevant."  As Mr. Black also alluded to, we had a

22   recent decision from the Federal Circuit in Cal-Tech where

23   the Federal Circuit completely disagreed with that.  It

24   looked at what the record suggests would have happened in

25   order to determine which parties would be at the

1      hypothetical negotiation.

2           The other point, Your Honor, is that no court has

3      ever struck an expert for the reasons that IPCom suggests

4      you should strike Mr. Bone.  No court has ever said,

5      "You've added too many parties to the hypothetical

6      negotiation, and that's improper."  Every case that IPCom

7      relies on is a case where an expert left out the

8      patentholder from the hypothetical negotiation or left out

9      the defendant from the hypothetical negotiation.

10          JUDGE GILSTRAP:  Well, let me -- let me stop you and

11     ask a question.  You've got this Cal-Tech slide on the

12     screen right now.  If I'm -- if I'm remembering correctly,

13     both Apple and Broadcom were accused infringers in that

14     case; correct.

15          MR. POWERS:  That's absolutely right.  And so --

16          JUDGE GILSTRAP:  And neither Nokia or Ericsson are

17     accused infringer in this case, are they?

18          MR. POWERS:  They're not, but they also haven't

19     stipulated that Ericsson and Nokia don't infringe.  So what

20     they've essentially done is withheld their infringement

21     claims in order to up their damages analysis.

22          So it would be like if Cal-Tech had sued only Apple

23     in order to only get what was an $800 million judgment

24     against Apple.

25          JUDGE GILSTRAP:  I mean, I think the statute's clear

```
 1          that it's infringement committed by the accused infringers.
 2          Why -- I'm not sure I fully understand your statement about
 3          they're playing games and not really accusing Nokia and
 4          Ericsson of infringement today, with the impression or the
 5          implication being maybe they will at a future date.  But I
 6          mean, if you truly believe that Ericsson and Nokia are
 7          infringers or alleged infringers or standing in the same
 8          position as AT&T and Verizon are here, there are means by
 9          which you could have sought to have them declared to be
10          necessary and essential parties to the infringement case
11          and forced IPCom to put them in that posture.
12               So I don't know how you say they haven't said they're
13          not infringers as a reason why they should still be able to
14          be at the negotiation table.
15               MR. POWERS:  So I agree with you, we could have filed
16          a declaratory judgment action.  We didn't do that because
17          we don't think our customers practice these patents either.
18          But you're certainly right, we could have sought a
19          declaratory judgment action --
20               JUDGE GILSTRAP:  And I'm not saying anybody's got to
21          make any kind of admission, but from a procedural
22          standpoint, you could have forced them into that posture,
23          could you not?
24               MR. POWERS:  Certainly we could have.  I don't think
25          that anybody thought they were going to file this type of
```

```
 1          motion because I've never seen a court exclude an excerpt
 2          from adding back in or adding in unaccused intervenors,
 3          which sort of comes back to the point, they -- IPCom wants
 4          to do an end run around Cal-Tech by essentially not
 5          accusing -- or not saying anything about how Ericsson and
 6          Nokia may or may not practice their patents.
 7                    JUDGE GILSTRAP:  Well, the problem I have, Counsel,
 8          at the end of the day is the Bone rebuttal damages report
 9          says that at the negotiation table would be IPCom,
10          Ericsson, and Nokia.  They don't put the infringers at --
11          or the alleged infringers at the negotiation table, as I
12          read it.
13                    MR. POWERS:  He absolutely does, and this was cited
14          in our brief.  I don't have a copy of the deposition
15          transcript.  This came up for 30 minutes during Mr. Bone's
16          deposition.  It's also in his report.  AT&T and Verizon
17          would both be at the hypothetical negotiation.  He made
18          that extraordinarily clear.  Their role in the hypothetical
19          negotiation would be to ask the intervenors to join, and
20          then all the parties together would negotiate a license
21          that's based on Nokia and Ericsson's revenue.  And they say
22          that looking at Ericsson and Nokia's revenue is improper,
23          but that's -- that's just one side of the coin.  The
24          revenue that Ericsson and Nokia make, that's money that's
25          paid by the carriers.
```

1          So if you want to know how valuable IPCom's

2     technology is, assuming infringement to the carriers, a

3     great measure of that would be how much are the carriers

4     willing to pay for the products that allegedly practice

5     this method.  And IPCom's infringement contingents make it

6     extraordinarily clear the only products that practice their

7     method are products made by Ericsson and Nokia and the

8     suppliers.

9          And under this Court's patent rules, 3(1)(b), IPCom

10     had a choice to make when it put out it's infringement

11     contentions.  It could either identify each method or

12     process that it thought practiced the claim method, or it

13     could identify the products that practiced the claim

14     methods.  It chose option two.  IPCom chose to accuse

15     Ericsson and Nokia's products as the products that

16     practiced the claim method or process.  Those are the

17     accused instrumentalities here.  There's no dispute that

18     it's AT&T -- it's AT&T and Verizon supplier's products that

19     are accused of practicing the claim method.

20          JUDGE GILSTRAP:  What else, Counsel?  Talk to me

21     about the licensing report, if you're ready.

22          MR. POWERS:  I am, Your Honor.  So on the licensing

23     report, just very briefly two points.  Mr. Bone, one,

24     incorporates this license analysis into his damages report.

25     We served it as a separate report not as a we want him to

1      conclude that Nokia and AT&T have a license, but to support

2      what he would then put out a month later in his rebuttal

3      damages report, which is if AT&T and Nokia are licensed,

4      here's how the damages are affected, because the license

5      only applies to Hitachi's patents.  There's a little bit of

6      complicated factor in terms of if Nokia has a license, you

7      have to cut out the appropriate royalty for Nokia's

8      equipment for just two of the five patents that are

9      asserted.  The math gets complicated, so we disclose how

10     the license supports the defense, but he doesn't make the

11     ultimate conclusion, and then he uses that, he relies on

12     that in his damages report, his damages rebuttal report.

13          And the second point is, sort of goes back to Mr.

14     Achey's motion earlier, this isn't complicated information

15     that's being synthesized here.  You have a 1988 agreement

16     between Hitachi and AT&T that we're trying to show applies

17     to Nokia of America Corporation today.  We have to trace

18     through all of these different parties.  Mr. Bone does that

19     by analyzing SEC filings, the agreements themselves, to

20     synthesize that information for the jury.  That's properly

21     what experts do, Your Honor.  They can summarize,

22     synthesize complicated information, and that's what Mr.

23     Bone has done in his license report.

24          JUDGE GILSTRAP:  All right.

25          MR. POWERS:  And, Your Honor, if -- I have on the

```
1          laptop, at least the page from Mr. Bone's deposition.  I
2          believe it's cited in our response, but it's page 14 --
3          docket 181, page 14, line 17 through 25, and the question,
4          I'll read it into the record.  Mr. Bone was asked, "It's
5          your opinion that the primary parties of the hypothetical
6          negotiation would have been the intervenors, Ericsson and
7          Nokia; correct?"  And Mr. Bone said, "Well, they would have
8          been the primary ones.  The carriers certainly would have
9          been there as well."
10                  JUDGE GILSTRAP:  All right.
11                  MR. POWERS:  Thank you, Your Honor.
12                  JUDGE GILSTRAP:  Thank you.  Anything further, Mr.
13         Black?
14                  MR. BLACK:  Just --
15                  JUDGE GILSTRAP:  Briefly, I hope.
16                  MR. BLACK:  Briefly.  This is the infringement we've
17         alleged.  It's a combinate -- it's AT&T use of this system
18         which is a combination of Nokia, and Mavenir equipment and
19         other things, AT&T gets the benefit.
20                  His report did not discuss Mavenir.  It portends that
21         Ericsson and Nokia would be at the table.  It just doesn't
22         make any sense on the facts, even if you were going to
23         accept their view of the law.  His report -- he said at his
24         deposition, he had some vague statement that he made, but
25         his report, which he's bound by, said that the negotiation
```

1      was with Ericsson and Nokia.  And then when he did the
2      analysis, he ignored AT&T's contributions, he ignored the
3      value to AT&T.  This is an artifice to drive down the
4      damages and to confuse the jury.
5           I believe Verizon tried something similar in the
6      Carousel case, and there have been many cases where when
7      the plaintiffs had the wrong negotiator, the reports have
8      been thrown out.  When the shoe's on the other foot, the
9      same thing has to happen to the defendant, particularly
10     here where it's obviously quite intentional.
11          JUDGE GILSTRAP:  Thank you.  All right.  With regard
12     to plaintiff's motion to strike expert reports of John
13     Bone, Document 181, as to the expert's rebuttal damages
14     report, I'm going to strike paragraphs 197 through 316.  I
15     think that it's clear that he's failed to comply with the
16     structure required by 35 U.S.C. 284.  Not only are the
17     intervenors who are not accused of infringement in this
18     case placed at the bargaining table in his hypothetical
19     negotiation, but they're in the front seats.  And somewhere
20     behind them, perhaps, are AT&T and Verizon, but they're
21     passive, and they're not active in this report.  The
22     active, the affirmative participants in the hypothetical
23     negotiation are not accused of infringement.  I don't think
24     Cal-Tech is applicable here.  And the portions of his
25     rebuttal damages report that I feel failed to comply with

1          the structure required by Section 284 are paragraphs 197

2          through 316, and I'm going to strike those portions of his

3          rebuttal damages report.

4               The remainder of his rebuttal damages report where he

5          takes the plaintiff's damages expert to task is certainly

6          proper, and it remains un-impacted by this ruling.  But

7          that portion I'm going to strike.

8               With regard to the Bone licensing report, I'm going

9          to grant the motion, and I'm going to strike that in its

10         entirety.  He doesn't have personal knowledge of these

11         documents that are handed to him by defendants.  I don't

12         know any fair way for him to be cross-examined.  One of the

13         cardinal sins of expert testimony is when it falls into the

14         category of being a conduit for hearsay testimony.  And

15         that's what this appears to me to be, a pure conduit by

16         which Mr. Bone can testify to matters that are hearsay to

17         him, that he has no personal knowledge of, and it precludes

18         a fair cross-examination by the opposing plaintiff.

19              I'm going to strike his licensing report.  I'm going

20         to consider the issue regarding Deutsche Telekom refund

21         litigation withdrawn for purposes of this motion.  We'll

22         take it up when we get to the motions in limine.

23              But that will be the ruling with regard to this

24         matter.

25              All right.  That brings us to IPCom's motion to

```
1            strike Dr. Daniel van der Weide's invalidity expert report.
2                 Let me hear from the moving plaintiff on this.
3                 MR. MATHEWS:  Your Honor, before you proceed, could I
4       just address one follow-up question regarding your prior
5       ruling?
6                 JUDGE GILSTRAP:  You may.
7                 MR. MATHEWS:  Thank you.  Nick Mathews representing
8       AT&T and Ericsson.
9                 With respect to your ruling on the Bone rebuttal
10      report, we would also request leave to file a corrected
11      Bone expert report within one week.  And I just want to
12      make that motion before Your Honor.
13                JUDGE GILSTRAP:  I gather that's opposed by the
14      plaintiff?
15                MR. BLACK:  Yes, Your Honor.  Opposed.
16                JUDGE GILSTRAP:  What would be the basis other than
17      you lost on this motion, Mr. Mathews?
18                MR. MATHEWS:  Yeah, so, Your Honor, the basis would
19      be that we have heard Your Honor's guidance regarding the
20      hypothetical negotiation.  Our view is that as set forth in
21      the report, the negotiation included the carriers and the
22      equipment suppliers.  We're more than happy to remove the
23      equipment suppliers if that's -- in light of the Court's
24      ruling, we certain would.  But, otherwise, those opinions
25      where the carrier is where the hypothetical negotiation can
```

1      still be presented, and I think that would resolve Mr.
2      Black's concerns.
3          JUDGE GILSTRAP:  All right.  I'm going to deny that
4      request.  It sounds pretty straightforward to me that you
5      want to pull out Nokia and Ericsson but use the same end
6      result, and my ruling is not based simply on the fact that
7      Nokia and Ericsson are at the hypothetical negotiation
8      table in Bone's rebuttal damages report, but them being the
9      affirmative active parties, and the carriers being passive
10     and inactive leads to a flaw Georgia-Pacific analysis, and
11     simply exorcising the equipment manufacturers from that
12     portion of the report but leaving the rest of it intact, I
13     don't think -- A, I don't think that addresses the real
14     concern the Court has; and, B, if it's not a supplement
15     merely to exorcise and cut out the equipment manufacturers
16     and leave the rest of the results in place, it's way too
17     late in the game to start over with an altogether new
18     damages report and a new analysis of just the accused
19     infringers in isolation on their side of the table at the
20     hypothetical negotiation, and a complete analysis of the
21     applicable Georgia-Pacific factors in light of these facts.
22          It's too late for a complete redo, and a partial redo
23     doesn't solve the problem.  So I'm going to deny your
24     request.
25          MR MATHEWS:  Thank you, Your Honor.

```
 1              JUDGE GILSTRAP:  All right.  Let's move to the
 2      plaintiff's motion to strike Dr. van der Weide's invalidity
 3      report.
 4              MR. FISHER:  Thank you, Your Honor.  Michael Fisher
 5      for IPCom.
 6              Now, this motion relates to the '147 Patent for which
 7      there's a co-pending inter partes review before the patent
 8      trial and appeal board, and we're asking the Court to
 9      strike certain portions of the invalidity report of
10      defendants' expert, Dr. Daniel van der Weide, due to
11      defendants' violation of certain stipulations that they
12      submitted to the PTAB.
13              Now, what happened in this case is that at the
14      initial stage of the IPR when the PTAB was considering
15      whether to institute the proceeding --
16              JUDGE GILSTRAP:  I know about version zero and
17      version one.
18              MR. FISH:  Okay.  That's great.  So the -- you know,
19      the whole reason that defendants and intervenors submitted
20      those stipulations was because the board has discretion to
21      deny institution of an IPR based not only on the merits of
22      the prior art, but also based on some discretionary factors
23      known as Vintu factors.  One of the most important of which
24      is factor four which relates to the overlap of the issues
25      between the proceedings.
```

1            And the purposes of that factor is to avoid -- to

2       avoid inefficiency and possibly conflicting decisions when

3       you have the same prior art being asserted in both

4       proceedings.

5            Now, in this case intervenors submitted those --

6       those stipulations in which they -- the defendants promised

7       not to assert the same grounds, and the strategy worked.

8       You know, the board found that the stipulations mitigated

9       the concerns of overlap.  They weighed that crucial Vintu

10      factor against denial of institution, and they granted

11      institution of the IPR.  So then a few months later we

12      received Dr. van der Weide's report, and we noticed that he

13      had two entire sections of the report devoted to the same

14      obviousness combinations that the -- that the defendants

15      had promised not to pursue.  And as Your Honor correctly

16      pointed out, it hinges on the difference between this

17      technical specification, TS25.331 version 1.0.0 versus

18      1.1.0, and it's a distinction without a difference, because

19      if you look at the very small number of edits between the

20      versions, none of them affect any part of that reference

21      that defendants and intervenors rely on.  In fact, not only

22      that, the obviousness arguments are the same in both cases.

23      The whole point is that there's certain parameters of the

24      system that come from the Motorola proposal, the secondary

25      reference, and the idea is that they would insert that --

1    insert those parameters, they would add them to the hand
2    over command within TS25.331.
3         So, you know, the dispute here -- we believe that
4    there are three grounds for striking those portions of the
5    van der Weide report.  There's breach of contract, judicial
6    estoppel, and equitable estoppel.  And they all pretty much
7    hinge on the same issue which is the meaning of the phrase
8    "same grounds."
9         Now, in the first instance "the same" means
10   resembling in every relevant respect is what the dictionary
11   says.  We have Exhibit J from our brief, which is the
12   dictionary definition of same.  So it doesn't say that it
13   resembles in every single respect no matter how
14   superficial, it resemble -- it means it resembles in every
15   relevant respect, and there are no relevant differences
16   between the two versions of this technical specification.
17        Furthermore, Black's Law dictionary agrees.  It says
18   that the word "same" does not always mean identical.
19        JUDGE GILSTRAP:  Just can't get away from claim
20   construction, how hard I try.
21        MR. FISH:  Well, we're doing our best, but sometimes
22   it just ends up there.
23        So to the extent that defendants disagree with this
24   interpretation, then the language of their stipulation is
25   ambiguous, and, of course, has to be construed against them

1       since they're the ones that drafted it.  Now they contend

2       that same grounds was intended to exclude the exact same

3       obviousness combination using just a differently numbered

4       version of the specification of the technical specification

5       25.331 that contains exactly the same statements and

6       language that the intervenors are relying on in the IPR.

7       That's not a reasonable interpretation.

8            Defendants are also trying to manufacture some

9       differences between the two version -- the two versions.

10      For example, one of them was before the patent officer --

11      the patent office and the examiner, and one wasn't, but

12      that's completely irrelevant.

13           As we pointed out in our -- to the PTAB in our patent

14      owners preliminary response, the fact that version 1.1.0

15      was before the examiner, coupled with the fact that there

16      are no relevant differences between that version and the

17      one that's being asserted in the IPR means that the patent

18      office already saw this material.  That's the whole point.

19      The two versions are essentially identical, so to see one

20      is essentially the same as seeing the other.

21           The defendants also point out that there's a

22      difference in the dates, but that doesn't matter either,

23      because both references predate our priority -- our

24      priority date anyway.  We're not -- we've never disputed

25      that either of these references is sufficiently early to

1          qualify as prior art.

2               So in terms of the grounds of judicial estoppel,

3          there are two elements.  The estoped party has to be

4          asserting a position clearly inconsistent with the previous

5          one, and the party must have convinced the court -- or in

6          this case, the PTAB, to adopt the previous position.

7               So with respect to the first element, there's no

8          dispute that defendants and intervenors took the position

9          before the PTAB that their stipulation would revolve the

10         overlap between the two cases.  But then they turn around

11         and they reintroduce the exact same overlapping issues by

12         pursing an obviousness combination which is the same as the

13         one they're pursuing in their IPR, in the patent office.

14              The second element is also met.  The PTAB relied on

15         the stipulations to waive Vintu factor 4, the one relating

16         to overlap in intervenor's favor.  They granted institution

17         of the IPR.  So had the -- had the board known that the

18         defendants were going to reintroduce the exact same

19         overlapping issues, the board would not have instituted the

20         IPR.

21              Now, defendants have also argued that the board's

22         institution decision said that they weighed the factor only

23         marginally against denying institution.  Well, that's cold

24         comfort to us because the factor should have been weighed

25         strongly in favor of denying institution, and second of

1          all, of course, institution was granted.

2              So our view is that if the board had known what the

3      defendants were up to, the board never would have

4      instituted the IPR.  In fact the PTAB was misled.  If you

5      look at the stipulations themselves -- and I'll put one

6      example up on the Elmo.  All right.  So the stipulations

7      say, if you look at the second sentence, "For the avoidance

8      of doubt, grounds refers to the specific combinations

9      asserted in the IPRs but not the prior art references

10     themselves."  So any reasonable person reading this would

11     -- would interpret this as meaning that defendants were

12     reserving their right to take these same prior art

13     reference -- references and maybe assert them as

14     anticipation references, or maybe to take them and combine

15     them in different ways with other secondary references, for

16     example.  But no one would have expected them to take the

17     exact two references that are listed under bullet point

18     three here, the Motorola proposal, and the TS25.331, and

19     combine them again in the district court just using a

20     superficially different version.

21             JUDGE GILSTRAP:  Is this your surprise argument under

22     equitable estoppel?  Or have you gotten to that yet?

23             MR. FISH:  It's -- they're sort of akin to each

24     other, although with respect to judicial estoppel versus

25     equitable estoppel, the focus in judicial estoppel is that

1      they actually convinced the board to grant institution
2      whereas equitable estoppel has the element of the -- of us,
3      the party asserting estoppel, not having knowledge of the
4      facts.
5          JUDGE GILSTRAP:  Give me your equitable estoppel
6      argument, please.
7          MR. FISHER:  Okay.  Well, the four elements; first,
8      the party to be estopped was aware of the facts.  That's
9      certainly true here.  Obviously, defendants were aware of
10     both versions of the -- of TS 25.331, and they certainly
11     were aware of their own strategy to try to circumvent their
12     stipulations.
13         Two, the party to be estopped intended his act or
14     omission to be acted upon.  No doubt that that's the case
15     here.  The entire reason that defendants filed these
16     stipulations was to make -- was to convince the PTAB to act
17     and institute the IPR.
18         The third one, which Your Honor touched upon, was the
19     party asserting estoppel did not have knowledge of the
20     facts.  It is true that we were aware of the existence of
21     both versions of TS25.331, but that's beside the point.
22     What really matter is that we had no way of knowing the
23     crucial fact here which is that defendants would then turn
24     around and combine that primary reference again with the
25     Motorola proposal to creating essentially the same

```
 1              combination and exactly the same genuine issues that were
 2              at stake in the PTAB.
 3                   So that's the thing that we didn't know and really
 4              couldn't have known based on, again, the wording of the --
 5              of the stipulation here.
 6                   JUDGE GILSTRAP:  All right.  Thank you, Counsel.
 7                   MR. FISHER:  Okay.
 8                   JUDGE GILSTRAP:  Let me hear a response from
 9              defendants.
10                   MR. DEANE:  Good afternoon, Your Honor.  Michael
11              Deane from Alston & Bird for the defendants.
12                   JUDGE GILSTRAP:  Please proceed.
13                   MR. DEANE:  So as you just heard, IPCom moves on
14              three different theories, and they -- they had a recitation
15              of the facts but barely applied them to the actual theories
16              that they're asserting to try to get this out of the case.
17              And I think that the first theory, the breach of contract
18              theory, fails on its face because they failed to focus on
19              the actual stipulation.  This is a voluntarily stipulation
20              that the defendants filed in the IPR and then e-mailed
21              about in this court, and the defendants were free to make
22              it as narrow or as broad as they wanted to, understanding
23              that that would impact the -- what would then later happen
24              at the PTAB.  And in order to prevail on this breach of
25              contract theory, they've come up with this idea that the
```

1        word "same grounds" is somehow ambiguous, but they're
2        ignoring the rest of the stipulation.  The grounds are
3        listed right there in the stipulation.  They're listed
4        right there in the IPR.  And they're limited to the
5        specific version, version 1.0.0.
6             Defendants could have used different language, but
7        defendants used an excessively narrow stipulation.  And as
8        we just saw, in order to try to suggest that the word "same
9        grounds" is ambiguous, they've pulled out dictionary
10       definitions.  Well, that's not proper.  It's either
11       ambiguous or it's not, and you can't take extrinsic
12       evidence and introduce it to create an ambiguity.
13            And so looking plainly at the stipulation, there is
14       no ambiguity.  The same grounds are defined right there,
15       and bringing up a dictionary later on to suggest that
16       "same" means something different than what is otherwise
17       stated directly in the stipulation can't create an
18       ambiguity for the Court.
19            And once you've determined that there's no ambiguity,
20       you know, you enforce the stipulation as it's written.  And
21       as it's written here, it's limited to the following
22       grounds:  Version one in view of the Motorola proposal.
23       There really can't be -- there's really no way to make this
24       any more clear.
25            And, you know, the thing about it is it's not just us

1      saying that this stipulation was clear and exceedingly

2      narrow.  That's exactly what IPCom told the PTAB when it

3      filed its response to our petition.  IPCom came in and told

4      the PTAB that our stipulation wasn't good enough.  It was,

5      quote, exceedingly narrow, and it would allow, quote, minor

6      tweaks to the different combinations in the district court

7      litigation.

8            And, you know, as you heard IPCom state, the -- PTAB

9      listened.  They only afforded the Vintu factor, the Vintu

10     factor for marginal weight.  And as Your Honor knows, the

11     different factors can be afforded different ranges of

12     weight, and the PTAB took the argument that IPCom made into

13     account and only gave the factor marginal weight.

14           And so now having benefitted from that explanation to

15     the PTAB, they're turning around here and telling the Court

16     op -- telling this Court the opposite.

17           But, moreover, even if the stipulation is ambiguous,

18     it's IPCom's burden to come up with a second reasonable

19     interpretation of what that stipulation might mean.  And

20     they didn't do that in their opening motion, but then they

21     did it in the reply for the first time.  But, again, they

22     have to rely on this special dictionary definition that

23     they've pulled out where the word "same" means something

24     other than what's written directly into the stipulation.

25           And that's why their interpretation can't possibly be

1      seen as reasonable.  And for that -- and for those reasons,

2      we think that their breach of contract theory must fail.

3          Now, as for judicial estoppel, here there's no risk

4      of an inconsistent result.  Wherein an article 3 court

5      there was prior art that was before the patent office and

6      this court.  There was prior are that was not before the

7      patent office of the PTAB, and there's -- whatever the jury

8      reaches in this case doesn't necessarily mean that it's

9      going to be in an inconsistent result of the PTAB.  Under

10     the different set of facts that are presented to the jury

11     here, the jury can reach one result, and it not be

12     necessarily inconsistent with the result at the PTAB.  And

13     that's the principal reason why courts want to use judicial

14     estoppel.

15         But getting to the elements of judicial estoppel, you

16     know, as IPCom stated, they must show the defendant has

17     taken an inconsistent position.  But we haven't taken an

18     inconsistent position.  We informed the PTAB that the

19     stipulation would mitigate concerns of overlap, and that

20     position is not clearly inconsistent with what we're doing

21     here.  The stipulation does mitigate concerns of overlap.

22     It's not necessarily every single concern of overlap, and

23     we've pointed out the ways, and I just pointed out the

24     ways, that the nonoverlapping issues can lead to a

25     different result.  The jury will consider the facts here

1      and reach one decision, and the PTAB in their

2      administrative capacity can consider the facts there and

3      reach another decision.

4           And as we said, the second element for judicial

5      estoppel requires that the intervenors convince the PTAB to

6      adopt our position.  And as we just said, they didn't do

7      that.  They actually gave IPCom the benefit of their

8      argument and weighed that factor less.  And so while, you

9      know, understandably IPCom's upset that they didn't use

10     their discretionary powers to deny IPR, that's taking too

11     broad of a look at the issue.  The issue is much narrower.

12          The issue is did the defendants on Vintu factor 4

13     convince the PTAB to accept their position.  And the answer

14     to that is no.  The defendants didn't enter a voluntary

15     pre-IPR institution stipulation so that the PTAB would give

16     it marginal weight.  They did that so that it would give it

17     heavy weight and overcome potentially other factors, and

18     that's simply not what happened.

19          So under the judicial estoppel theory, we believe

20     that IPCom's motion should be denied as well.

21          And then, finally, Your Honor, as to equitable

22     estoppel, you know, I think -- I think that you hit the

23     nail on the head when we were talking about the surprise.

24     IPCom was aware of these facts.  We filed our IPR with our

25     stipulation, and then we served our invalidity contentions

1            expressly charting and expressly combining the Motorola
2            proposal with a new version of TS25.331.  And then we --
3            and we told them that.  And then they went to the PTAB and
4            said, "Hey, this stipulation's too narrow.  They're going
5            to make minor tweaks in the district court."  And now
6            they're showing up and saying, "Well, what we meant was
7            that they were going to change the reference from
8            obviousness to anticipation."  But that's not a minor
9            tweak, Your Honor.  That's a wholesale change.  That's a
10           change in the statute, that's a change in the number of
11           references.  That's not the minor tweak that IPCom told the
12           PTAB about.
13                So not only was IPCom aware of the facts, they told
14           the PTAB about those facts, and the PTAB, you know, waived
15           that factor accordingly.
16                And then finally, with respect to the fourth factor
17           that we went over, the substantial injury factor that we
18           addressed in our brief, that factor isn't met here.  IPCom
19           hasn't cited a case where an administrative agency
20           declining to use a discretionary power is substantial
21           injury.  I mean, the word "substantial" and the word
22           "injury" must mean something, but the IPR is still pending,
23           their patent is still presumed valid.  They haven't
24           actually lost anything, and so the injury is unclear.  And
25           we understand that they claim their injury was that they

```
1          wanted to make a different argument to the PTAB, but the
2          bottom line is that they did.  They did tell the PTAB about
3          the minor tweaks the defendants were going to potentially
4          set forth in the district court, and that's exactly what
5          the defendants did here.
6               And so when you look at the facts combined with the
7          theories that they moved under as a whole, all three of
8          their theories must fail.
9               JUDGE GILSTRAP:  All right.  Thank you.
10              MR. DEANE:  Thank you, Your Honor.
11              JUDGE GILSTRAP:  Brief rebuttal?
12              MR. FISHER:  Yes.  First of all, Your Honor, as
13         counsel acknowledged, the PTAB's going to reach one
14         decision, and the jury in this case is going to reach
15         another decision.  PTAB could find the 147 not invalid over
16         the version 1.0.0, and then the jury finds it invalid over
17         1.1. -- or 1.1.0 -- 1.1.0.  So how is that -- I don't
18         understand how that's not an inconsistent decision since
19         the references are essentially the same.
20              Second, our injury is that we are fighting the same
21         invalidity grounds in two tribunals.  In terms of the --
22         the use of so-called special definition, it's just an
23         ordinary dictionary definition, and so that's entirely
24         reasonable.  Thank you.
25              JUDGE GILSTRAP:  Thank you, Counsel.
```

```
 1              With regard to Document 189 and the plaintiff's
 2      motion to strike portions of Dr. Daniel van der Weide's
 3      invalidity report, I don't find that there's a breach of
 4      contract here.  This is a very clear stipulation, and it
 5      was intended to be narrow, and I think it should be held to
 6      the scope and the narrowness of the original stipulation.
 7      And putting a very targeted narrow stipulation into the
 8      record and then arguing later, Well, they're all
 9      essentially the same, is not sufficient to achieve a breach
10      of contract finding, in my view.
11              I don't find there's judicial estoppel.  It's not
12      clearly inconsistent in the Court's view, and I don't find
13      there's any substantive surprise here, so I don't find
14      equitable estoppel applies.
15              In short, I'm going to deny the plaintiff's motion to
16      strike the asserted portions the Dr. Van der Weide's
17      invalidity report.
18              Now, next is the motion to strike paragraph 154 of
19      Dr. Steven Wicker's report.  This is plaintiff's motion.
20      It's Document 188.
21              Counsel, I've looked at this very carefully.  I don't
22      see that the Court's going to benefit by argument on this.
23      This seems to me to be a very targeted issue.
24              With regard to paragraph 154 of Dr. Wicker's report,
25      the second sentence of that paragraph which at present
```

1     reads, "Mr. Laumen admitted that he received numerous

2     references from the 3GPP standards body" and did not -- and

3     not disclosed them to his patent attorney, I'm going to

4     grant the motion to the extent that that sentence will end

5     after 3GPP standard body, period.  I'm going to strike the

6     last phrase of that second sentence, and not disclose them

7     to his patent attorney.  Other than that, I'm not going to

8     otherwise alter or limit Dr. Wicker's report.

9          And that's going to be the Court's ruling on

10    Document 188.

11          Let's go ahead and take up next Document 182, the

12    plaintiff's motion for partial summary judgment on

13    defendants's equitable estoppel waiver and acquiescence

14    affirmative defenses.

15          And let me hear from the moving plaintiff on this.

16          MR. EDWARDS:  Good afternoon, Your Honor.  Jeff

17    Edwards for IPCom.

18          JUDGE GILSTRAP:  Please proceed.

19          MR. EDWARDS:  Thank you, Your Honor.

20          Your Honor, IPCom filed a motion to -- for summary

21    judgment of a number of equitable defenses by all of the

22    defendants and intervenors, waiver, acquiescence and

23    estoppel.  The only response that came in in opposition was

24    from AT&T on an equitable estoppel defense based on some

25    communications in January 2020, a notice letter to AT&T

```
1    from IPCom, and then a lack of response, and that was the
2    entirety of the opposition.  All the other defenses thereby
3    fall out of the case.  It does not appear -- I just took
4    another look at it -- that equitable estoppel defense is
5    part of the pretrial order.  AT&T --
6         JUDGE GILSTRAP:  Correct me if I'm wrong, and I may
7    be, I agree that the other defendant and intervenor -- I
8    don't find that Verizon or Nokia responded to the equitable
9    estoppel, but my reading was that there was a response from
10   both AT&T and Ericsson.  You don't have Ericsson down as
11   responding?
12        MR. EDWARDS:  Your Honor, that's a little confusing
13   to me, and it's not clear.  The title is AT&T and Ericsson,
14   but the communication was all between -- it's all based on
15   communication between AT&T and IPCom and what AT&T thought
16   or didn't know or didn't do, based on that communication.
17   And --
18        JUDGE GILSTRAP:  And we'll get to that point just in
19   a moment.  For purposes of clarifying the landscape here,
20   it appears to the Court that the second issue raised in
21   this motion regarding waiver and acquiescence seems to have
22   effectively been withdrawn.
23        Do the parties disagree with that?
24        MR. MATHEWS:  Not as to defendants and intervenors.
25        JUDGE GILSTRAP:  Okay.  So really, we're left with
```

1          the equitable estoppel issue regarding AT&T and/or

2     Ericsson.

3               MR. EDWARDS:  I'm sorry, Your Honor, you're asking

4     whether IPCom has withdrawn that portion of the motion?

5               JUDGE GILSTRAP:  Well, the defendants don't seem to

6     -- the defendants and intervenors don't seem to oppose it,

7     so I'm assuming it's granted as unopposed.  Or maybe I'm

8     misunderstanding the parties.

9               MR. EDWARDS:  That's what I understood, Your Honor.

10               MR. MATHEWS:  Correct, Your Honor.

11               JUDGE GILSTRAP:  Okay.

12               MR. MATHEWS:  We withdraw those defenses --

13               JUDGE GILSTRAP:  Okay.

14               MR. MATHEWS:  -- and the only live issue is equitable

15     estoppel as to AT&T, including the Ericsson products and

16     AT&T.

17               JUDGE GILSTRAP:  Okay.  Well, that means that the

18     motion as to waiver and acquiescence is granted as

19     unopposed as to both defendants and both intervenors, and

20     that means the equitable estoppel issue is granted as to

21     Nokia, and to the extent it applies, Verizon, but I'll hear

22     argument on whether and to what extent the equitable

23     estoppel issue does or doesn't apply to AT&T and Ericsson.

24          I think we narrowed the scope of what's really left

25     here.

```
1          MR. EDWARDS:  Yes, Your Honor.  And before I move on
2     to AT&T, if I may, there's nothing in the opposition papers
3     about equitable communi -- about any pre-suit 2018 or 2019
4     communications, which were the basis of the Ericsson
5     equitable estoppel motion.  It was all based on 2020
6     communications.  The opposition that was filed was all 2020
7     communications between AT&T and IPCom.  So that should also
8     fall away with the other ones that Your Honor just
9     recognized.
10         JUDGE GILSTRAP:  All right.  Well, give me your
11    argument on what's left.
12         MR. EDWARDS:  What's left is the -- is AT&T's
13    equitable estoppel defense which it opposed based on
14    IPCom's January 10, 2020, notice letter about its patent
15    portfolio to AT&T and what -- what AT&T said was a
16    misstatement in the letter or misleading silence which led
17    AT&T to fail to possibly do certain things to its
18    detriment, which it claims makes the patents unenforceable.
19    But the problem with the argument is that none of the
20    elements of equitable estoppel are met here, and I -- the
21    third element I'll sort of put to the side because it is
22    kind of wrapped up in all the facts that were part of the
23    defendants' unclean hands and spoliation motion.  And we
24    can focus here on the first two factors.
25         One of them, the first one, is the misstatement or
```

1          misleading silence arising from the January 10, 2020, IPCom
2          notice letter.  They simply -- there simply is nothing on
3          the face of the letter that could -- could -- that they
4          cite as an affirmative misstatement that caused them to
5          rely on it to their detriment.  They say that there's a
6          statement at the end of the letter that IPCom would like to
7          start negotiations a few weeks after the letter, that when
8          AT&T then responded back with their own letter saying, We
9          have a lot of patents here.  There's a lot of things about
10         standards essential patents that can affect infringement,
11         you know, can you send us some claim charts, give us some
12         information, and then there was no further communication
13         from IPCom.  AT&T claims that it relied on that for failing
14         to take certain actions that were to its detriment, such as
15         failing to file a declaratory judgment or failing to
16         otherwise mitigate damages or infringement or something
17         like that.  But there -- the face of the letter itself
18         shows that there is no misstatement, and there is no --
19         there's no threat of litigation in the letter as required
20         under, for example, the Myers case from the Federal
21         Circuit.  And the silence that happened afterwards is not
22         therefore misleading silence under the case law.
23              In addition, on the second issue, reliance, AT&T has
24         put in absolutely no evidence on the issue.  For example,
25         as in Myers or in the defendants' primary case, wafer

```
 1          shape, where the record had clear testimony, documentary
 2          evidence, about what the defendant might have done
 3          differently in its business or what it might have done
 4          differently in bringing a declaratory judgment action.
 5          Here there's nothing but attorney argument in the record,
 6          so there's absolutely no evidence beyond the attorney
 7          argument.  And here the burden of proof is even heightened
 8          because the defendants chose to frame this defense as
 9          turning on the unclean hands and spoliation facts that they
10          asserted in that other motion which Aukerman says that
11          equitable estoppel is normally a preponderance unless
12          there's an allegation of intentional wrongdoing, which
13          defendants' theory does bring that into this.  And as well,
14          both spoliation and unclean hands are subject to a clear
15          and convincing evidence standard.
16               So AT&T simply has not brought forth sufficient
17          evidence from which the Court could find on clear and
18          convincing evidence after a trial that there was equitable
19          estoppel, that they meet the misstatement or misleading
20          silence or reliance.  And we believe also the -- the
21          prejudice, but that's wrapped up in what the Court decided
22          a little earlier today.
23               JUDGE GILSTRAP:  All right.  Let me hear from the
24          defendants and intervenors.  Or I guess for practical
25          purposes we're down to AT&T, so let me hear from them.
```

1          MR. MATHEWS:  That's right.  Thank you, Your Honor.

2          Nick Mathews for AT&T.  And just to be clear on where

3     the record stands, it's true, the equitable estoppel issue

4     applies only to AT&T, but it would also encompass the

5     Ericsson and Nokia equipment rather accused of infringement

6     just in AT&T's network.  But I think it is fair to view

7     this as an AT&T-focused motion.

8          Very, very briefly, Aukerman, the main case is very

9     clear.  Equitable estoppel is not limited to a particular

10    factual situation, nor is it subject to resolution by

11    simple or hard and fast rules.  I'll briefly hit each of

12    the three factors.

13         The first is whether the patentee through misleading

14    conduct leads the alleged infringers to reasonably infer

15    that the patentee does not intend to assert its patents.

16    The main piece of evidence we have is a letter that we

17    received from IPCom in January of 2020.  This letter was an

18    accusation of infringement.  It's from a well-known patent

19    licensing outfit that has targeted telecommunications

20    providers in the past.  It was sent to AT&T, and it points

21    out that there are 200 patent families in IPCom's

22    portfolio, 35 essential for telecommunications standards,

23    and that the majority are allegedly essential to 3G and the

24    4G standards.

25         Attached to the letter was a list, 43 pages long, of

1     many patents.  Many of them expired, many of them from

2     outside the United States, but they were all attached to

3     the letter.

4          In the letter at the end IPCom asked that licensing

5     discussions start within about one month.  That's February

6     of 2020.  AT&T immediately responded.  A licensing

7     executive looked at the letter, took it seriously, and

8     provided a very careful response to IPCom.

9          Number one, AT&T pointed out that many of the patents

10    were expired.  Number two, points out that many of the

11    patents on the list are from countries outside the United

12    States.  Number three, AT&T points out that IPCom doesn't

13    identify any particular AT&T products or services that

14    IPCom's patents might pertain to.  This is all laid out in

15    that letter that AT&T sent back within two weeks.

16         At the end, AT&T says, "If you wish to pursue further

17    discussions, please send claim charts directed to specific

18    AT&T products and services that you believe are not already

19    licensed."  This is what AT&T sent directly back to IPCom.

20    This is in January of 2020.

21         And in response to this letter, IPCom did nothing.

22    They didn't send a single claim chart, they didn't send a

23    revised list that removes the irrelevant patents, they

24    didn't ask for a phone call.  IPCom did nothing.  The only

25    natural take away from this exchange is that IPCom did not

1          intend to enforce its patent portfolio against AT&T.

2                So we think it's very clear just based on these two

3          letters, if you look at this, and especially the summary

4          judgment standard, that a reasonable fact finder could

5          determine that AT&T did rely and was -- excuse me.  That

6          IPCom's misleading conduct led AT&T to infer that IPCom was

7          not going to enforce its patents.

8                The second factor is reliance.  I think the Wafer

9          Shave case is directly on point.  In that case, the court

10         found that the failure to take affirmative actions to

11         protect yourself from a lawsuit is evidence in itself of

12         reliance.  And in that case, Wafer Shave, the court noted

13         that Gillette did not try to mitigate damages by

14         effectuating a quick settlement or initiating a declaratory

15         judgment action.  That's exactly the relief that AT&T could

16         have sought had IPCom stuck to its negotiating timeline and

17         agreed to give us the claim charts and continue

18         negotiations.  Instead, they went away.  So AT&T did rely

19         on IPCom's conduct.

20               Number three is prejudice.  This has nothing to do

21         with intent.  This has to do with the facts as they exist

22         in the case.  The fact of the matter is that after AT&T

23         responded in February of 2020, IPCom then amends the

24         Hitachi deal in April 2020 to remove the inventor

25         cooperation agreement.  That is prejudice, whether it's

1    intentional or not, AT&T by not being able to file a DJ was
2    not able to get that evidence.
3         Number two, July 2020, IPCom reorganizes its
4    management and allows Bernhard Frohwitter to walk away with
5    all the e-mails.  Again, whether intentional or not, that
6    is meaningful prejudice that impacted AT&T.
7         And so for those reasons, we believe that the motion
8    should be denied.
9         JUDGE GILSTRAP:  All right.  Anything further, Mr.
10   Edwards?
11        MR. EDWARDS:  Judge, just that the record does not
12   contain anything about reliance.  The early letters speak
13   for themselves, and I think I've addressed that.  The --
14   there is absolutely no record evidence on reliance.  Waver
15   Shave has very specific citations to what the defendants
16   put in the record.  It was a very, very long and detailed
17   and involved and expensive record over more than a decade,
18   I think, and there was specific evidence that the defendant
19   might have changed its business practices.  There was
20   testimony, there was documents.
21        Here, there's -- the -- AT&T has nobody to put this
22   story in.  There's nothing in the record about this story,
23   and the cases that they cite in their brief are boilerplate
24   cases for where AT&T was sued by a patentee, and AT&T
25   countersued.  So it has nothing to do with the facts here.

1        So it's just a conclusory statement by -- by the attorneys.

2                JUDGE GILSTRAP:  All right.

3                MR. EDWARDS:  Thank you, Your Honor.

4                JUDGE GILSTRAP:  Thank you.  With regard to document

5        No. 182 and the plaintiff's motion for partial summary

6        judgment regarding defenses of equitable estoppel as urged

7        by AT&T regarding itself and the Ericsson products within

8        its system that are at issue in the case, I'm going to deny

9        this motion.  I think that the -- there are underlying

10       factual questions that make it extremely difficult to grant

11       this at a summary judgment level.  Assuming that the

12       verdict returned by the jury facilitates the bench trial

13       issues to be taken up post verdict, I'm going to allow AT&T

14       to make it's equitable estoppel argument there, but I'm not

15       going to exclude that at this early staged -- at this early

16       stage.  Not having heard any of the evidence in the case,

17       not having heard the witnesses, there's -- there's not a

18       basis that I can see whereby the Court would be on solid

19       ground, given the obvious underlying factual issues that go

20       into an equitable estoppel claim to exclude it in its

21       entirety on a summary judgment basis.

22            So I'm going to deny plaintiff's motion as to AT&T

23       and the related Ericsson equipment within its accused

24       system, but as earlier stated in the record, I'm going to

25       grant the motion as to the equitable estoppel defense as to

```
1          Nokia, Verizon, and the waiver and acquiescence defense.
2          I'm granting that as unopposed by both defendants and
3          intervenors.
4               Okay.  Counsel, it looks like this brings us to
5          disputed motions in limine.  We're going to take a recess
6          at this juncture, and I'm going to direct the parties to
7          actively meet and confer as quickly as possible in light of
8          the guidance that you've received from the Court on the
9          dispositive motions that have been taken up and heard
10         today, and see where you can readily agree that hopefully a
11         significant number of the disputed motions in limine are
12         now able to be resolved based on that earlier guidance
13         received today.
14              And I'll look for a report from the parties once we
15         come back on the record.  But at this point, the Court
16         stands in recess.
17              MR. BUDWIN:  Your Honor, may I have permission to be
18         excused for the afternoon session?  I have a conflict and
19         wanted Your Honor's permission before --
20              JUDGE GILSTRAP:  We have plenty of lawyers in this
21         room.
22              MR. BUDWIN:  I figured that.  Thank you.
23           (Wherein a break was taken from 2:40 to 3:27 p.m.)
24              JUDGE GILSTRAP:  Be seated, please.
25              Before we get into the disputed motions in limine,
```

1          there is a motion on the docket that has not been directly

2          dealt with, at least to my knowledge, and this is

3          defendants' motion for partial summary judgment of no

4          pre-suit willful infringement.

5               I assume it's pretty much understood that there was

6          no pre-suit knowledge, and I assume plaintiff's not going

7          to argue that defendants were willful, based on anything

8          that occurred pre-suit.

9               MR. BLACK:  That's correct, Your Honor.

10              JUDGE GILSTRAP:  Is there a need for me to act on

11         this motion?  Is it going to be withdrawn?  I mean, I don't

12         really see a dispute here.

13              MR. BLACK:  I withdraw the willfulness -- the

14         pre-suit willfulness allegation.

15              MR. MATHEWS:  We, therefore, withdraw the motion.

16              JUDGE GILSTRAP:  Motion's withdrawn.  Okay.

17              Before we get to disputed motions in limine, I'll

18         note for the record that there are a series of agreed

19         motions in limine, and, actually, there are two iterations,

20         apparently, of the agreed motions in limine, and we have a

21         motion under docket No. 285 to grant the agreed motions

22         which would -- would activate and would grant by agreement

23         the motions in limine set forth in docket No. 284 which

24         would replace those in docket No. 274, which were the

25         earlier iteration that, apparently, had been clarified or

1    updated.

2         So am I correct the parties are in agreement that the

3    motions in limine as agreed to in Document 284 are to be

4    the operative agreed motions in lieu of any that were set

5    forth in document No. 274 and --

6         MR. BLACK:  Yes, Your Honor.

7         JUDGE GILSTRAP:  -- and that based on that agreement,

8    it's your request that the Court grant these by agreement

9    of the parties?

10        MR. MATHEWS:  Yes, Your Honor.

11        MR. BLACK:  Yes.

12        JUDGE GILSTRAP:  Okay.  So ordered.  Okay.  I

13   understand that there's some minor agreement as to

14   narrowing on the motions in limine, particularly

15   plaintiff's No. 3, No. 12, and perhaps some narrowing or

16   modification of No. 8.

17        Here's what I would suggest, Counsel.  Let's just

18   start with No. 1 and work our way forward.  If we come to

19   one where you have an agreement, either in whole or in

20   part, make sure that you announce it, and let me know about

21   it then, and we'll adjust as we go.  That way, I'm less

22   likely to overlook something unintentionally.

23        All right.  Let's start with plaintiff's motion in

24   limine No. 1, which has to do with all the matters that we

25   talked about this morning as the first motion and the Bosch

1          licenses, Hitachi licenses, Mr. Frohwitter, etc., etc.

2                MR. BLACK:  Yes, Your Honor.  Martin Black.

3                We heard several hours of argument this morning about

4          issues relating to the Hitachi licenses, Bosch licenses,

5          and Frohwitter.

6                Obviously, licenses are going to be mentioned during

7          the case, so we don't have any problem with that.  What our

8          concern is evidence or argument saying that we misbehaved

9          during discovery or made documents unavailable for the

10         case.  We don't believe that any foundation has been or can

11         be laid for that.

12               JUDGE GILSTRAP:  All right.  What's defendants got to

13         say?  What do defendants have to say?

14               MR MATHEWS:  Thank you, Your Honor.  Nick Mathews for

15         AT&T and Ericsson.

16               Certainly not looking to re-urge the motion from this

17         morning, but there are a couple of issues that we are

18         concerned about.

19               Without question, there is evidence in this case

20         that's missing.  Encumbrances from Hitachi, from Bosch,

21         Frohwitter's e-mails.  That is going to color the trial.

22         We have concerns the jury will perceive that, recognize

23         that the evidence isn't there, and we fear that they may

24         blame us, when the fact of the matter is, the evidence

25         should have been collected by IPCom.  And so outside the

1      context of a summary judgment motion and the context of a

2      MIL, we do think it would be appropriate to allow the

3      defendants and the intervenors to explain and talk about

4      why we're missing this relevant evidence that is referred

5      to and cited to in these agreements.

6          JUDGE GILSTRAP:  Well, there's a very high risk of

7      prejudice, depending on how that is done, Mr. Mathews.  I'm

8      going to grant this.  The Court's going to serve as a

9      gatekeeper.  If the defendants believe that there's a point

10     along the course of the trial where it becomes probative

11     and important to make that explanation, you'll need to come

12     to the bench and get approval in advance, leave in advance.

13     That way, I can hear what you're going to say before the

14     jury hears it, and I can try to allow anything substantive

15     to get through that filter but avoid anything overly

16     prejudicial.

17         MR MATHEWS:  Thank you, Your Honor.

18         JUDGE GILSTRAP:  Okay.  Plaintiff's No. 1 is granted.

19         Number 2.  This has to do with the phrase that I

20     struck from -- is it Wicker's report?

21         MR. FISHER:  Your Honor, Michael Fisher for IPCom.

22     This one has to do with -- it's the motion to exclude

23     evidence, argument, or insinuation that IPCom or its

24     predecessors or the inventors breached a duty to disclose

25     patents to standard setting organizations such as ETSI,

 1          3GPP, etc.

 2              JUDGE GILSTRAP:  Well, I don't have any problem with

 3          testimony or evidence that shows patents were not

 4          contributed to the standard.  I have a problem with an

 5          assertion that there was an affirmative duty that was

 6          breached, and I think the Court needs to be actively

 7          involved in any recitation to the jury that there was a

 8          duty to disclose that was affirmatively breached.  I'm

 9          going to grant this and require leave be granted before

10          there's any assertion to the jury that there was a duty

11          that was affirmatively breached.

12              The undisputed fact of what's not in the standard and

13          what was not contributed to the standard, that really is --

14          is outside of what I'm intending to cover by granting this

15          MIL.  I don't intend -- I don't intend for the jury to be

16          told, either by a witness or an argument, or any other way,

17          that the inventor breached an affirmative duty, without

18          coming to the bench and explaining to me exactly what, why,

19          and so forth, before it happens.  That's -- that's a bell

20          that can't be un-rung once you call somebody a -- someone

21          that's affirmatively breached a contractual obligation.

22          But if there's no dispute about what's not in the standard,

23          what was not contributed to standard, without assigning

24          blame or fault, I don't have a problem with that.  But if

25          there's going to be any evidence that imposes some kind of

1      fault or blame or breach of a duty, that, I'm going to want

2      -- that's what's covered by the grant here.  Clear enough?

3              MR. FISHER:  Yes, Your Honor.  Thank you.

4              JUDGE GILSTRAP:  So to that extent, this is granted

5      with that clarification.

6              Number 3, withholding or failing to disclose prior

7      art to the PTO.

8              MR. DEANE:  Thank you, Your Honor.  Michael Deane

9      from Alston & Bird.  And the parties have agreement on MIL

10     No. 3 consistent with your ruling this morning about a Dr.

11     Wicker this afternoon.  The parties agreed that defendants

12     can state that inventors possessed prior art and can show

13     which art was and was not before the patent office but

14     cannot say that the inventor did not give the reference to

15     a patent to the patent attorney; i.e., cannot connect the

16     dots between the prior facts.

17             JUDGE GILSTRAP:  Plaintiffs agree with that?

18             MR. PLIES:  Yes, Your Honor.

19             JUDGE GILSTRAP:  All right.  Then I'll order this

20     granted to the extent it reflects the parties'

21     understanding and agreement as announced into the record.

22             MR. DEANE:  Thank you, Your Honor.

23             JUDGE GILSTRAP:  Okay.  Plaintiff's MIL No. 4.

24     Ownership, investor structure or sources of funding

25     regarding IPCom.

1           MR. EDWARDS:  Yes, Your Honor.  Jeff Edwards for

2     IPCom.  This is a standard MIL that this Court and other

3     courts often routinely grant about who owns IPCom, who are

4     the investors in IPCom, what were the sources of the

5     funding over time, or now, and the defendants in their

6     response say, among other things, they want to be able to

7     tell the jury that IPCom restructured to remove Mr.

8     Frohwitter as managing director, but he kept participating

9     in negotiations.  It's sort of the same theme in the

10    unclean hands motion.  There are a number of other

11    justifications they give for wanting to get this evidence

12    in, although it's not necessary for such purposes.  Like

13    showing the chain of title of the patents.

14          You don't need to say who invests in IPCom or in the

15    prior owners in order to say who owned the patent over time

16    or who negotiated the purchase of a patent or how much it

17    cost or how it was transferred.

18          JUDGE GILSTRAP:  Let me -- let me jump in here,

19    Counsel.  This is -- this is a situation I see very often.

20    Plaintiff's concern that there's going to be some attempt

21    to denigrate their side of the case with that kind of

22    evidence, and defendants are going to tell me that they

23    simply want to be able to give an accurate background

24    overview of how we got to where we are.  And I've heard

25    that many times, and I suspect that's what defendants are

1    going to tell me here.  And to the extent a generic

2    background overview of how we got to where we are is given,

3    I think that's appropriate, but where it crosses the line

4    into insinuation and denigration is another thing.  And I'm

5    -- I typically grant these so that I can ensure that it

6    stays high level and background.  And I would say this to

7    plaintiffs, an effort by plaintiff to cast themselves as

8    David versus Goliath usually opens this door for the

9    defendants to come in and show that David is not a little

10   boy with a slingshot but somebody completely different.

11        So I'll grant this.  The clear guidance I'm trying to

12   give both sides is a generic high level overview of items

13   on a timeline that factually show how we got to where we

14   are is typically okay.  But to go beyond that, and to try

15   to insinuate somebody is something untoward, either as an

16   investor or a funder or an officer or a principal is going

17   to require leave of the Court before they go there.

18        MR. EDWARDS:  Your Honor, may I ask a clarifying

19   question?

20        JUDGE GILSTRAP:  Okay.

21        MR. EDWARDS:  Would you allow under your ruling

22   someone to bring out the fact that IPCom has hedge fund or

23   investor companies as stockholders and how much their

24   investment is worth and that sort of thing?

25        JUDGE GILSTRAP:  Unless there's some justification

1      for it, typically I would not grant leave for that.

2              MR. EDWARDS:  Thank you.

3              JUDGE GILSTRAP:  But as with many of these, the Court

4      can make a much clearer decision in real time when I see

5      what's actually before -- before me.  I can hear the last

6      ten questions, and I know where the next one is going to go

7      before you ask me, Can I do this or not?  That's a whole

8      lot better posture to be in than where I sit today.

9              So I'm going to -- I'm going to grant this.  I'm

10     going to be an active gatekeeper.  I don't see any

11     probative value compared to the prejudicial effect to go

12     into financial structures of any of the parties without

13     leave of the Court.  My intent is I don't want to tie the

14     defendants' hands where they can't even talk about who the

15     plaintiff is or how they came into being or what they do,

16     but it needs to be high level and generic.  And if it goes

17     beyond that, I'm going to expect a request in advance and

18     an explanation as to why it needs to go beyond that.

19     Understood?

20             MR. EDWARDS:  Thank you.

21             JUDGE GILSTRAP:  Okay.  And I'm serious, plaintiffs,

22     about opening the door with that David or Goliath routine.

23     I've seen that happen before, too.  And if you open it, I

24     am going to let the defendants walk right through it.

25             All right.  MIL No. 5, plaintiff's MIL No. 5 is next.

```
 1         People that would, or entities that would receive benefit
 2         or an income from any judgment.  And this says except to
 3         show witness interest or bias.  So I take it by the way
 4         this motion in limine is structured that the parties are
 5         not intending to exclude -- or the plaintiff's not
 6         intending to exclude any witness being asked about whether
 7         they would receive a material benefit if plaintiff wins or
 8         defendant wins, or whatever the outcome may be.  Is that
 9         correct?
10              MR. EDWARDS:  That's fair game.
11              JUDGE GILSTRAP:  Okay.  It's beyond that that
12         plaintiff seeks the Court's involvement as a gatekeeper?
13              MR. EDWARDS:  Yes, Your Honor.
14              JUDGE GILSTRAP:  Okay.  Let me ask defendants.
15              What -- what problem do you have with that, and why
16         would you need to go into who gets a benefit and who
17         doesn't, unless they're a witness on the stand that's going
18         to testify to the jury.
19              MR. ACHEY:  Yes, Your Honor.  Wes Achey with Alston &
20         Bird.
21              I think this is tied into all the issues we heard
22         this morning with Frohwitter.  Frohwitter FIPA, the
23         Frohwitter companies.  It's been made pretty clear that Mr.
24         Frohwitter's not going to show up, so -- but we do think
25         it's relevant for giving the background of Mr. Frohwitter
```

1          and how these patents were assigned from the various

2          entities that Frohwitter controlled through IPCom and how

3          they stand to benefit because Mr. -- I think Mr. Black

4          acknowledged that Mr. Frohwitter does have a financial

5          stake in this case.

6               So, you know, we feel like that's -- that's going to

7          be relevant.  It's all going to be tied into who IPCom is

8          and how we got here, because it is an important role in

9          this case.

10              JUDGE GILSTRAP:  Well, Mr. Frohwitter is not a

11         defendant in this case, and we're not going to try a case

12         against an empty chair.  That is clearly something that's

13         typically excluded.  Again, how IPCom is structured and how

14         it started out, where it started out and the various steps

15         along the way to where it is today, as long as it's factual

16         and it doesn't involve some insinuated fault or harm or

17         wrongdoing, it stays purely high level factual, I don't

18         have a problem with it.  But I don't intend this trial to

19         be all about Bernhard Frohwitter, and how evil he is or how

20         righteous he is, and he's not even here.  That's not --

21         that's not what this trial is going to be about.

22              MR. ACHEY:  I understand.

23              JUDGE GILSTRAP:  And so if you're going to go beyond

24         something high level, and if you're going -- if you're

25         going to ask or you're going to imply somebody may be less

```
 1          than unbiased and fair-minded because of a financial
 2          interest or bias, if it's not a witness on the witness
 3          stand, you're going to have to get leave from me before you
 4          do it.  Okay?
 5               MR. ACHEY:  Understood.
 6               JUDGE GILSTRAP:  All right.  With that explanation,
 7          that's granted.
 8               All right.  Plaintiff's MIL No. 6.  This is the one I
 9          assume there's an agreement on.  This was mentioned earlier
10          under some of the -- there's not?
11               MR. EDWARDS:  No, Your Honor.  I'm sorry.  Must be
12          another.
13               Your Honor, this motion has to do with the fact that
14          IPCom was created in 2007, has been involved in licensing
15          and various litigations over that time period.  And the
16          defendants opposition to this motion primarily where it
17          focuses entirely on 19 settlement agreements between Nokia
18          and IPCom between, I think it's 2010 and 2014.  What
19          happened is Nokia for --
20               JUDGE GILSTRAP:  Let me stop you, Counsel.  Are these
21          settlement agreements a part of the damages expert's
22          report?
23               MR. EDWARDS:  No.  They don't -- they don't relate to
24          the patents-in-suit or their foreign counterparts.  They
25          relate to settlements of one off, one patent at a time in
```

 1          Germany, or the UK --

 2              JUDGE GILSTRAP:  But that was not my question.

 3              MR. EDWARDS:  I'm sorry.

 4              JUDGE GILSTRAP:  Are these included in --

 5              MR. EDWARDS:  No, they are not.

 6              JUDGE GILSTRAP:  -- and discussed within the damage

 7          expert --

 8              MR. EDWARDS:  They are not.

 9              JUDGE GILSTRAP: -- report?

10              MR. EDWARDS:  That are not in the damages expert's --

11          oh, well --

12              JUDGE GILSTRAP:  I mean, this is not going to be a

13          backdoor Daubert motion under limine practice where you

14          circumscribe a damages expert's report when you didn't do

15          it --

16              MR. EDWARDS:  They're not -- I'm sorry.  They're not

17          relied on as comparable licenses, is what I meant to say.

18              JUDGE GILSTRAP:  Well, I don't intend under limine

19          practice to limit an expert from anything that's within the

20          four corners of their report.  If it needed to be

21          circumscribed, it should have been done by way of a Daubert

22          motion or motion to strike, and that's not what limine

23          practice is for.  So this is not going to be a backdoor

24          Daubert motion, and I'm not going to keep the expert from

25          saying what's in their report.  They're not going to go

```
 1          beyond their report.  And if this has some application
 2          outside the expert witnesses to the fact witnesses, then
 3          you need to let me know about it, and we can talk about
 4          that.
 5               MR. EDWARDS:  Your Honor, our concern is the -- is
 6          the prejudice of putting before the jury and arguing that
 7          the patents ensued are somehow invalid because a German
 8          unrelated patent or UK patent was settled when Nokia sued
 9          IPCom in 2010, and they agreed to settle it on a no royalty
10          basis.  And that's what all of these are.  They have
11          nothing to do with the patents-in-suit.  That --
12               JUDGE GILSTRAP:  Tell me why you didn't bring a
13          Daubert motion or a motion to strike if you feel like that
14          portion of the expert's report is not probative or lends
15          itself to a prejudicial application.
16               MR. EDWARDS:  May I confer, Your Honor?
17               JUDGE GILSTRAP:  Sure.
18               MR. EDWARDS:  Thank you.
19               MR. BLACK:  Defendants are trying to figure out
20          whether it's in the report because we don't think it is.
21               JUDGE GILSTRAP:  Well, if it's in the report, it's
22          going to stay in the report.  That part, I can tell you.  I
23          mean, the plaintiffs --
24               MR. BLACK:  I understand.
25               JUDGE GILSTRAP:  Yeah.
```

```
 1          MR. BLACK:  I understand the practice, Your Honor.

 2     Things have to be brought by Daubert, not by MIL.  This

 3     issue -- these were -- but nobody's said yet that it's in

 4     his report.  It's not a -- these are not licenses that were

 5     used as comparables by anyone.  They are -- they were the

 6     -- the parallel-type YARs in Europe on unrelated patents,

 7     and maybe after a first instance decision, rather than

 8     appeal, in order to deal with the cost issues, they just

 9     agreed to license them for free and settle them.

10          JUDGE GILSTRAP:  Well, let me ask you this.  Outside

11     the damages context, would there be any relevance to these

12     through either another expert or a fact witness?

13          MR. BLACK:  No, not at all.  They're not comparable

14     licenses.  No one's ever said that they are, because

15     they're just settlements of like an IPR that went bad

16     before they went on appeal.  And the trouble is they want

17     to put a 15 in front of the jury and then say, "Oh, this

18     implies that the rest of the portfolio's invalid.  That's a

19     big concern.  That's why we have -- that's why we filed it

20     as a MIL.

21          JUDGE GILSTRAP:  All right.  Let me ask the

22     defendants.  Beyond the expert witnesses who may address

23     these in their expert reports, do you have any intention of

24     bringing these in through other witnesses?

25          MR. POWERS:  No, Your Honor.  Jonathan Powers for
```

1       AT&T and Ericsson.

2           The only reason we would use these settlement

3       agreements is to rebut IPCom's damages model.  That's the

4       sole purpose and --

5           JUDGE GILSTRAP:  Do you have a damages expert that

6       has issued a report that's -- I guess that's Mr. Bone?  Is

7       that right?

8           MR. POWERS:  That's correct, Your Honor.

9           JUDGE GILSTRAP:  So this is the part of his report

10      that I didn't strike.

11          MR. POWERS:  Well, I don't know that Mr. Bone talks

12      about these licenses in the portion that you didn't strike,

13      but the licenses are still relevant during the

14      cross-examination of IPCom's damages expert and their

15      technical portion of an expert Dr. Chrissan.  Got some

16      slides.  It's sort of -- to understand why these licenses

17      are relevant requires breaking down exactly what IPCom's

18      damages model is and their proudless patents, and the

19      gradings that they use to apportion out their damages from

20      the DC license.  And I'll be happy to talk about those,

21      Your Honor.

22          Before I do, I met and conferred with Mr. Edwards.

23      He asked that I seal the courtroom for this portion.

24          JUDGE GILSTRAP:  That's fine.  But before we get into

25      the particulars, what you're telling me is these settlement

```
 1        agreements or license agreements you may -- you may want to
 2        bring these up by cross-examination when the expert who you
 3        are cross-examining has not addressed them in his report
 4        and has not testified about them affirmatively on direct.
 5             MR. POWERS:  That's exactly right, because they are
 6        one hundred percent contradictory to the grades that
 7        IPCom's expert assigned to certain patents during their
 8        apportionment analysis.  So he says --
 9             JUDGE GILSTRAP:  Well --
10             MR. POWERS:  He says these patents -- certain
11        patents, certain unasserted patents, are worth certain
12        amounts, but IPCom has given away royalty-free licenses to
13        those patents that contradict the opinions of their
14        experts.  So we think they're highly relevant and show
15        plause in IPCom expert's methodology.
16             JUDGE GILSTRAP:  I don't know why I'm hearing about
17        this on Daubert -- I mean, on motion in limine practice.
18        The -- let me -- let me put it this way, and maybe we can
19        short-circuit the process.
20             Each of the damages experts are going to testify
21        within the four corners of their damages reports, as they
22        exist once the pretrial's over and any possible
23        circumcision -- or circumscription, I should say, of those
24        reports has taken place.  And once those witnesses have
25        testified within the four corners of their reports, they're
```

1       going to be cross-examined within the areas that they

2       testified on direct.  So if what you-all are concerned

3       about is within either of the damages expert's reports and

4       as testified to by those damages expert, they're fair game

5       for cross-examination.  But you can't cross-examine a

6       witness within the scope of the direct if you've got

7       something not addressed in his report, not talked about in

8       his testimony based on that report, and you come out of

9       left field with it, and it's not in your expert's report,

10      and your expert doesn't opine that it creates all the

11      problems that you want to infer through this

12      cross-examination.  If you're going to do that, you're

13      going to have to get leave from me before you do it.

14           If it's within that expert's report and that expert

15      cross -- I mean, testifies about it on direct,

16      cross-examine them all day long about what they've raised

17      in their direct testimony, but don't bring something in

18      that's extraneous that is foreign to the report and foreign

19      to their direct testimony, without leave of the Court.

20           MR. POWERS:  Absolutely understood, Your Honor.  That

21      covers half of our response, for the Nokia settlement

22      agreements.  There's a second portion where IPCom's experts

23      affirmatively devalue certain patents based on other

24      litigation, not the Nokia settlement agreements.  For

25      example, litigation between IPCom and HTC, they say the

1    result of that litigation devalued certain unasserted

2    patents which increases their damages number here.  They do

3    disclose that in their reports as the basis for upping

4    their damages number.  I highly doubt they're going to ask

5    their expert about it on direct.  We think we should still

6    be able to mention that litigation with them on

7    cross-examination.

8         JUDGE GILSTRAP:  I think if it's in their expert

9    report, it's fair game.  I think if it's not, it's not.

10        MR. POWERS:  Understood, Your Honor.

11        JUDGE GILSTRAP:  Questions?  All right.  I'm going to

12   grant plaintiff's motion in limine 6 to comport with the

13   guidance I've given you on the record.  The expert

14   witnesses on damages are going to be limited to testifying

15   affirmatively within the four corners of their reports, and

16   they're subject to being cross-examined, both as to their

17   testimony and what they may have put in their reports that

18   they don't raise on direct examination.  And if you're

19   going to go beyond those parameters, you need to get leave

20   of the Court in advance.  All right.

21        MR. POWERS:  Thank you.

22        JUDGE GILSTRAP:  All right.  Plaintiff's MIL No. 7.

23   This has to do with claims and patents that -- and accused

24   products that have been dropped or no longer in the case.

25        What's the problem with this from the defendants'

1   standpoint.

2     MR. FISHER:  Thank you, Your Honor.  Michael Fisher

3   for IPCom.

4     So a patent or product that has been dropped from the

5   case obviously doesn't have --

6     JUDGE GILSTRAP:  I understand why you want me to

7   grant this.  What I want to hear from them is why I

8   shouldn't grant it.

9     MR. FISHER:  Oh.  Sorry.

10     JUDGE GILSTRAP:  Stand by.  You may still be needed.

11     MR. POWERS:  Thank you, Your Honor.

12     I would ask that we seal the courtroom so that I can

13   explain the context for the relevance of our limited

14   opposition.

15     JUDGE GILSTRAP:  All right.  Then based on counsel's

16   request, I'll order the courtroom sealed.  Anyone present

17   not subject to the protective order that's been entered in

18   this case should excuse themselves and remain outside until

19   the courtroom is reopened and unsealed.

20        (COURTROOM SEALED.)

21

22     (This portion of the transcript is sealed and

23       Filed under separate cover.)

24

25       (COURTROOM UNSEALED.)

```
1            JUDGE GILSTRAP:  Is there some partial agreement on
2       plaintiff's MIL 8, Counsel, or what do we have here?
3            MR. BLACK:  I believe so, that there's some agreed
4       text.
5            MR. POWERS:  There is, Your Honor, if you'll give me
6       a moment.
7            JUDGE GILSTRAP:  Take a moment.  Go ahead, Counsel.
8            MR. POWERS:  Based on IPCom's representation that it
9       will not seek to bolster its expert testimony based on
10      those experts having employed similar methodologies in
11      other litigations, defendants withdraw their opposition to
12      IPCom's MIL No. 8.
13           JUDGE GILSTRAP:  All right.  Then based on that
14      withdrawal, I will grant plaintiff's MIL No. 8.
15           MR. POWERS:  Thank you, Your Honor.
16           JUDGE GILSTRAP:  Plaintiff's MIL No. 9.  What's the
17      defendants' problem with this as proffered?
18           MR. MATHEWS:  Thank you, Your Honor.  Nick Mathews.
19           The issue with our MIL -- with the MIL is twofold.
20      The pre-suit correspondence between IPCom and the
21      defendants is relevant to two important issues.  Number 1
22      is damages, and No. 2 is the fact that IPCom is still
23      pursuing a claim for post suit willfulness.  So they've
24      dropped pre-suit willfulness, but they still have a claim
25      for post suit.
```

1          So on the willfulness issue, we believe that the

2     pre-suit correspondence which shows the good faith

3     activities of AT&T and others is relevant and informative

4     to the post suit lack of willful infringement defense.  We

5     think it's relevant to the overall conduct of the parties.

6     That's willfulness.

7          On damages, it's incredibly important.  We just heard

8     a little bit about this while the court was sealed, but

9     IPCom's damages methodology is based on patent proud lists.

10    These are lists of patents that are sent before lawsuits

11    are filed in the context of license negotiations.

12         IPCom says that the patent proud list that it

13    exchanged with Deutsche Telekom and other companies are

14    informative of the most valuable patents that are in their

15    portfolio.

16         In this case, the letters that we looked at earlier,

17    they show none of the patents-in-suit were called out by

18    IPCom when the letter got sent to AT&T.  Not one of them.

19    They weren't flagged or highlighted.  And we think that's

20    very fair ground for cross-examination as to the value of

21    these particular patents, because they weren't called out.

22         So those are the two bases for opposing the MIL.

23         JUDGE GILSTRAP:  All right.  Let me hear from

24    plaintiff in response.

25         MR. EDWARDS:  Your Honor, as to the fact that they

```
 1          weren't called out, these are the initial notice letters.
 2          So these letters were -- were made moot by the removal of
 3          pre-suit willfulness from the case.  The -- first of all,
 4          the Verizon letter, Verizon says that they never got the
 5          letter, so it's moot as to Verizon.  But -- well, let me
 6          put the letter up here.
 7               JUDGE GILSTRAP:  Are you telling me, Counsel, that if
 8          plaintiff concedes they can't establish pre-suit knowledge
 9          of the patents-in-suit, and therefore, can only make a
10          claim for willful infringement based on conduct occurring
11          after suit was filed, that defendants conduct prior to the
12          filing of suit is ipso facto irrelevant to the willfulness
13          consideration?
14               MR. EDWARDS:  Well, in this case --
15               JUDGE GILSTRAP:  Are you telling me that?
16               MR. EDWARDS:  In all cases, no.
17               JUDGE GILSTRAP:  You're telling me that in this case.
18               MR. EDWARDS:  Yes.
19               JUDGE GILSTRAP:  Why is this case different?
20               MR. EDWARDS:  Well, this letter -- this letter does
21          not -- the post suit willfulness case is based entirely on
22          the evidence after the filing of the complaint.  The notice
23          letter on January --
24               JUDGE GILSTRAP:  That's why it's called post suit.
25               MR. EDWARDS:  Correct.  And there is nothing about
```

1      the January 10, 2020, letter that relates one way or the
2      other to post suit willfulness.  The letter doesn't call
3      out the patents, and there's nothing from that letter from
4      which a jury could find one way or the other about
5      willfulness as to post suit after the complaint was filed
6      and failure to take a license.
7              JUDGE GILSTRAP:  All right.  What else?
8              MR. EDWARDS:  The defendants' claim that there's an
9      inconsistency between the representations about standards
10     essential patents status in the January 10, 2020, letter
11     which is, as Mr. Mathews just mentioned, doesn't talk about
12     the patents-in-suit, it's listed in the appendix of the
13     letter, and IPCom's position after and during this
14     litigation, but there isn't any way to tease out an
15     inconsistency between a cover letter that doesn't talk
16     about those patents-in-suit and a statement about the SEP
17     status of the patents-in-suit in this litigation.  So it's
18     irrelevant as to that.
19             JUDGE GILSTRAP:  All right.  Anything further?
20             MR. EDWARDS:  No.
21             JUDGE GILSTRAP:  I'm going to deny this motion in
22     limine.
23             Let's go to plaintiff's MIL No. 10.
24             MR. PLIES:  Jeff Plies for IPCom.
25             So, Your Honor, defendants want to run a theme in

1          this case that Nokia and Ericsson were at the standards

2          bodies, and they're the ones who developed the technical

3          standards that are at issue in some the infringement

4          contentions in this matter.  And they're going to contend

5          that IPCom either -- or its predecessors, either weren't

6          there at the standards bodies, or that they didn't make any

7          substantive contributions to the standards.  And then levy

8          that to try to suggest that IPCom cannot properly allege

9          that the networks implementing the standards can infringe

10         the patents and play on jury's potential confusion or bias

11         or try to get them to think that IPCom doesn't deserve to

12         accuse products that practice the standards because IPCom's

13         not the one who developed them.

14              As we know, that's not a proper infringement

15         analysis.  Infringement analysis, as we know, is mapping

16         the construed claims to the accused instrumentalities.  You

17         know, as we also know, knowledge of the patent is not

18         required for infringement, and certainly who built the

19         product or who wrote the standards is similarly irrelevant

20         to whether or not the products map to the claims.

21              A lay jury could easily get confused on this issue

22         about whether IPCom can accuse products and

23         instrumentalities that practice standards designed by

24         others, and so that's an inference that we don't think it's

25         proper for the defendants to try and imply to the jury, and

1       it's a similar reason that often MILs are granted, and

2       there's an agreed one in this case, for why defendants

3       normally are not allowed to say why the accused

4       instrumentalities are covered by their own patents, because

5       the juries can get confused about whether they can infringe

6       the plaintiff's patents as well.

7           So our MIL goes to try and address that concern, Your

8       Honor, and defendants in their opposition really just sort

9       of bear out the concern; right?  So first of all, they

10      restyle our MIL leaving out the part about implying

11      noninfringement, and then they say, Defendants agree that

12      they will not argue that they do not infringe the asserted

13      patents solely because IPCom and its predecessors did not

14      contribute to the standards at issue.

15          So, Your Honor, it seems like they do intend to argue

16      this, but that's not the only reason they're going to argue

17      for noninfringement.  And then they say the fact that

18      IPCom, Bosch, and Hitachi did not develop the standards

19      that IPCom now relies on to prove infringement, defendants

20      should be permitted to tell the jury as much to foreclose

21      the speculation on the part of the jurors.

22          So this -- you can see right here, they're

23      telegraphing exactly where they're going.  We think this is

24      improper.  They're trying to confuse the jury into thinking

25      that because we didn't develop the standards, and they did,

```
 1        the products don't infringe.  And we think the Court should
 2        grant the MIL.
 3             JUDGE GILSTRAP:  All right.  What do you say, Mr.
 4        Mathews?
 5             MR. MATHEWS:  So first of all, Your Honor, defendants
 6        will not argue that they do -- do not infringe because
 7        IPCom did not contribute the accused technology.  We are
 8        not going to do that.  But one of the things the defendants
 9        can always say, and they should be able to say in this
10        case, is that they did not copy the accused technology but
11        rather was independently developed.  And in this case, the
12        accused technology is largely the technical standards that
13        were not developed by IPCom, and they were developed in
14        many respects by some of the defendants to this case.  And
15        we believe that's relevant to the question of willfulness
16        as to not copying.  It's also relevant to rebutting IPCom's
17        secondary considerations of nonobviousness.
18             JUDGE GILSTRAP:  There's not an affirmative
19        allegation of copy made by the plaintiffs in this case, is
20        there?
21             MR. MATHEWS:  No.
22             JUDGE GILSTRAP:  Why do you need to rebut what's not
23        been asserted?
24             MR. MATHEWS:  Several reasons.  They, one, argue that
25        our conduct is willful.  The fact that we did not copy
```

1       their technology is evidence that our conduct was not

2       willful.  Number 2, they argue that their inventions are

3       not obvious.  One factor is whether copying was involved,

4       and there was no copying here.

5            And so, again, we have no intention whatsoever to

6       argue that we don't infringe due to development, but we do

7       you think that the fact, just the mere fact of how the

8       accused technology was developed, that it was independently

9       developed separate and apart from IPCom is relevant and

10      should be fair game.

11           JUDGE GILSTRAP:  Well, answer this for me.

12           Are your intending to stop with the factual assertion

13      that IPCom did not help develop the standard, or are you

14      going to take the next step and say, But all these innocent

15      defendants over here did help develop the standard, and,

16      therefore, they haven't done anything wrong?

17           MR. MATHEWS:  Yes, so we will not say that.  What we

18      will say are the simple facts of how the accused technology

19      was developed.

20           JUDGE GILSTRAP:  Well, I have no problem with the

21      fact being portrayed to the jury, and I don't think there's

22      any real dispute, that the plaintiff did not help formulate

23      or contribute to the development of the standard.  And I

24      think that's fair game.

25           I think going beyond that as to who did develop the

1       standard and -- once you go beyond that plaintiff did not

2       develop the standard, then I think you are starting down

3       the slippery slope of, "And we did, and, therefore, we

4       don't infringe," and all kinds of possible implications and

5       innuendo that might confuse the jury.

6              I'm -- I'm not opposed, and I have no problem with

7       evidence being presented that shows that the plaintiff did

8       not develop the standard.  If you're going to go beyond

9       that, and we're going to get into a big discussion of who

10      did and what is the standard and who contributed to it, and

11      why is it valuable, then I think I need an explanation in

12      advance of that happening.

13             MR. POWERS:  Fair enough, Your Honor.  Completely

14      understood.  One point we will make is that certain of the

15      parties' own standard development documents is asserted

16      prior art discussed in expert reports in this case.  It's

17      our presumption that that would be carved out from the

18      scope your MIL ruling, given that it was disclosed in the

19      reports.

20             JUDGE GILSTRAP:  Absolutely.

21             MR. POWERS:  Okay.

22             JUDGE GILSTRAP:  I'm not trying to limit the expert's

23      reports by a MIL ruling.

24             So I'll deny the motion as to the fact that IPCom did

25      not contribute to the standard or help develop the

```
 1            standard.  I'll grant the motion to the extent there's a
 2            discussion of the standard beyond that fact, and I'll
 3            expect defendants to seek and obtain leave before they go
 4            further than that.  And this ruling does not impact and is
 5            not intended to impact the existing scope of the experts'
 6            reports.
 7                 MR. MATHEWS:  Thank you, Your Honor.
 8                 JUDGE GILSTRAP:  Okay?
 9                 MR. FISHER:  Your Honor, may I just ask one
10            clarification on that?
11                 JUDGE GILSTRAP:  You may.
12                 MR. FISHER:  So having tried a similar case before
13            here with Nokia with different counsel, and with -- not
14            with Nokia -- with Ericsson, and having heard in opening
15            how they have all these patents that cover the standard and
16            how they made the standard and how our folks weren't there,
17            and implying, really, an opening, that from the very
18            beginning of the case that they're better than us because
19            they were at the standards body, and we weren't, and,
20            therefore, the products can't possibly infringe the IPCom
21            patents.  I just want to make sure that we don't get into
22            that in the opening before we can deal with it in limine,
23            and everything else, because it is a major theme that
24            they've -- that they have tried to run in prior cases, and
25            it's very dangerous and unfair.
```

```
 1              JUDGE GILSTRAP:  Well, the Court's limine rulings
 2      don't -- aren't limited to only witness testimony.  They're
 3      limited to any statements before the jury, whether it's
 4      opening statement, closing argument, direct or
 5      cross-examination.
 6              If you're going to communicate to the jury something
 7      that runs afoul of one of my MIL rulings in any way, in any
 8      context, you need to do so and get leave from me before you
 9      do it.  A MIL can be violated in opening statement just as
10      easily as it can with a witness on the witness stand, in my
11      view.
12              MR. FISHER:  Thank you, Your Honor.  I just wanted
13      that on the record so we don't have a problem later.
14              JUDGE GILSTRAP:  All right.  Let's go to plaintiff's
15      MIL No. 11.  Is this the empty chair argument, Counsel?
16              MR. BLACK:  Yes, Your Honor.  My chair was empty.
17      Yes, it's the empty chair argument, and I think we've ran
18      around on that.  We don't have a stipulation from the
19      defendant yet, so...
20              JUDGE GILSTRAP:  Defendant, why should you be free to
21      try the empty chair?
22              MR. MATHEWS:  So we don't intend to try the empty
23      chair, but we do have --
24              JUDGE GILSTRAP:  Probably an empty German chair.
25              MR. MATHEWS:  It's certainly and empty German chair
```

```
 1          at the moment.  Yeah, that's right.
 2               So the issue we have is this.  There is factual
 3     testimony that IPCom's damages experts rely upon from Mr.
 4     Christoph Schoeller who is a witness in this case.  And the
 5     damages experts rely on Schoeller's testimony to support
 6     this proud patent list that you've heard a little bit
 7     about.  And the problem we have is that when we deposed Mr.
 8     Schoeller, he testified that he actually wasn't involved
 9     with this directly.  So we asked Mr. Schoeller, "Do you
10     have an understanding as to how the patents that were
11     selected for presentation to potential licensees were
12     selected by IPCom?"  Again, this is the proud patent list,
13     the crux of their damages model.  He says no.  And then the
14     follow-up question is, "Is it your testimony that it was
15     Mr. Frohwitter who is primarily responsible for identifying
16     the patents that IPCom wanted to highlight?"  And he says
17     yes.  And so we think this is very fair game for
18     cross-examination.
19               The fundamental input to their damages model is
20     testimony from someone who lacks personal knowledge.  And
21     the one person that he points to is the person who's not
22     here.  And so that's the challenge we have, and I'm sorry
23     to keep re-urging this issue, really, to Mr. Frohwitter,
24     but it is important given how central he is and what
25     they've done here with their damages model.  And that's the
```

1      basis for our opposition.

2           JUDGE GILSTRAP:  Let me ask this question.  Every

3      witness is presumed to be testifying based on their own

4      personal knowledge, unless they're an expert.  It's one

5      thing to show a witness doesn't have personal knowledge;

6      it's another thing to show where that knowledge is

7      reposited that the witness doesn't have within their own

8      personal knowledge.

9           I have no problem showing any witness who says they

10     don't know, and they don't have personal knowledge of a

11     matter, don't have personal knowledge of a matter, and

12     that's completely fair.  Why is it important to then go the

13     next step and say, But the person who does have personal

14     knowledge is over there in Germany and won't cross the

15     Atlantic to come over here and stand up for himself?

16     That's where it gets to be a problem, Mr. Mathews.

17          MR. MATHEWS:  And I agree, Your Honor.  What you just

18     described may be a step too far, but the issue here is that

19     --

20          JUDGE GILSTRAP:  Oh, I'm describing what I'm afraid

21     might happen from your side of the case.

22          MR. MATHEWS:  I understand, Your Honor.  The issue we

23     have is this an issue that's going to permeate several

24     witnesses.  It's not just Mr. Schoeller.  The experts rely

25     on Mr. Schoeller.  They talk about this proud patent list

```
1         extensively.  They use it as the linchpin for their model.
2              What I'm concerned about with this motion in limine
3         is that we are going to lack the ability, and we're going
4         to be constrained and what is, I think you would agree,
5         fair game cross-examination regarding an improper input to
6         a damages opinion.  And that's what we'd like to get into.
7         Where the line draws in terms of, you know, the actual
8         person who did that isn't here, whether that's permitted or
9         not, that's an open issue.  We think that's fair game in
10        the context of everything that's happened, but we certainly
11        want to make clear that we should be allowed in the damages
12        case to talk to the expert of IPCom to make clear that its
13        input, the input they're using, is not based on anything
14        with personal knowledge.
15             JUDGE GILSTRAP:  Well, I mean, as you understand,
16        many times expert witnesses testify about things based on
17        what they've been told by other people, and they don't have
18        personal knowledge of it, but they've been told X, Y, and
19        Z, they run their analysis, and they come up with an
20        opinion that X, Y, Z is either terribly bad or wonderfully
21        good.  So they don't have personal knowledge almost by
22        definition.
23             MR. MATHEWS:  And what we have, Your Honor, is two
24        layers of that.  Right?  We have an expert asking for tens
25        of millions of dollars sitting on the stand whose only
```

```
 1          input is a fact witness who doesn't have personal
 2          knowledge.  And that fact witness says the only person who
 3          does is Mr. Frohwitter.
 4              JUDGE GILSTRAP:  Well, I'm not going to preclude you
 5          from showing that a witness has testified about something
 6          they have no personal knowledge of.  That's fair.  I'm
 7          going to require you get leave of the Court before you go
 8          on to identify who does have the personal knowledge that
 9          the witness doesn't have.
10              MR. MATHEWS:  Understood.
11              JUDGE GILSTRAP:  And you'll have to justify that
12          before you go into that.
13              MR. MATHEWS:  Okay.  Thank you, Your Honor.
14              JUDGE GILSTRAP:  All right.  That, I think,
15          accurately, Counsel, would be a grant as clarified in the
16          record.
17              All right.  Plaintiff's MIL No. 12.
18              MR. MATHEWS:  Defendants' opposition to MIL No. 12 is
19          withdrawn.
20              JUDGE GILSTRAP:  MIL 12 -- plaintiff's MIL 12 is
21          granted.  All right.
22              That brings us to defendants' motions in limine.
23          Let's start with No. 1.
24              MR. ACHEY:  Good afternoon, Your Honor.  Wes Achey
25          with Alston & Bird representing Nokia again.
```

```
 1                JUDGE GILSTRAP:  Yes, sir.

 2                MR. ACHEY:  MIL No. 1 seeks to prevent the parties

 3      from discussing the fact that an expert has worked for a

 4      party in the past recurrently.  I think MIL No. 1 was also

 5      styled as to relating to law firms, but my understanding is

 6      that IPCom has agreed that the parties will not discuss

 7      experts' prior work for law firms, so what we're really

 8      talking about here with this MIL is experts' work with the

 9      parties in the case.

10                And particularly this relates to Dr. Chrissan who

11      you've heard about who does the grading and the

12      comparability analysis.  We believe that allowing IPCom to

13      discuss the fact that Dr. Chrissan has worked and is

14      working for Nokia is irrelevant and will be confusing and

15      prejudicial.

16                JUDGE GILSTRAP:  Let me ask you this, Counsel.  Give

17      me some idea of the extent of what we're talking about.

18                Has Dr. Chrissan worked for Nokia two or three times,

19      or has he worked for Nokia 50 or 60 times?

20                MR. ACHEY:  Sure.  One time, is my understanding, and

21      he is -- he's been retained in the context of being a

22      source code reviewer.  So it's very different, and what

23      we're concerned about is that somehow IPCom uses the fact

24      that he's retained by Nokia to somehow imply that he is

25      doing the same type of grading system comparability
```

```
1       analysis that we're attacking in this case.  We -- and so
2       in order to rebut that, we're going to have to go into
3       exactly what he's doing, what he's not doing, and we think
4       it will turn into a sideshow that will, frankly, waste
5       time, create jury confusion, and -- and then --
6            JUDGE GILSTRAP:  Is he doing for Nokia in the other
7       case anything similar to what he's doing for Nokia in this
8       case?
9            MR. ACHEY:  He is not, Your Honor.
10           JUDGE GILSTRAP:  Well, without going into all the
11      details and creating a sideshow, why can't it clearly be
12      shown, "How many times have you worked for Nokia before?"
13      "Once."  "Did you do anything for them in that case similar
14      to what you're doing for them in this case?"  "No."  And
15      then we go on down the road.  What's the problem with that?
16           MR. ACHEY:  That is one way to do it, but --
17           JUDGE GILSTRAP:  I don't intend to let something
18      become a sideshow that doesn't need to become a sideshow.
19      But, I mean -- and from the other side of the coin,
20      plaintiffs, I don't see any real great probative value to
21      pointing out that a witness has worked for an opposing
22      party once before, unless you've got a whole lot more than
23      one time.
24           Now, if they did exactly there what they're doing
25      here, and there's some implication that it's just a cookie
```

1      cutter, Take my money, sign my name, and give you the same
2      thing I gave you before, that may be different, if it goes
3      to the credibility.  But if defense counsel's
4      representation's correct, that the work previously is not
5      of a similar type as the work at present, I don't see how
6      having done it once before if really probative of anything.
7           Why don't you tell me what plaintiff's view is?
8           MS. GAGLIARDI:  Sharon Gagliardi, Your Honor, for
9      IPCom.
10          JUDGE GILSTRAP:  Yes, ma'am.
11          MS. GAGLIARDI:  The MIL would cover other experts
12     besides Dr. Chrissan.  Dr. Wicker, for instance, has
13     testified, my understanding, is eight times prior for AT&T.
14     I think it's probatively -- it's discussed for lack of bias
15     and for his qualifications.  And defendants' opposition to
16     plaintiffs' MIL 6, for example, they say that, you know,
17     Dr. Chrissan's bought and paid for.  Great.  You know, they
18     tend to talk about him and say he's a hired gun.
19          And so to show a lack of bias, we do think it's
20     relevant to show his expertise and how he's --
21          JUDGE GILSTRAP:  So is your response if Dr. Chrissan
22     is a hired gun, then Dr. Wicker is a hired arsenal?  Is
23     that your -- is that your reply?  I mean, two wrongs don't
24     make a right here.  I understand the MIL is broader than
25     just Dr. Chrissan, although Dr. Chrissan seems to be the

```
 1          main topic of the discussion in the briefing on the MIL.

 2               What other experts do you think fall into this

 3          category where they've repetitively been retained by either

 4          plaintiff or any of the defendants?

 5               MS. GAGLIARDI:  Dr. Wicker has been this defendant's

 6          expert.  He's been eight AT&T infringement cases before.

 7               JUDGE GILSTRAP:  Okay.  And that's eight out of how

 8          many?

 9               MS. GAGLIARDI:  I have no idea.

10               JUDGE GILSTRAP:  I mean, you-all are fighting about

11          something that in all reality is probably not going to

12          register high on the jury's radar screen.

13               If there's a reasonable basis, even if it's somewhat

14          tenuous, to show that the witness has a bias, I think

15          that's fair game.  But there's got to be some basis, and at

16          least with Dr. Chrissan, having worked for Nokia once

17          before is no real reasonable basis to say he's biased

18          toward Nokia.  And I'm not sure --

19               MS. GAGLIARDI:  No, we're trying -- we're trying to

20          show lack of bias.

21               JUDGE GILSTRAP:  Well, whichever way the knife cuts.

22          In other words, you know, this is -- this is one of these

23          is good for the goose, good for the gander situations.

24          Eight times for AT&T, that -- you know, I don't know what

25          -- I don't know what the overall likelihood that that
```

1          creates some kind of bias is.  I know Dr. Wicker's probably

2          testified many times more than eight times in this

3          courtroom, and he's a very active expert witness.  I would

4          be surprised if eight times is any kind of a major part of

5          his background and experience.

6               I tell you what let's do.  I'll grant this, and I'll

7          make it mutual to both sides and all parties, and if

8          anybody's going to ask an expert witness how many times

9          they worked for the -- how many times they worked for the

10         other side, come up and show me that there's some

11         reasonable basis to think it might make a difference.

12         Otherwise, to be honest with you, it probably makes you

13         look worse trying to bring it up than it helps you.  And

14         that goes for both sides.

15              If there's something there, there's something there.

16         But trying to show there's something there when there's not

17         something there is usually fairly counterproductive.

18              But if you think you've got a basis to show that the

19         past history of the opposing party's expert that you want

20         to cross-examine shows bias, come tell me why you think

21         there's a basis for that before you go into it with the

22         witness.  And that's -- that's good for the plaintiff, and

23         it's good for the defendants.  We'll all play by the same

24         rules.  Clear?

25              MS. GAGLIARDI:  Yeah, I think we were trying to

```
1        affirmatively say that our expert is not biased because of
2        his work.
3             JUDGE GILSTRAP:  Well, you know, if -- if I let
4        somebody through the door to try and show that there is,
5        I'm certainly going to let you go back the other way.  But
6        what I'm trying to say is, before the first person goes
7        through the door in either direction, show me there's some
8        basis for it.
9             MR. BLACK:  I just want to be clear, Your Honor.  The
10       -- the -- for Dr. Wicker, I understand what you're saying.
11       We choose -- choose that.  We may want to cross him and
12       say, "You always represent people who will have patents
13       rather than the other side," something like that.  That's
14       pretty common.  The issue with Dr. Chrissan, which I think
15       has some concern, is they -- they go after Dr. Chrissan and
16       they try to show he doesn't know what he's talking about,
17       he's not good technically, he shouldn't be doing this
18       analysis, but we --
19            JUDGE GILSTRAP:  And you want to show he was good
20       enough to work --
21            MR. BLACK:  Yeah.
22            JUDGE GILSTRAP:  -- for Nokia once before.
23            MR. BLACK:  And that's it.  It would only be in
24       rebuttal.  Rehabilitation.
25            JUDGE GILSTRAP:  Well, let's see -- let's see if they
```

```
 1          open that door.  If they really do make it look like he's a
 2          fumbling idiot, and you want to show he was good enough to
 3          be their fumbling idiot in an earlier case, I'll probably
 4          let you.  Just depends on how far they go.  But both sides
 5          are excluded from going into the number of times any
 6          experts worked for either a law firm or a party in the case
 7          without prior leave.  And a showing at the bench that
 8          there's some reasonable basis to go into that.  And I
 9          promise you, folks, I'm helping you here.  Keep you --
10          keeping you from hurting yourselves by doing something
11          dumb, by making you come show me that there is some
12          reasonable basis for this before you just jump out there to
13          do it.  All right.  That's defendants' MIL No. 1.
14              Let's go to defendants' MIL No. 2.  MIL No. 1 is
15          granted, and is made mutual.
16              MR. STEVENSON:  Ted Stevenson for defendants.
17              JUDGE GILSTRAP:  Yes, sir.
18              MR. STEVENSON:  This motion in limine goes to license
19          agreements that have been entered into by others in the
20          industry, particularly the DT, but not only DT with IPCom.
21              Our argument is that the plaintiff's counsel
22          shouldn't be able to argue or insinuate that because others
23          in the industry have taken licenses, that that in any way,
24          shape, or form means that the defendants in this case
25          infringe the patents.
```

1          I think they agreed to that part of it, but then they

2     might want to make an end run on it, and I think the

3     argument's going to be about the potential end run.  And in

4     particular, what I think the -- in our meet and confers and

5     in the briefing, IPCom's counsel wants to go into is that

6     T-Mobile practices or infringes the licensed patents, and

7     T-Mobile, of course, is a beneficiary of the Deutsche

8     Telekom, they're an affiliate in the U.S. of Deutsche

9     Telekom who they would then say needed a license and had to

10    get a license, and they inferences the patents, and by the

11    way, they all do the same thing of the other carriers, and

12    we think that's an unfair argument.

13         First of all, there's no evidence whatsoever in the

14    record that T-Mobile meets the elements of any of the

15    patents, claims, and suit.  Even if they did, it would be

16    utterly and completely irrelevant.  There were some stray

17    statements and expert reports about inoperability, and we

18    don't have any objection to saying that a benefit of

19    standards is interoperability.  That's fair game.  But I

20    don't think it should be allowed to be said that because

21    T-Mobile necessarily needs a license and infringes the

22    patents, and they have the same equipment or the same

23    equipment vendors as AT&T or Verizon, we can just short

24    circuit the infringement analysis here and infer or, you

25    know, kind of get one step ahead of the game that it must

1          also be the case that AT&T and Verizon infringe.

2               JUDGE GILSTRAP:  What do plaintiffs say in response?

3               MR. FISHER:  Thank you, Your Honor.  Michael Fisher

4          for IPCom.

5               So the issue here is not that we plan to use the

6          third party licenses to insinuate that defendants

7          infringed.  As counsel correctly pointed out, we already

8          have a MIL on that.  MIL -- agreed MIL 14.  "No party or

9          witness shall offer any evidence, testimony, argument, or

10          suggestion that the existence of a license implies that the

11          defendants or intervenors infringe the asserted patents."

12               The problem here is that they're going too far by

13          trying to preclude us from entering evidence in testimony

14          that other players in the industry licensed the patents.

15          They say it's not relevant, but, in fact, it's directly

16          relevant to the value of the patents.

17               You know, we've got several licensees, we've got

18          T-Mobile that actually practice the license patents, and

19          that shows the importance and value of those patents to --

20          to the rest of the industry.  And it's not enough just to

21          say that they're licensed; it actually has a lot of value

22          that they're actually using the technology.  So our view is

23          that that should be -- that should be fair game.  And as I

24          said, defendants are protected by agreed MIL 14 which would

25          preclude us from going beyond that.  Thank you.

1          JUDGE GILSTRAP:  Do you have anything further, Mr.
2     Stevenson?
3          MR. STEVENSON:  Your Honor, there is no evidence
4     whatsoever that T-Mobile is actually using any claim of any
5     asserted patent in this case, or, in fact, in the entire
6     portfolio of many hundreds of patents that was licensed by
7     DT.  It just doesn't exist.  And so to substitute, well,
8     they're practicing but they're using the technology because
9     they're also a cellular carrier, I think that's where the
10    unfairness is.
11         JUDGE GILSTRAP:  Well, just for my own purposes, I
12    gather we're not talking about plaintiffs saying, "We have
13    these patents, and here's a long list of all the big
14    important companies in the world that have all come to our
15    doorstep and taken a license except AT&T and Verizon and
16    Nokia and Ericsson, and they haven't, and they're holding
17    out, and they're getting the benefit of our, you know,
18    patent to technology without paying for it, just like all
19    these other big carriers did.  That's not what we're
20    talking about.
21         MR. STEVENSON:  Well, I -- I think -- I don't think
22    that's the argument I'm talking about.  I would object to
23    that argument as an unfair characterization.  That's
24    basically saying, Everybody in the industry infringes, and
25    they do the same thing as these companies that we're now

1    suing in this case, so go ahead and find against them.   And
2    I don't think that's the case.   They have an agreement, a
3    license agreement, with a German company who included their
4    U.S. affiliate, and there's no proof of what patents or
5    even that they're using the same technology.   What Your
6    Honor will see in this case is that even between AT&T and
7    Verizon there were differences in how the technology is
8    implemented.   Different infringement cases.

9        So I think that argument, if that were made, I would
10   probably stand up and object to it.   But I think they also
11   want to go one step further, which is to say this is all
12   interoperable, everybody does the same thing.   Hint, hint,
13   you don't really need to pay that much attention to our
14   technical proof because other companies have already
15   conceded they infringe the patents-in-suit.   You can't
16   conclude that when there is a portfolio license covering
17   hundreds of families that these five patents-in-suit have
18   anything to do with that.

19       JUDGE GILSTRAP:   Plaintiff apparently says in their
20   briefing that their expert opines about interoperability.

21       MR. STEVENSON:   Correct.

22       JUDGE GILSTRAP:   And that the industry as a whole
23   implements the accused methods in the same fashion.   If
24   that's in the expert's report, why are we hearing about
25   this at a MIL stage instead of a Daubert motion?

1          MR. STEVENSON:  There are three sentences in the
2     report, and they cite them in their brief.  Three sentences
3     only, in which they say -- in relation to the SMS
4     technology, this is something that is done in the industry.
5     What they say is, the SMS bearer, like this -- that's the
6     short text message, is used as a bearer for the M
7     notification signal.  Right?  That's what they say.  That
8     doesn't get to whether the claim is infringed.  Because as
9     Your Honor found, it has to be put into the bearer in
10    native format.  They don't get into that.  So we have these
11    straight sentences and literally hundreds of pages of
12    expert reports that say, The industry does this.  It's for
13    interoperability.  I don't have any problem with
14    interoperability.  Where I think the line ought to be drawn
15    is, though, it's not an inference of infringement, and it
16    shouldn't be hinted about or implied or argued that because
17    other patent -- because other companies who do business in
18    the United States, their parents have taken a patent
19    license in Germany, that that somehow means that they're
20    doing the same thing that the defendants in this case are
21    doing, and it's an inference of infringement.  I think that
22    would be a very incorrect and unfair argument to make.
23         JUDGE GILSTRAP:  What's your view on this earlier
24    agreed MIL, and is this duplicative of that?
25         MR. STEVENSON:  No, it goes one step further.  So the

1    agreed MIL was what we were able to reach agreement of, but

2    this one goes to, I would essentially say the end run, the

3    inferential end run, around the agreed MIL, that, you know,

4    you can't go and connect the dots for the jury by saying --

5    and making the argument that I just foreshadowed to the

6    Court.

7        JUDGE GILSTRAP:  All right.  So what you're asking me

8    to preclude is that final step that you're concerned about

9    that not only are the licenses going to be discussed, and

10   not only is there going to be whatever the testimony in the

11   experts' reports about interoperability is, but what you're

12   concerned about is going one step beyond that and saying,

13   And because of these things, defendants infringe.

14       MR. STEVENSON:  Yes.  Or making that implication,

15   yes.

16       JUDGE GILSTRAP:  What else from the plaintiff on

17   this?

18       MR. FISHER:  Your Honor, this end run, or the hint,

19   hint that defendants are talking about is something that

20   we're not going to do.  We can't do.  There's a MIL

21   preventing us from doing it.  In fact, the extra -- the

22   expanded MIL that defendants seek is actually the thing

23   that goes too far because it blocks us from introducing

24   highly relevant evidence of the value of these patents.

25   They want to prevent us from even talking about third

1      parties who thought that these patents were important

2      enough and valuable enough not just to take a license, but

3      to actually practice the -- practice the technology, thus

4      showing its value to the industry.

5              JUDGE GILSTRAP:  Well, I mean the MIL as proffered,

6      Counsel, says that the plaintiff should be constrained from

7      showing that the licenses cannot be used to imply

8      infringement.  I take it you don't have any problem with

9      that, and you're not going to try to say that the license

10     is being taken and used mean that these defendants are

11     infringing them.

12             MR. FISHER:  That's exactly right, but the MIL has

13     two parts.  You see, it's -- IPCom can't use the third

14     party licenses to imply infringement by defendants or the

15     licensees.

16             Now, of course, the licensee doesn't infringe, but I

17     think the implication of this MIL here is that they don't

18     even want us to talk about the -- the implication that the

19     -- the willingness of the licensees to actually enter into

20     the license shows -- shows their importance.  So they're

21     trying to sort of roll everything all in together by

22     include -- by sort of including both parts of the

23     defendants and the licensees.  Then it's the licensee's

24     part that we take issue with.

25             JUDGE GILSTRAP:  All right.  All right.

```
 1              MR. FISHER:  Thank you.
 2              JUDGE GILSTRAP:  Well, as to use of the licenses to
 3         imply infringement attributable to the defendants in this
 4         case, I'm going to grant that.  But that's a very narrow
 5         ruling, and it's not intended to keep out license
 6         agreements or to keep out evidence that other parties
 7         besides the defendants practiced this technology pursuant
 8         to those licenses, but it is a clear directive by this
 9         Court that you're not going to say the licenses and their
10         use by others implies that the defendants in this case are
11         infringing the asserted patents.
12              And I'll just have to hear the evidence, and if this
13         comes up during the trial, I'll see you at the bench, and
14         we'll talk about it.  I'm not trying to tie the plaintiff's
15         hands.  I am trying to keep somebody from going off the
16         reservation and trying to use the existence of licenses and
17         the use of them by licensees to show that these defendants
18         are ipso facto infringing the asserted claims.  That's not
19         in any way intended to limit the plaintiffs from showing
20         what the value of their patented technology is.  All right?
21         So this is granted with those clarifications.
22              All right.  Number 3, defendants -- this is
23         unopposed, I hope, or is it not?
24              MR. MATHEWS:  Yeah, 3 is not opposed.  It's agreed
25         MIL.  I corrected that.
```

1          JUDGE GILSTRAP:  I'll grant defendants' 3 that the

2      defendants' overall profits and revenues are excluded

3      without prior leave of the Court.

4          All right.  Number 4.

5          MR. MATHEWS:  And if I'm not mistaken, I believe this

6      is the last motion of the day, so I'll try to make it

7      quick.

8          Your Honor, we filed this MIL out of an abundance of

9      caution in light of the testimony from one of IPCom's fact

10     witnesses, Christoph Schoeller, that he presented during

11     his deposition.  We laid out the quotes on pages 9 and 10

12     of our opening brief, but, you know, he had strong opinions

13     about the fact that AT&T should pay more than Deutsche

14     Telekom because they are in litigation ten years after the

15     DT deal.  He offered opinions about treble damages, etc.

16         We have no problem, of course, with fact witnesses

17     talking about facts, but opinions should not be fair game,

18     and just so everyone's on the same page, we'd like to get a

19     MIL in place so that all witnesses are instructed that they

20     should not be opining or offering opinions on

21     damages-related issues.

22         JUDGE GILSTRAP:  So in other words, you want me to

23     grant a MIL that the parties and the witnesses should

24     comply with the Federal Rules of Civil Procedure.  I mean,

25     those rules are there, and if somebody attempts to testify

1          beyond their personal knowledge, or if a fact witness

2          attempts to opine on a matter, I would expect -- I mean,

3          what's the difference between you jumping up and saying you

4          violated the MIL instead of saying you violated the Rules

5          of Civil Procedure?

6                    MR. MATHEWS:  It's a fair point.

7                    JUDGE GILSTRAP:  I mean, the safeguards are there.

8                    MR. MATHEWS:  It's a fair point, Your Honor.  I guess

9          our concern is this was not agreed to, for whatever reason.

10          And, you know, IPCom has talked a little bit in their

11          opposition about what they -- they would like to do.  Some

12          of it we're okay with.  But they also say, "Hey, we should

13          be able to talk about IPCom's internal views as to the

14          similarities of companies and their businesses at a

15          hypothetical negotiation."  That's on page 9 of their

16          brief.  We think that's too far, and that's really the

17          cause for the MIL.  And especially in light of their

18          opposition.  But, generally, we agree, Your Honor.  We

19          think the rules do preclude that sort of testimony.

20                    JUDGE GILSTRAP:  Well, you know, I've been known many

21          times to deny motions in limine under the basis of follow

22          the rules.  And if somebody can show me why the rules don't

23          provide adequate protection here, I'm happy to fashion a

24          limine order that covers that gap.  I'm just not persuaded

25          there's a gap in coverage here.

1          Does plaintiff have anything to add to this

2      discussion?

3          MR. BLACK:  No, I think you're exactly right, Your

4      Honor.  The function of the MIL is to make sure that

5      anything that might poison the jury that you can't take

6      back is dealt with before rather than after.  But basic

7      issues like whether a question's a fact question or opinion

8      question, they just have to be taken up one by one.

9          He suggested that we have a MIL and then inform all

10     the witnesses not to give opinions.  And then Your Honor

11     immediately jumped in and said, Well, the Federal rules

12     deal with that, but our witnesses don't know what the

13     federal rules are.

14          JUDGE GILSTRAP:  No, but the lawyers know what the

15     Federal Rules are.

16          MR. BLACK:  Right.  But we don't always know what the

17     witnesses are going to say.  So we know if we ask a

18     question, Mr. Mathews is very experienced, and he will know

19     that that question he's asked is completely inappropriate

20     because he's asking the fact witness for an opinion.  And

21     I'll object, or maybe visa versa, and we'll deal with it

22     then.  I don't think we need a MIL.

23          MR. MATHEWS:  And that's probably fine, Your Honor.

24     One thing I will say is, Mr. Schoeller, I believe, is not

25     currently an IPCom employee.  In his deposition he had a

```
 1          tendency to volunteer information that was not within the
 2          scope of the question, so if a specific instruction were
 3          made to Mr. Schoeller, I think that would help things.
 4               MR. BLACK:  We'll work with Mr. Schoeller, and I did
 5          see the part where he was going on about the wonderful
 6          nature of treble damages in the United States patent system
 7          for local infringers.  We'll make sure he's not under that.
 8               JUDGE GILSTRAP:  Suggest to him he should not go on
 9          about that in front of the jury.
10               MR. BLACK:  I will.  We will do our very, very best
11          if he comes.
12               JUDGE GILSTRAP:  And for the benefit of everybody
13          present, if there are witnesses who tend to want to
14          volunteer beyond the scope of the question asked, my
15          practice is not for you to try and manage them, but look at
16          me and say the witness is nonresponsive, and I will manage
17          the witness.
18               So if somebody wants to start volunteering
19          information that's not called for, until -- until you
20          exercise that option of asking the Court to grant an
21          objection that the witness is nonresponsive, you're at your
22          own peril.  But I'm happy, and I'm -- I have no hesitancy
23          about reigning a witness in that wants to just take off and
24          keep running.  But that's up to you to raise that with me
25          when it happens and not -- I don't want any of this, Well,
```

1          Mr. Smith, I didn't ask you that.  If you think the witness
2     nonresponsive, you raise it with the Court, and the Court
3     will address it.  Okay?
4          MR. BLACK:  Yes, Your Honor.
5          MR. MATHEWS:  Thank you, Your Honor.
6          JUDGE GILSTRAP:  All right.  Defendants' MIL No. 4 is
7     denied.  All right.  Those appear to be all the disputed
8     motions in limine.  We've covered the disputed dispositive
9     motions.  That leaves the third leg of the stool being the
10    pre-admitted exhibits.
11         It's one minute until 5:00 p.m.  I'm going to recess
12    for the evening.  I'm going to direct the parties to
13    actively meet and confer over the evening with regard to
14    outstanding and disputed exhibits to be pre-admitted, and,
15    hopefully, narrow those significantly, if not completely
16    resolve them.
17         To the extent they are not completely resolved, I'll
18    see you a 9:00 in the morning.  If there are categories of
19    exhibits that you cannot resolve despite your meet and
20    confer best efforts by 10:00 this evening, I want an e-mail
21    report to my staff as to those categories that you still
22    have disputes on.  And then I may -- well, I want to start
23    with as much information in the morning as possible.
24         Miss Doan, you've been up about three times.  I don't
25    know which of these defendants is going to go to trial

| | |
|---|---|
| 1 | first.  I'll have to tell you that later.  I'm told that's |
| 2 | what you have on your mind.  If it's something else, tell |
| 3 | me what it is. |
| 4 | MS. DOAN:  Your Honor, if you're deciding which one |
| 5 | -- |
| 6 | JUDGE GILSTRAP:  I will decide.  I have not decided. |
| 7 | MS. DOAN:  That's fine, Your Honor. |
| 8 | JUDGE GILSTRAP:  Okay. |
| 9 | MS. DOAN:  I just wanted to put on the record that... |
| 10 | JUDGE GILSTRAP:  What else do we need to talk about. |
| 11 | MS. DOAN:  The only thing, Your Honor, relates to |
| 12 | that.  Kevin Anderson, our lead counsel, and I are leaving |
| 13 | to go to trial in California.  It starts next week, and |
| 14 | it's set for a month.  So we just wanted to make sure the |
| 15 | Court was aware of that before you made that decision. |
| 16 | JUDGE GILSTRAP:  Okay. |
| 17 | MS. DOAN:  Yeah. |
| 18 | JUDGE GILSTRAP:  I'll factor that in. |
| 19 | MS. DOAN:  Yeah.  Thank you, Your Honor. |
| 20 | JUDGE GILSTRAP:  What else, Counsel, before we recess |
| 21 | for the evening? |
| 22 | MR. STEVENSON:  Nothing from defendants. |
| 23 | MR. BLACK:  Nothing from plaintiffs, Your Honor. |
| 24 | JUDGE GILSTRAP:  This is one of the most skilled |
| 25 | group of advocates I've had in my courtroom in a long time. |

```
 1           There is no reason you should come back in here tomorrow
 2      morning with a long list of disputed exhibits.  You know my
 3      practices, you know the Court's view on the Rules of
 4      Evidence.  You heard my rulings on the substantive matters
 5      that have come up today.  I'm not expecting a lengthy list
 6      of exhibits in the morning, so please use your best efforts
 7      on an ongoing basis, with that go in mind.  Anything
 8      further?
 9           MR. STEVENSON:  No, Your Honor.
10           JUDGE GILSTRAP:  We stand in recess until tomorrow
11      morning.
12           (Wherein the hearing adjourned at 5:00 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2      STATE OF ARKANSAS      )
                              ) ss
3      COUNTY OF WASHINGTON )

4          I, CYNTHIA A. DONALD, Certified Court Reporter, in and for
    the aforesaid county and state, do hereby certify that the within
5   transcript was reduced to typewritten form by me or under my
    direction and supervision; that the foregoing transcript is a true
6   and accurate record to the best of my understanding and ability.

7          I FURTHER CERTIFY that I am neither counsel for, related
    to, nor employed by any of the parties to the action in which this
8   proceeding was taken; and, further, that I am not a relative or
    employee of any attorney or counsel employed by the parties
9   hereto, nor financially interested, or otherwise, in the outcome
    of this action; and that I have no contract with the parties,
10  attorneys, or persons with an interest in the action that affects
    or has a substantial tendency to affect impartiality, that
11  requires me to relinquish control of an original deposition
    transcript or copies of the transcript before it is certified and
12  delivered to the custodial attorney, or that requires me to
    provide any service not made available to all parties to the
13  action.

14         The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means, unless under
15  the direct control and/or supervision of the certifying reporter.

16         IN WITNESS WHEREOF, I have hereunto set my hand and
    affixed my seal of office this 9th day of March, 2022.

17

18

19         OFFICIAL SEAL
      CYNTHIA A. DONALD, CCR, RPR      _____
20     ARKANSAS SUPREME COURT
      CERTIFIED COURT REPORTER         CYNTHIA A. DONALD, CCR
            LS No. 183                 Certified Court Reporter
21                                     Arkansas Supreme Court
                                       License No. 183

22

23

24

25

Donald Court Reporting & Transcription, LLC
1-888-438-7836 - donaldcrt@gmail.com